**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NICHOLAS SEIBEL, individually, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN INTERNATIONAL GROUP, INC., d/b/a AIG, | ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.: 1:22-cv-01483

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

Plaintiff Nicholas Seibel ("Seibel" or "Plaintiff") alleges, on behalf of himself and all others similarly situated, upon personal knowledge as to himself and his acts and as to all other matters upon information and belief, as follows:

**NATURE OF THE ACTION**

1.      This is a class action for damages against National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") and American International Group, Inc. ("AIG") (collectively "Defendants") arising from their wrongful conduct towards Plaintiff and other similarly situated travel insurance policyholders.  Plaintiff, along with the Class (defined below), seeks to represent those who purchased a travel insurance policy from Defendants.  The policy included various travel-related coverage protections offering indemnification for both pre- and post-departure perils.  Defendants charged Plaintiff and the Class a lump sum premium for these two distinct, mutually exclusive types of coverage.

2.      The subject matter of this action is whether Defendants can lawfully charge lump sum premiums for two distinct forms of travel related coverage: pre-departure benefits and post-

departure benefits. While quasi-related to the respective travel insurance policy (the contract) for the purpose of defining the parameters of pre-departure and post-departure coverages, the crux of this Complaint is Defendants' practice of charging all-inclusive travel insurance premiums and its related refusal to refund portions of premiums that were never earned and could never be earned if a trip is cancelled before its departure date.

3.      This action seeks to reimburse Plaintiff, and those similarly situated, for improperly charged, lump sum travel insurance premiums that offer no distinction between pre-departure and post-departure coverages and by their nature, systematically overcharge policyholders who cancel their trips.

4.      Plaintiff, and those similarly situated, purchased the insurance for travel plans that were subsequently cancelled prior to departure. Plaintiff, and those similarly situated, did not receive any *pro rata* refund for that portion of the gross policy premium, which was paid exclusively for post-departure coverages that were unearned by Defendants because of the cancellation of the trip. As a result, Plaintiff, along with the Class he seeks to represent, have suffered injury in the form of monetary loss from paying a lump sum premium to Defendants and for paying a premium to protect against the risk of travel related losses, a risk Defendants were never exposed to and never assumed.

5.      Travel insurance products provide reimbursement in the event of financial loss or hardship related to travel. Travel insurance is available to cover a wide array of perils associated with travel, including both pre-departure risks, such as the possibility that a traveler will lose pre-paid, non-refundable deposits or payments if a trip needs to be canceled prior to departure, as well as risks that arise exclusively post-departure, such as trip interruption, medical emergencies during a trip, and baggage being lost, stolen or damaged during a trip. By its nature, this second category

of coverages, exclusively post-departure risk, is insurance coverage providing indemnification for travel related perils that can only arise after travel is underway.

6. AIG Travel Policies (defined below) offers group insurance policy protection for both pre- and post-travel risks and sell that protection in a pre-packaged bundle. AIG Travel Policies can include some or all of the travel insurance protections offered by AIG Travel. Typically, the more perils covered by the policy, the more expensive the gross premium for all the coverages combined into a single plan.

7. When a traveler purchases an AIG Travel Policy, he or she receives a "Description of Coverage." The AIG Travel Policy consists of the Description, which governs the terms and conditions for coverage when there is a sudden, unexpected problem or event before or during travel. The Description delineates the different policy benefits purchased by the insured through his or her plan, the coverage limits of each corresponding benefit, and the gross premium paid for the entire package of separate coverage options purchased.

8. Defendants can readily identify the *pro rata* share of the gross premium attributable to each policy benefit purchased by each insured under that person's specific plan. This information is not, however, provided to the insureds.

9. AIG Travel Policies do not address how refunds for unearned, pre-paid premiums are to be handled. AIG Travel has an obligation to refund any unearned portion of the gross insurance premium that a travel insurance policyholder paid in advance of his trip. This includes any portion of the premium paid for delineated post-departure coverages that are never provided, and the risks underlying those coverages Defendants never assumed, because the trip never departed. AIG Travel was never at risk of having to cover the perils of actual travel. Thus, in this situation, Defendants failed to provide any consideration in return for the portion of the gross

3

premium which must always be paid in advance of travel for any of the provided coverages, including post-departure perils.

10.    Contrary to this refund obligation, whenever a policyholder informs Defendants that he or she is cancelling their trip, or the trip is otherwise being cancelled for whatever reason, Defendants systematically refuse to return any portion of the gross premium paid for the purchased AIG Travel Policy.  This systematic refusal to refund any portion of the gross premium includes Defendants' failure to return the *pro rata* portion of the gross premium, which the insured paid exclusively for coverage of post-departure risks – which risks were never assumed by, or transferred to Defendants, when an insured's trip is cancelled prior to the Departure Date.

11.    This methodical failure of Defendants to return the unused and unearned premium to purchasers of AIG Travel policies is unfair, unjust and unlawful.  Each member of the proposed Class (defined below) has been similarly injured financially by Defendants' misconduct and is entitled to a refund of the portion of the gross premium that Defendants accepted in exchange for insuring against post-departure risks, but for which they never provided any coverage (*i.e.*, assumed the specified risks) in return.

## **PARTIES**

12.    At all relevant times, Plaintiff Nicholas Seibel was (and continues to be) a citizen and resident of Pittsburgh, Pennsylvania.  He seeks to represent a nationwide Class of more than one hundred members, with individuals residing in all fifty states.

13.    AIG is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.  It is and was at all relevant times a corporation engaged in business of insurance in Pennsylvania and authorized to transact business in Pennsylvania.  AIG has an office in Pittsburgh, Pennsylvania.

14. AIG is the world's leading international insurance and financial services organization with operations in several countries and jurisdictions.[1]  In the United States, AIG companies are the largest underwriters of commercial and industrial insurance, and AIG American General is the top-ranked life insurer.[2]  The company's common stock is listed on the New York Stock Exchange, as well as the stock exchanges of London, Paris, Switzerland, and Tokyo.[3]  It provides a wide range of property casualty insurance, life insurance, retirement solutions, and other financial services through its General Insurance, Life & Retirement, and Investments business units.[4]

15. In 2006, AIG acquired Travel Guard (aka "AIG Travel"), a provider of travel insurance programs and emergency travel assistance.[5]

16. AIG Travel commits to a satisfaction guarantee, including advertisements that state "if you are not completely satisfied, you can receive a full refund of the cost, minus the service fee."[6]

17. Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NUFIC") is one of AIG's principal general insurance company subsidiaries.  NUFIC is incorporated in Pennsylvania and maintains a branch office in Pittsburgh, Pennsylvania.  The company's headquarters are in New York, New York, but it is currently authorized to transact

---

[1]     Press Release, *AIG's National Fire Insurance of Pittsburgh, PA. Introduces Maximum A-Side Excess Coverage for Directors and Officers*, AIG (May 12, 2003), http://www.corporate-ir.net/media_files/nys/aig/releases/051203.pdf (last visited Feb. 17, 2022).
[2]     *Id.*
[3]     *Id.*
[4]     *Id.*
[5]     *Explore AIG's Timeline*, AIG, https://www.aig.com/about-us/history/timeline (last visited Feb. 17, 2022).
[6]     *Id.*

business, and does transact business, in all fifty states and the District of Columbia.[7]  NUFIC underwrites form policies, all containing nearly identical language, created and sold by AIG Travel.

## JURISDICTION AND VENUE

18.    This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005.  Subject matter jurisdiction is proper because:  (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendants[8]; and (4) the Defendants are not government entities.

19.    Personal jurisdiction is proper as Defendants' headquarters are both located in New York, New York.  Defendants have also purposefully availed themselves of the privilege of conducting business activities within the state of New York.  Venue is proper in this District pursuant to 28 U.S.C. §1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District.  At all pertinent times, Defendants were (and remain) in the business of marketing, advertising, distributing, and selling travel insurance, which includes both pre-departure and post-departure coverages, throughout Pennsylvania and nationwide.

---

[7]    *Specialty    Accident    &    Health    Product    Inquiries*,    AIG, https://www.aig.com/business/insurance/group-accident-and-health/specialty-accident-and-health/contact-us (last visited Feb. 17, 2022).
[8]    Plaintiff booked a trip to France with a group of travelers, some of which are, and were at all relevant times, residents of states other than Pennsylvania.  The other travelers purchased travel insurance policies and may be members of the proposed Classes (defined herein).

## FACTUAL ALLEGATIONS

**A.    AIG Travel Insurance Plans**

20.    AIG sells travel insurance policies on either an annual basis or for a single trip. Annual policies are not trip-specific and are designed to provide insurance coverage for 365 days of travel.  Conversely, single trip policies are designed specifically to cover the perils associated with a specific trip.  This case relates to single trip polices.

21.    AIG Travel Policies are sold through numerous platforms, such as their own website, by phone, through travel agents or via the internet, including through airline and cruise ship websites (often in conjunction with the purchase of a ticket), as well as other service websites.

22.    AIG Travel Policies are sold in a variety of packages, offering varying levels and types of coverages.  There are five main plans offering a range of benefits, including trip cancellation, trip interruption, baggage delay, and coverage for medical and dental expenses.  The plans are:  (1) AIG Travel Guard Deluxe; (2) AIG Travel Guard Preferred; (3) AIG Travel Guard Essential; (4) AIG Travel Guard Pack N' Go Plan; and (5) AIG Travel Guard Annual Plan (collectively, "AIG Travel Policies").[9]

23.    AIG Travel describes its Travel Guard Deluxe Plan as the most comprehensive plan AIG offers.[10]  The deluxe plan purports to offer AIG's highest level of primary medical expense coverage and coverage for Trip Cancellation (even due to job loss), trip delay, lost, delayed, or damaged baggage and 24/7 assistance services to help with any travel-related needs before and

---

[9]    Lucy Lazarony, *AIG Travel Insurance Review*, Forbes Advisor, Nov. 11, 2021, https://www.forbes.com/advisor/travel-insurance/aig-travel-insurance-review/ (last visited Feb. 17, 2022).
[10]    *Deluxe Travel Insurance Plan*, Travel Guard, AIG, https://www.travelguard.com/travel-insurance/plans/deluxe (last visited Feb. 17, 2022).

during traveling.[11]  Upon information and belief, policies issued under this plan, regardless of the state for which they are issued, include both pre-departure and post-departure coverages and charge a lump sum premium for both coverages.

24.    AIG markets its Travel Guard Preferred as a plan with "amazing coverage for medical expenses, Trip Cancellation, Trip Interruption, lost or delayed Baggage, and medical evacuations."[12]  Upon information and belief, policies issued under this plan, regardless of the state for which they are issued, include both pre-departure and post-departure coverages and charge a lump sum premium for both coverages.

25.    AIG Travel Guard Essential is "savvy coverage for the budget minded traveler."[13]  This plan, like the deluxe and preferred plans, includes coverage for Trip Cancellation, Trip Interruption, lost or delayed Baggage, and medical evacuations.[14]  However, the maximum coverages for this plan are modest in comparison to both the deluxe and preferred options.  For example, the maximum reimbursement for cancellation of an insured trip is $50,000 less than that of the preferred and deluxe plans.[15]  Upon information and belief, policies issued under this plan, regardless of the state for which they are issued, include both pre-departure and post-departure coverages and charge a lump sum premium for both coverages.

26.    AIG Travel markets its AIG Travel Guard Pack N' Go plan as "Immediate coverage for unplanned trips and adventures."[16]  It is "ideal for spur-of-the-moment, last-minute travelers

---

[11]    *Id.*
[12]    *Travel Guard Preferred Insurance Plan*, Travel Guard, AIG, https://www.travelguard.com/travel-insurance/plans/preferred (last visited Feb. 17, 2022).
[13]    *Essential Travel Insurance Plan*, Travel Guard, AIG, https://www.travelguard.com/travel-insurance/plans/essential (last visited Feb. 17, 2022).
[14]    *Id.*
[15]    *Id.*
[16]    *Pack N' Go Travel Insurance Plan*, Travel Guard, AIG, https://www.travelguard.com/travel-insurance/plans/pack-n-go (last visited Jan. 8, 2022).

who don't need trip cancellation coverage."[17]  It includes only post-departure coverage and 24-hour emergency travel services.[18]  Upon information and belief, the premium paid by the policyholder of an AIG Travel Guard Pack N' Go plan would not include any consideration for trip cancellation or other pre-departure risks and therefore, no portion of the premium for this plan is allocated to pre-departure risks.

27.    AIG Travel Guard Annual plan is year-round coverage for travel investments.[19]  It provides coverage for multiple trips throughout the year and touts longstanding experience in this area of coverage as a reason to purchase the plan.  Specifically, AIG claims that it has "over 30 years of experience and has covered millions of travelers."[20]

**B.    AIG Travel Policy**

28.    As mentioned earlier, the AIG Travel Policies (excluding the Pack N' Go plan) included both Pre-Departure Benefits and Post-Departure Benefits.  These two types of benefits are distinguished by the Policy as separate, unique coverages with distinct coverage effective and expiration times.

*i.    **Pre-Departure Benefits***

29.    AIG Travel Policies limit Pre-Departure Benefits to Trip Cancellation and Trip Exchange coverages.  These coverages become effective at 12:01 a.m. local time on the date

---

[17]      *Id.*
[18]      *Id.*
[19]      *Annual Travel Insurance Plan*, Travel Guard, AIG, https://www.travelguard.com/travel-insurance/plans/annual (last visited Jan. 8, 2022).
[20]      *Id.*

following payment to the Defendants and expire on the earlier of: (a) the cancellation of the Insured's Trip; or (b) 11:59 p.m. on the day before the scheduled Departure Date.[21],[22]

30.    <u>Trip Cancellation</u> coverage is defined by the Policy as follows:

The Company will pay a benefit to reimburse the Insured for covered expenses up to the Maximum Limit shown in the Schedule or Declarations Page [$150,000], if an Insured cancels his/her Trip[23] due to any of the following Unforeseen[24] events:

(a) Sickness, Injury, or death of an Insured, Family Member, Traveling Companion, Business Partner, or Host at Destination. Sickness or Injury must be certified by a Physician;

(1) Sickness or Injury of an Insured, Traveling Companion, or Family Member traveling with the Insured, which results in medically imposed travel restrictions as certified by a Physician at the time of Loss;

(2) Sickness or Injury of a Family Member not traveling with the Insured must be because their condition is life-threatening or because they require the Insured's immediate care;

(3) Sickness or Injury of the Business Partner must be so disabling as to reasonably cause the Insured to cancel the Trip to assume daily management of the business;

(b) the Insured or Traveling Companion is hijacked, quarantined, subpoenaed, required to serve on a jury, or required to appear as a witness in a legal action; provided the Insured or Traveling Companion is not a party to the legal action or appearing as a law enforcement officer;

(c) the Insured or Traveling Companion, or Host at Destination is called to active military service or as a reservist, or military leave is revoked or reassigned. The military leave for the dates of travel must be approved prior to the effective date of coverage;

---

[21]    A copy of Plaintiff's AIG Travel Policy is attached hereto as Attachment 1. *See* Attachment 1 at 2.

[22]    Departure Date means "the date on which the Insured is originally scheduled to leave on his/her Trip. This date is specified in the travel documents." Attachment 1 at 28.

[23]    Trip means "a period of travel away from home to a Destination outside the Insured's City of residence. The trip has a defined Departure Date and Return Date; and does not exceed 364 days." Attachment 1 at 32.

[24]    Unforeseen means "not known, anticipated or reasonably expected, and occurring after the effective date of the benefits under which the claim is being made." Attachment 1 at 32.

(d) the Insured or Traveling Companion, (or, if the Insured is a Child, the Insured's parent or legal guardian), is involuntarily terminated or laid off from their employment. The termination notice must occur at least 30 days after the Insured's effective date of coverage. The employee must have been an active employee with the same employer for at least 1 year. This provision is not applicable to temporary employment, seasonal employment, independent contractors or self-employed persons;

(e) the Insured or Traveling Companion (or, if the Insured is a Child, the Insured's parent or legal guardian), has an involuntary employer-initiated transfer of 100 or more miles which requires the Insured's Primary Residence to be relocated; provided that he or she has been an active employee with the same employer for at least 1 year. Notification of the transfer by the employer to the Insured must occur after the effective date of coverage;

(f) the Insured's or Traveling Companion's Primary Residence is made Uninhabitable, or the Destination is made Uninhabitable or Inaccessible, by Natural Disaster (other than a hurricane), fire, vandalism, or burglary;

(g) a named hurricane making the Insured's Primary Residence Uninhabitable, or making the Destination Inaccessible or Uninhabitable. Coverage for a hurricane applies only if insurance was purchased prior to the tropical storm first being upgraded to a hurricane;

(h) the Insured or Traveling Companion is delayed due to a traffic accident while en route to the Insured's Destination. The traffic accident must be substantiated by a police report;

(i) the Insured or Traveling Companion is required to work during his/her scheduled Trip. He/she must provide proof of requirement to work, such as a notarized statement signed by an officer of his/her employer. In the situation of self-employment, proof of self-employment and a notarized statement confirming that the Insured is unable to travel due to his or her job obligations will be required. The Insured or Traveling Companion must be employed by the company at the time the Policy is purchased, and must have vacation approved for the dates of travel prior to the effective date of coverage;

(j) the Insured is a full-time teacher, other full-time employee, or a student at a primary or secondary school and is required to complete an extended school year that falls on or beyond the Departure Date;

(k) the Insured is required to take an academic examination on a date that has been fixed after the effective date of coverage, and the date falls during the Trip;

(l) the Insured's required participation in a scholastic sporting, theatrical, or musical event on a date that has been fixed after the Trip Cancellation coverage effective

11

date and falls during the Trip.  This requirement must be documented in writing by a school representative;

(m) the Insured or Traveling Companion has Complications of Pregnancy or a Normal Pregnancy or Childbirth.  The onset of these conditions must occur after the Insured's effective date of coverage and must be verified by medical records;

(n) the Insured or a Traveling Companion is the victim of a Felonious Assault within 10 days prior to the Departure Date;

(o) Mental or Psychological Disorders of an Insured or Traveling Companion requiring inpatient hospitalization for 5 or more consecutive days which results in medically imposed travel restrictions as certified by a Physician at the time of Loss;

(p) the Insured, Traveling Companion or Family Member is confined in an inpatient rehabilitation facility for the purpose of overcoming addiction within 30 days prior to scheduled Departure Date;

(q) Financial Default of a Travel Supplier; provided the Financial Default occurs more than 14 days following the Insured's effective date for the Trip Cancellation benefit.  There is no coverage for the Financial Default of any person, organization, agency, or firm from whom the Insured purchased travel arrangements supplied by others;

(r) Strike causing cancellation or delay of the Insured's pre-arranged travel services;

(s) Inclement Weather causing cancellation or delay of the Insured's Trip;

(t) a Terrorist Incident in a City listed on the Insured's itinerary within 30 days of the Insured's scheduled arrival;

(u) mechanical/equipment failure of a Common Carrier which results in a delay of the Insured's Trip for at least 72 consecutive hours;

(v) complete or partial closure of the air traffic control tower or the airport from which the Insured is scheduled to depart.  Closure must be caused by fire or a power outage, and must result in a delay of the Insured's Trip for at least 48 consecutive hours.  Does not apply to closures caused by a Natural Disaster or Inclement Weather;

(w) the Destination is under a hurricane warning as issued by the NOAA hurricane center within 3 days of the scheduled Departure Date.  Cancellation of the Trip must occur more than 14 days following the Insured's effective date of the Trip Cancellation benefit;

(x) cancellation of the Insured's scheduled cruise by the Travel Supplier, due to insufficient or excessive water levels in the body of water where the cruise is scheduled to sail.   If the Travel Supplier provides an alternate mode of transportation rather than cancelling the cruise, this benefit does not apply;

(y) the Insured is on a list as a donor or recipient for an organ transplant and, after the effective date of coverage, receives official notification that an organ match is available for immediate transplant.  The transplant must be considered Medically Necessary, and a Physician must confirm that the transplant and/or surgery is so disabling as to prevent travel;

(z) the Insured or Traveling Companion is traveling for the purpose of adopting a Child, but the adoption is cancelled for reasons beyond the Insured's control.  The adoption must be approved prior to the effective date of coverage.

Coverage will be provided for the following additional Unforeseen event if the insurance is purchased within 15 days of Initial Trip Payment, and the Wedding Bundle upgrade is elected and any required cost is paid:

(aa) cancellation of a wedding by the bride or groom.  Does not apply if the Insured is the bride or groom in the wedding.

Coverage will be provided for the following additional Unforeseen event if the Pet Bundle upgrade is elected and any required cost is paid:

(bb) the Insured's or Traveling Companion's Pet is in critical condition or dies within seven days prior to the Departure Date.  The Insured must provide veterinary records documenting the condition or death of the Pet.

Coverage will be provided for the following additional Unforeseen event if the Security Bundle upgrade is elected and any required cost is paid:

(cc) cancellation of a Trip or delay of a Common Carrier as a result of a Riot or Civil Disorder.

Trip Cancellation Benefits:  The Company will pay a benefit to reimburse the Insured for any of the following applicable expenses, up to the maximum limit shown in the Schedule or Declarations Page, for Trips that are canceled prior to the scheduled Departure Date due to any of the Unforeseen events listed above.

(a) Cancellation Penalties for unused travel arrangements; and

(b) Travel Supplier change fees; and

(c) the cost of re-depositing frequent traveler awards utilized for the Trip.

There is no coverage for the increased cost of a reservation if the Insured changes the Trip dates.

The amount reimbursed will not exceed the Trip Cost[25].

Attachment 1 at 6-9, "Trip Cancellation."

31.  <u>Trip Exchange</u> coverage is defined by the Policy as follows:

The Company will pay a benefit to reimburse the Insured for the expenses below, up to the maximum limit shown in the Schedule or Declarations Page if:

(a) the Insured cancels the Trip due to one of the Unforeseen events shown in the Trip Cancellation section; and

(b) the Insured chooses to transfer the reservation from the cancelled Trip to a future Trip with the same Travel Supplier; and

(c) the future Trip costs more than the cancelled Trip.

Benefits will be paid for:

> (a) the difference in the cost between the original reservation and the new reservation; and

> (b) change fees paid to transfer the reservation; and

> (c) Cancellation Penalties for reservation that cannot be transferred; and

> (d) the cost paid for this Policy.

Trip Cancellation and Trip Exchange benefits cannot be combined.

Attachment 1 at 9-10, "Trip Exchange."

32.  The following exclusions apply to Trip Cancellation and Trip Exchange coverages:

(a) intentionally self-inflicted *Injury*, suicide, or attempted suicide of the *Insured*; or

(b) intentional harm to a *Pet* caused by the *Insured*, *Traveling Companion* or *Family Member*; or

(c) the *Insured*, *Pet* or *Traveling Companion* traveling for the purpose of securing medical treatment; or

(d) costs for the *Trip* paid using loyalty rewards points, frequent travel miles, or other non-monetary redeemable points or rewards through similar programs; or

---

[25]  Trip Cost means "the Insured's share of the cost of a Trip."  Attachment 1 at 32.

(e) maintenance/membership/association fees for timeshare reservations; or

(f) trip payments that are insured under a different policy; or

(g) payments made for this policy and any other insurance; or

(h) *Pre-Existing Medical Conditions*.

*Id.*

33.     The Pre-Departure Benefits in the Policy only apply to pre-departure risks, which only attach to the insurer and the insured before the scheduled Trip begins.  A portion of the premium Plaintiff, and those similarly situated, paid for coverage under his AIG Travel Policy was specifically allocated to pre-departure risks.  Defendants know or can calculate the *pro rata* portion of the premium Plaintiff, and those similarly situated, paid for pre-departure coverages.

34.     The AIG Travel Policy also includes Cancel for Any Reason and Fifteen Day Look provisions.  Both provisions appear to either invoke pre-departure coverage or require pre-departure action from the policyholder.

35.     The Cancel for Any Reason provision is effective at 12:01 a.m. Standard Time on the date following payment to Defendants of any required cost.  This coverage expired when the Trip is cancelled, or two (2) days prior to the Departure Date, whichever is earlier.  Attachment 1 at 39.  The Cancel for Any Reason expenses include:

    a.  50% or 75% of the Cancellation Penalties for Unused travel arrangements; and

    b.  50% or 75% of the Travel Supplier change fees; and

    c.  50% or 75% of the cost of re-depositing frequent traveler rewards utilized for the Trip.

The amount reimbursed will not exceed 50% or 75% of the Trip Cost.  Cancel for Any Reason will not provide coverage for the increased cost of a reservation if the Insured changes the Trip dates.

Attachment 1 at 39.  This is an additional Pre-Departure benefit.

36.    The Fifteen Day Look provision states as follows:

You may cancel this insurance by giving the Company or the agent written notice within the first to occur of the following:  (a) 15 days from the Effective Date of your insurance; or (b) your scheduled Departure Date.  If you do this, the Company will refund your premium paid provided no insured has filed a claim under this Policy.  After this 15-day period, the premium is non-refundable.

Attachment 1 at 1.

37.    AIG Travel offers the following guidance related to premium refunds:  "You may be eligible for a refund of your premium under the following conditions:  (1) you are requesting a refund from Travel Guard within 15 days of purchasing your policy; (2) your request for a premium refund is made prior to the departure date listed on your policy; and (3) you have not filed a claim."[26]  This language does not appear in the AIG Travel Policy, but is instead included on AIG's website under the heading:  "Frequently Asked Questions regarding COVID-19 and Travel Insurance."[27]  This is problematic, however, because an insurer is entitled only to such a reasonable premium as the risk carried warrants.  If risk does not or cannot attach, the insurer may not claim or retain the premium.

**ii.    _Post-Departure Benefits_**

38.    Post-Departure Benefits are all other coverages, excluding Trip Cancellation and Trip Exchange coverages, included in the Policy:  (1) Trip Interruption; (2) Single Occupancy Benefit; (3) Trip Delay; (4) Missed Connection; (5) Trip Saver; (6) Travel Inconvenience; (7) Baggage Coverage; (8) Baggage Delay; (9) Rental Vehicle Damage Coverage; (10) Pet Care; (11) Ancillary Evacuation Benefits; (12) Travel Medical Expense Benefit; (13) Pet or Service Animal Travel Medical Expense Benefit; (14) Emergency Evacuation and Repatriation of Remains; (15)

---

[26]    _Frequently Asked Questions_, Travel Guard, AIG, https://www.travelguard.com/travel-news/coronavirus-advisory (last visited Jan. 12, 2022).

[27]    _Id._

Repatriation of Remains; (16) Non-Flight Accidental Death and Dismemberment; (17) Flight

Guard; and (18) Security Evacuation.  Attachment 1 at 10-26.

39.     The Post-Departure Benefits are effective at 12:01 a.m. local time on the scheduled

Departure Date shown on the travel documents and end on the earliest of:

> (a) The Insured's arrival at the Return Destination, even if this occurs earlier than the scheduled Return Date[28]; or
>
> (b) The scheduled Return Date; or
>
> (c) The Insured's arrival at the Destination on a one-way Trip; or
>
> (d) The date listed as the return date by the Insured on the application.[29]

*Id.*

40.     The Post-Departure Benefits in the AIG Travel Policy only apply to post-departure

risks, which can only attach to the insurer and the insured after the scheduled Trip begins.  A

portion of the premium Plaintiff, and those similarly situated, paid for coverage under his AIG

Travel Policy was specifically allocated to post-departure risks.  Defendants know, or have the

ability to calculate, the *pro rata* portion of the premium Plaintiff, and those similarly situated, paid

for post-departure coverages.

41.     If a Trip never departs, no risk ever attaches – so the insurer is never at risk of

paying a claim for a post-departure peril.  The post-departure coverages have no value to the

---

[28]     Return Date means the "date on which the Insured is scheduled to return to the point where the Trip started or to a different specified Return Destination.  This date is shown in the travel documents."  Attachment 1 at 31.

[29]     Rental Vehicle Damage Coverage is a Post-Departure Benefit, and it begins when the Insured signs the rental agreement and takes possession of the rental vehicle provided the required cost has been paid on or before the date and time the rental agreement has been signed.  Attachment 1 at 4.  Rental Vehicle Damage Coverage ends the earlier of (a) the vehicle's return to the rental agency; or (b) 11:59 p.m. on the Rental Return Date.  *Id.* at 5.

insured until the Trip departs – meaning if an insured's trip never departs, value never attaches to those coverages.

42.      The AIG Travel Policy does not provide for the refund of unearned premiums and is without a controlling provision regarding partial premium refunds for post-departure risks that never attach.  Instead, the AIG Travel Policy includes a Fifteen Day Look provision, attempting to make the whole premium non-refundable after 15 days.  In nearly every instance, this Fifteen Day Look expires before any post-departure risks could ever attach – making an entire category of benefits (post-departure benefits) paid for in full by the policyholder to the insurer without consideration.

**C.      <u>Allegations Related to Plaintiff</u>**

43.      On January 30, 2020, Plaintiff purchased a trip from Boston, Massachusetts to Paris, France departing October 7, 2020 and returning October 17, 2020 ("France Trip").  Plaintiff purchased an AIG Travel Policy from AIG and underwritten by NUFIC for the France Trip and it is attached to this Complaint as Attachment 1 ("France Trip Policy").  This is a form policy provided by AIG.

44.      On August 20, 2020, Plaintiff purchased a Sixthman Cruise Line cruise[30] scheduled to depart from Miami, Florida on November 7, 2021 and return to that same port on November 12, 2021 ("Cruise Trip").  Plaintiff purchased an AIG Travel Policy from AIG and underwritten by NUFIC for the Cruise Trip and it is attached to this Complaint as Attachment 2 ("Cruise Trip Policy").  This is a form policy provided by AIG.

---

[30]      Sixthman is a theme cruise charter company owned by Norwegian Cruise Line.

45.    The France Trip Policy and the Cruise Trip Policy are both form policies, providing the same pre-departure and post-departure coverages.  Both policies are AIG Travel Guard Preferred Plans and are interchangeable for purposes of allegations of this Complaint.[31]

46.    Differences in the language or substance between the France Trip Policy and Cruise Trip Policy are limited to the following:

| **France Trip Policy**<br>(Product Code: 943503 NW 07/19)<br>(Attachment 1) | **Cruise Trip Policy**<br>(Product Code: 943503 PA 02/20)<br>(Attachment 2) |
| --- | --- |
| State and Privacy Notice: This document is only applicable to residents of Alabama, Arkansas, Arizona, Delaware, Hawaii, Kentucky, Maine, Nebraska, New Jersey, New Mexico, Ohio, Pennsylvania, West Virginia and Wyoming. | State and Privacy Notice: This document is only applicable to residents of Pennsylvania. Attachment 2 at 2. |
| "Travel Insurance Underwritten by" Attachment 1 at 1. | Language not included. |
| Coverage may not be included in all fifty states. Attachment 1 at 2. | Text deleted. |
| Assistance Services: The following non-insurance services are provided by Travel Guard: Travel Medical Assistance, Worldwide Travel Assistance, Emergency Travel Assistance, Concierge Services, Personal Security Assistance, Identify Theft Assistance. Attachment 1 at 2. | Assistance Services: The following non-insurance services are provided by Travel Guard: Travel Medical Assistance, Worldwide Travel Assistance, Concierge Services, Personal Security Assistance, Identify Theft Assistance.  Attachment 2 at 2. |
| Pet Pack . . . up to $100 per day, to a maximum of $500.  Attachment 1 at 3. | Pet Care . . . up to $100 per day, to a maximum of $500.  Attachment 2 at 3. |
| Language for subsection (d) of Trip Cancellation and Trip Exchange Exclusions not included. | In addition to the General Exclusions, the following exclusions apply to the Trip Cancellation and Trip Exchange benefit. |

---

[31]    Page numbers between the two policies may not be the same.  Formatting changed slightly between the two policies, creating additional pages in the Cruise Trip Policy.

|  | Unless otherwise specified below, these exclusions apply to the Insured Traveling Companion, Family Member, Host at Destination, Business Partner, and Pet. This benefit will not cover any loss for, caused by or resulting from: (d) Mental or Psychological Disorder of the Insured, unless hospitalized overnight. Attachment 2 at 10. |
|---|---|
| Language for subsection (c) of the Trip Interruption and Trip Interruption–Return Transportation Exclusions not included. | Trip Interruption and Trip Interruption–Return Transportation Only Exclusions does not cover: (c) Mental or Psychological Disorder of the Insured, unless hospitalized at least overnight. |
| Language from subsection (l) of the Travel Medical Expense Exclusions not included. | Travel Medical Expense exclusions: No benefits will be paid for any loss for, caused by, or resulting from: (l) Mental or Psychological Disorder of the Insured. Attachment 2 at 20. |
| Language from subsection (f) of the Emergency Evacuation and Repatriation of Remains Exclusions not included. | Emergency Evacuation and Repatriation of Remains Exclusions: No benefits will be paid for any loss for, caused by, or resulting from: (f) Mental or Psychological Disorder of the Insured. Attachment 2 at 23. |
| State Exceptions:<br>Arkansas – "The Arbitration provision is amended to add arbitration is non-binding and voluntary. The Disagreement Over Size of Loss provision is amended to add 'appraisals and arbitration are non-binding.'" Attachment 1 at 37.<br>Maine – "The Effective and Termination Date is amended to add the following: Unless otherwise provided, all benefits shall terminate at 12:01 a.m. standard time on the expiration dated stated in the policy. The Actual Cash Value definition is deleted and replaced in its entirety by the following definition: Actual Cash Value means the replacement cost of an insured item of property at the time of loss, less the value of Physical Depreciation as to the item damaged. "Physical Depreciation" means a value as determined according to standard business practices. The Payment of Claims: When Paid provision is amended to add 'If an undisputed claim or any undisputed part of a claim is not paid within 30 days from receipt of Proof of Loss, the Company will pay interest at | State Exceptions not included. |

1 ½% per month from the date Proof of Loss is received'.  The following provision is added to the Policy: Plan Cancellation: 'This plan may be cancelled by the Company only on the following grounds:

A. Nonpayment of premium;

B. Fraud or material misrepresentation made by or with the knowledge of the named Insured in obtaining the policy, continuing the policy or in presenting a claim under the policy;

C. Substantial change in the risk which increases the risk of loss after insurance coverage has been issued or renewed, including, but not limited to, an increase in exposure due to rules, legislation or court decision;

D. Failure to comply with reasonable loss control recommendations;

E. Substantial breach of contractual duties, conditions or warranties; or

F. Determination by the superintendent that the continuation of a class or block of business to which the policy belongs will jeopardize a company's solvency or will place the insurer in violation of the insurance laws of this State or any other state.'" *Id.* at 37-38.

West Virginia – The Arbitration provision is deleted in its entirety and replaced with the following language.

"If the Company and the Insured do not agree whether coverage is provided under this policy of insurance for a claim made by or against the Insured, both parties may, by mutual consent, agree in writing to arbitration of the disagreement.  If both parties agree to arbitrate, each party will select an arbitrator.  The two arbitrators will select a third arbitrator.  If they cannot agree upon the selection of a third arbitrator within 30 days, both parties must request that selection of a third arbitrator be made by a judge of a court having jurisdiction.  Unless both parties agree otherwise, arbitration will take place in the county in which the address shown in the declarations is located.  Local rules of law as to procedure and evidence will apply.  A decision agreed to by any two

| | |
|---|---|
| will be binding.  Payment of the arbitrator's fee shall be made by us if coverage is found to exist.  If coverage is not found, each party will: (a) pay its chosen arbitrator; and (b) bear the other expenses of the third arbitrator equally." *Id.* at 38.<br><br>Wyoming – The Legal Actions provision is replaced with the following: "No action at law or in equity may be brought to recover on this Policy prior to the expiration of 60 days after written proof of Loss has been furnished in accordance with the requirements of this Policy.  No such action may be brought after the expiration of 10 years after the time written proof of loss is required to be furnished.  Such action arising within this state shall be brought in the county where the cause of action arose or in the county where the insured instituting the action resides."  The Arbitration provision is amended to add "Any arbitration proceedings shall be conducted within the state of Wyoming." *Id.* at 38. | |
| Assistance Services:    Emergency  Travel Assistance: Flight rebooking assistance, Hotel rebooking assistance, Rental vehicle booking assistance, Coordinate emergency return travel arrangements,  Roadside  assistance,  Rental vehicle return assistance, Guaranteed hotel check-in, and Missed connection coordination.  Attachment 1 at 40. | Emergency Travel Assistance not included as its own category.   These services are found under the "Worldwide Travel Assistance" subsection of Assistance Services.  Attachment 2 at 40. |

47.     The definitions of Pre-Departure and Post-Departure benefits are identical between the France Trip Policy and the Cruise Trip Policy.  The effective dates and times for Pre-Departure and Post-Departure benefits are identical between the France Trip Policy and the Cruise Trip Policy.  The expiration dates and times for the Pre-Departure and Post-Departure benefits are identical between the France Trip Policy and the Cruise Trip Policy.

48.     Travel Cancellation coverage is identical between the France Trip Policy and the Cruise Trip Policy.  Travel Exchange coverage is identical between the France Trip Policy and the

Cruise Trip Policy.  Therefore, the coverage provided for Pre-Departure benefits is the same between the France Trip Policy and the Cruise Trip Policy.[32]

49.     Upon information and belief, Pre-Departure and Post-Departure benefits, including coverages and time during which risk can attach are the same in every AIG Travel Policy.

50.     The specific contract details are provided herein to build a foundational understanding of the coverages included in AIG Travel Policies and demonstrate the distinction between pre- and post-departure coverages.  Additionally, review of the contracts demonstrates that AIG makes a distinction between pre- and post-departure benefits in every AIG Travel Policy that includes both coverages (it even offers a Pack N' Go Plan that excludes pre-departure benefits from the included coverages).  Yet, AIG does not provide a breakdown of the premium paid for each distinct coverage and it does not offer *pro rata* refunds for portions of the premium it never earns.

1. ***The France Trip Details***

51.     On January 30, 2020, Plaintiff, along with his wife and two other passengers residing in Florida, purchased an international trip from Bruce Travel, a Division of LUXE Travel, scheduled to depart on Wednesday, October 7, 2020, at 7:13 p.m. from Boston, Massachusetts (Delta Flight No. 0224).  The flight was scheduled to arrive in Paris De Gaulle, France at 8:15 a.m. on October 8, 2020.  On Saturday, October 17, 2020 at 10:10 a.m., Plaintiff and his travel companions were scheduled to leave France and fly back to Boston, arriving at 12:19 p.m. on October 17, 2020.

---

[32]     This excludes any specific differences noted within the Table included in Paragraph 39 of this Complaint.

52.     Plaintiff purchased a round-trip flight from Boston, MA to Paris, France from Delta Airlines for $788.35.  The flight was non-refundable from the airline company.

53.     Plaintiff prebooked several transportation transfer and events for his ten-day France Trip.  The travel itinerary for the France Trip included pre-booked transportation, train tickets, and tour tickets.  The total cost for the France itinerary items was $29,076.00.

54.     The tour company required a 10% deposit to confirm all services and the deposit was non-refundable from ITS International Tours Specialists.  Final payment to the travel tour company was due 60 days prior to travel (August 8, 2020).  Cancellation of the France itinerary items within 30 days or less of the scheduled departure date would result in 100% penalty of the full price.

55.     A missed connection, trip interruption, or trip delay related to any of the France itinerary items may have triggered a post-departure benefit because these events were scheduled to occur during the France Trip.

56.     On February 27, 2020, Plaintiff purchased a travel insurance plan from Travel Guard, Policy No. 944616762[33] to protect his investment in case his Trip was cancelled pre-departure and to protect his investment during the Trip (post-departure risks).  The lump sum premium for the France Trip Policy was $440.98.  In exchange for paying the lump sum premium, Defendants agreed to indemnify Plaintiff if the France Trip was cancelled (a pre-departure risk), delayed, or interrupted (collectively post-departure risks).  The France Trip Policy also included coverages for other post-departure risks including lost or damaged baggage and medical expenses.

---

[33]     The Policy is attached to this Complaint as Attachment 1.

57.    On August 24, 2020, Plaintiff cancelled the France Trip, and the travel agency provided a full refund of all deposits less a $150 service charge.  AIG did not contribute to any portion of the refund Plaintiff received for the France Trip.

58.    Also on August 24, 2020, Plaintiff requested a refund from Defendants for the premium he paid to Defendants in the amount of $440.98 for the France Trip Policy.  Defendants denied Plaintiff's request for refund of the premium because it was outside of the "Fifteen Day Look" period.  AIG sent Plaintiff an email response on August 25, 2020.  The response included the following language:

> We have reviewed your request for a premium refund.  It is our policy that all premium refund requests must be submitted within 15 days of the effective date of the policy, however we are pleased to offer you a travel insurance credit voucher in the amount of $440.98.

59.    The "Fifteen Day Look" period expired on March 13, 2020 (15 days after Plaintiff purchased the France Trip Policy) and 209 days or almost seven months before the departure date (October 7, 2020).  According to the Policy's "Fifteen Day Look Period" the entire lump sum premium becomes non-refundable 209 days before AIG could ever earn the portion of the premium paid for post-departure coverages.

60.    Plaintiff cancelled the France Trip before the Departure Date, therefore, no post-departure risk ever attached and the portion of the travel insurance premium he paid for post-departure coverages was unearned by Defendants and should be refundable.

61.    The travel insurance credit voucher expires on August 25, 2022.  It can only be used in conjunction with one future trip and if the voucher amount exceeds the travel insurance premium cost for the future trip, any excess is forfeited by Plaintiff to Defendants.  This is not a proper *pro rata* refund of the unearned portion of Plaintiff's premium.  It also contains

unreasonable restrictions, making it unlikely Plaintiff will receive the refund to which he is entitled.

### 2. *The Cruise Trip Details*

62.     On August 20, 2020, Plaintiff purchased a Sixthman Cruise Line cruise scheduled to depart from Miami, Florida on November 7, 2021 at 3:30 p.m.  The cruise was scheduled to arrive in Great Stirrup Cay, Bahamas at 8:00 a.m. on November 8, 2021, where guests spend the day (8:00 a.m. to 4:30 p.m.) ashore.  On November 11, 2021, the cruise was set to arrive in Puerto Plata, Dominican Republic for a day (8:00 a.m. to 4:30 p.m.) ashore.  Finally, the cruise would return to the Port of Miami at approximately 8:00 a.m. on November 12, 2021 ("Cruise Trip"). Plaintiff is from Pennsylvania and therefore needed travel accommodations to and from Miami, in addition to the cost of the Cruise Trip.

63.     The total cost of the Cruise Trip for Plaintiff and his wife was $3,267.  The total cost of the Cruise Trip was scheduled to be paid in 12 installments of $272.25 beginning on September 20, 2020, and ending on August 20, 2021.  All deposits and payments were non-refundable from the travel supplier/cruise line.

64.     On September 4, 2020, Plaintiff purchased a travel insurance plan from Travel Guard, Policy No. 946119552.[34]  The lump sum premium for the Cruise Trip Policy was $342.58. In exchange for paying the lump sum premium, Defendants agreed to indemnify Plaintiff if the Cruise Trip was cancelled (a pre-departure risk), delayed, or interrupted (collectively post-departure risks).  The Cruise Trip Policy also included coverages for other post-departure risks such as lost or damaged baggage and medical expenses.  The Cruise Trip Policy is nearly identical to the France Trip Policy.

---

[34]     The Cruise Trip Policy is attached to this Complaint as Attachment 2.

65.    In or around June 2021, the Sixthman Cruise Line cancelled the Cruise Trip and offered full refunds to its customers, including Plaintiff.  Plaintiff received a refund in the amount of $3,269.19 on June 29, 2021.

66.    Plaintiff requested a refund of the premium he paid to Defendants in the amount of $342.58.  Defendants denied Plaintiff's request for refund of the premium because it was outside of the "Fifteen Day Look" period.  The "Fifteen Day Look" period expired on September 19, 2020 (15 days after Plaintiff purchased the Cruise Trip Policy) and 414 days or 14 almost months before the departure date (November 7, 2021).  According to the Cruise Trip Policy's "Fifteen Day Look Period" the entire lump sum premium becomes non-refundable 414 days before AIG could ever earn the portion of the premium paid for post-departure coverages.

67.    The cruise line cancelled the Cruise Trip before the Departure Date, therefore, no post-departure risk ever attached and the portion of the travel insurance premium he paid for post-departure coverages was unearned by Defendants and should be refundable.

68.    Additionally, the Cruise Trip Policy expressly states that Defendants only indemnify Plaintiff, and others similarly situated, to the extent portions of his Trip Costs are non-refundable.  Here, the entire trip was refundable from the cruise line – meaning no risk may have ever attached to Defendants.

**CLASS ACTION ALLEGATIONS**

69.    Plaintiff brings this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated, on behalf of a proposed nationwide class, including residents of all 50 states (the "Nationwide Class"), and a Pennsylvania Subclass.

70.    The Nationwide Class is initially defined as:

All persons (including natural persons, corporations, firms, partnerships, joint stock companies, associations, and other organizations of persons) in the United States who, during the longest applicable statute of limitations period (the "Class Period") purchased, through paying a single, lump-sum premium, a travel insurance policy from Defendants that included both pre-departure and post-departure benefits for a trip that was cancelled prior to the trip departure date.

71.    The Pennsylvania Subclass is initially defined as:

All persons (including natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons) in the Commonwealth of Pennsylvania who, during the longest applicable statute of limitations period (the "Class Period") purchased, through paying a single, lump-sum premium, a travel insurance policy from Defendants that included both pre-departure and post-departure benefits for a trip that was cancelled prior to the trip departure date.

72.    Excluded from the Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates.

73.    The number of persons who are members of the Class is so numerous that joinder of all members in one action is impracticable.  The Class is reasonably estimated to be at least in the thousands.  While the precise number, names, and addresses of all members of the Class are unknown to Plaintiff, such information is ascertainable from Defendants' records, including as to the identity of its insureds and the policies and coverages purchased.

74.    The claims of the Class all derive directly from a single uniform policy of Defendants of not refunding insurance premiums paid for post-departure benefits, whenever an insured cancels their travel prior to the scheduled departure.

75.    The objective facts are the same for all Class members in that:  (a) each paid a gross premium to Defendants as consideration for a travel insurance plan with pre-bundled coverage options, which included coverage protection exclusively against post-departure travel risks; (b) each of the Class members' trips were canceled prior to the scheduled departure date; and (c) Defendants unfairly, unjustly and unlawfully failed to return the *pro rata* portion of the gross

premium that was paid exclusively for post-departure benefits to the Class member (whether or not requested by the Class member).

76.    Defendants did not differentiate, in degree of care or candor, their actions or inactions among individual members of the Class regarding their failure to make *pro rata* refunds of unearned, risk-free premiums for post departure perils that were never actually insured by Defendants as a result of trips that were canceled before departure.  The objective facts are the same for all members of the Class.  Within each Claim for Relief asserted below by the respective Class, the same legal standards govern resolution of the same operative facts existing across all members' individual claims.

77.    Because the claims of each member of the class have a common origin and share a common basis in terms of Defendants' systematic misconduct, there are common questions of fact and law that exist as to each Class member under Federal Rule of Civil Procedure 23(a)(2), and which predominate over any questions affecting only individual members under Federal Rule of Civil Procedure 23(b).

78.    Substantial questions of fact and law that are common to all members of the Class, and which control this litigation and predominate over any individual issues, include the following:

   a.    Whether Defendants, as a matter of course and policy, can charge lump sum premiums for both pre-departure and post-departure risks;

   b.    Whether Defendants, as a matter of course and policy, can include the "Fifteen Day Look" provision in its policy and apply it to the unearned portions of the premium;

   c.    Whether Defendants can retain unearned, risk-free premiums paid exclusively for coverage of post-departure perils, whenever the purchaser of an AIG or Union Fire Insurance Plan canceled their travel prior to his or her scheduled departure;

   d.    Whether Defendants' Travel Insurance Plans address the entitlement of insureds to refund of unearned, risk-free premiums paid for post-departure perils that were never actually insured pre-departure;

e. Whether by virtue of cancelling the trip prior to departure, Defendants faced no risk of having to cover post-departure perils and thus retained unearned premiums;

f. Whether by virtue of trip cancellation prior to departure, Defendants provided no consideration in exchange for premiums paid exclusively for coverage of post-departure perils;

g. Whether it would be unjust for Defendants to retain the *pro rata* portion of the gross premium paid exclusively for post-departure coverage, when the trip was cancelled before the departure date; and

h. Whether Defendants' conduct constitutes unlawful conduct in violation of Pennsylvania Consumer Protection Act, 73 P.S. §§201-3 & 201-9.2.

79.    Plaintiff's claims are typical of the claims of the Class and arise from the same course of conduct undertaken by Defendants against the Class as a whole.  There are no conflicts between the interests of the named Plaintiff and the interests of the members of the Class.  The relief Plaintiff seeks is typical of the relief sought for the members of the Class.

80.    Plaintiff will fairly and adequately represent and protect the interests of the Class because of the common injury and interests of the members of the Class and the singular conduct of Defendants that is, and was, applicable to all members of the Class.  Plaintiff has retained counsel competent and experienced in class action litigation that will adequately represent and protect the interests of the members of the Class.

81.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) not only because common questions of fact and law predominate, but also because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of

decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

82.    Plaintiff is also not aware of management difficulties which should preclude maintenance of this litigation as a class action.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into further Subclasses.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Classes)

83.    Plaintiff repeats and realleges every allegation contained above as if fully set forth herein.

84.    Implied in every contract of insurance is a covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.  An insurer is said to act in "bad faith" when it breaches its duty to deal fairly and in good faith with its insured.

85.    When Defendants charged Plaintiff and other Class members lump sum premiums, it knew, or should have known, that if Plaintiff, or a member of the Class, canceled his trip before

the departure date, he would be unable to use the post-departure coverages included in the Policy. These post-departure coverages include trip interruption and trip delay.

86.    Additionally, Defendants included a Fifteen Day Look provision in the Policy, making the premium "non-refundable" fifteen days after Plaintiff and members of the Class purchased the Policy.  Defendants created and included this provision to discharge their obligation to refund unearned premiums for post-departure coverages that could not be earned if the trip is cancelled before the departure date.

87.    In breach of the covenant of good faith and fair dealing, Defendants acted in an unreasonable or imprudent manner by charging a lump sum premium for post-departure and pre-departure, without distinguishing the two types of coverages, and making unearned portions of the premium non-refundable before any risk could possibly attach for the coverages.  Defendants further refused to refund unearned portions of the travel insurance premium.

88.    As a direct result of Defendant's conduct as alleged above, Plaintiff and members of the Class have been damaged in an amount to be determined according to proof at the time of trial.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Classes)

89.    Plaintiff repeats and realleges every allegation contained above as if fully set forth herein.

90.    Defendants have been unjustly enriched at the expense of Plaintiff and other members of the Class because of Defendants' systematic and willful misconduct.

91.    Plaintiff and other members of the Class have conferred a benefit upon Defendants by paying lump sum premiums that offer no distinction between pre-departure and post-departure

coverages and by their nature, systematically overcharge policyholders who cancel their trips prior to the departure date.

92.    There is no lawful justification or excuse for Defendants' systematic and willful misconduct.  The AIG Travel Policies executed by and between Plaintiff and other members of the proposed Class, on the one hand, and Defendants, on the other, do not set forth the alleged right of Defendants to charge lump sum premiums, and in fact are silent on the methodology or basis for calculating and imposing lump sum premiums on insureds.  This matter is not governed by the AIG Travel Policies.

93.    Pre-Departure Benefits and Post-Departure Benefits each include discrete lines of coverage for which Defendants separately calculate premiums, and then combine to charge policyholders an imprecise lump sum premium for both types of coverage.  Then, Defendants include the Fifteen Day Look provision, which purports to make any premiums insureds pay "non-refundable" fifteen days after the payment is made.  In many cases, the fifteen days expires well before the Departure Date and the attachment of any post-departure risks.  By lumping the premium for pre-departure and post-departure coverages and making it non-refundable long before the Departure Date, Defendants are creating a loophole in which they can cheat policyholders out of unearned premium refunds, specifically those for post-departure risks that never attach because a trip is cancelled.

94.    Additionally, Plaintiff and other members of the Class have conferred a benefit upon Defendants through paying unearned, risk-free premiums for post-departure risks, and Defendants have understood and knowingly retained that benefit without lawful justification or excuse.

95.    Whenever travel is canceled prior to commencement of the insured trip, Defendants' retention of the premiums paid for these post-departure benefits is unjust and inequitable because Defendants are never placed in a position of being at risk of having to pay post-departure benefits to Plaintiff and other members of the proposed Class.  Put simply, no coverage of any post-departure peril is ever assumed by Defendants in this scenario, and thus, such coverage is illusory since the *sine qua non* of post-departure travel insurance (irrespective of the type and level purchased within any AIG Plan) is **actual travel** on the insured trip.

96.    Never having been placed at coverage risk, Defendants' retention of these premiums is also unjust because they have provided no consideration in return for retaining the unearned premiums.

97.    There is no lawful justification or excuse for Defendants to withhold the refund of any premiums previously paid for post-departure benefits if an insured needs to cancel his or her insured trip.  If anything, the AIG Travel Policies (written exclusively by Defendants from an upper hand position of bargaining) expressly state that "Post-Departure Benefits" will take effect on the scheduled "Departure Date."

98.    Because Defendants do not give any consideration for the premiums which are allocable to post-departure benefits and do not draw any distinction between the premium paid for pre-departure versus post-departure benefits, even if any portion of the insurance contract purported to allow retention of premiums paid for exclusively post-departure benefits (the Fifteen Day Look) when an insured does not commence travel, this provision would be without consideration void and/or ineffective as a matter of law.

99.    It would be inequitable for Defendants to retain the profits obtained from their wrongful conduct and retaining such profits would come at the expense of Plaintiff and other

members of the Class who are entitled to a *pro rata* refund of their gross premium.  Plaintiff and other members of the Class are entitled to restitution and/or disgorgement of all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

### THIRD CAUSE OF ACTION
#### Violation of the Pennsylvania Consumer Protection Act,
#### 73 P.S. §§201-3 & 201-9.2
#### (On Behalf of Plaintiff and the Pennsylvania Subclass)

100.    Plaintiff repeats and realleges every allegation contained above as if fully set forth herein.

101.    Through their conduct described herein, Defendants have engaged in unfair and deceptive acts and practices that resulted in injury to Plaintiff and the other members of the proposed Class.

102.    Defendants' acts and practices were directed to consumers, including Plaintiff and members of the proposed Class.

103.    Defendants' practice of charging all-inclusive, lump sum travel insurance premiums, and their related refusal to refund portions of premiums that were never earned and could never be earned if a trip is cancelled before its departure date is unfair, deceptive, and resulted in injury to Plaintiff and members of the proposed Class.

104.    This action seeks to reimburse Plaintiff, and those similarly situated, for improperly charged, lump sum travel insurance premiums that offer no distinction between pre-departure and post-departure coverages and by their nature, systematically overcharge policyholders who cancel their trips before the departure date.

105.    Further, by virtue of Plaintiff and other members of the Class canceling their trips prior to departure, Defendants' consideration (namely, the provision of insurance coverage protecting against post-departure perils) either became entirely void or materially failed before

ever being rendered, because Defendants never had to assume the risk of having to cover any of these perils.

106.    Plaintiff and other members of the Class have suffered monetary damages, including in the form of the unearned premiums retained by Defendants.

107.    By reason of the foregoing, Defendants violated the Pennsylvania Consumer Protection Act by, *inter alia*, improperly lumping premiums and failing to return the premium apportionable to travel that did not occur and for which they never had to assume the risk of having to cover any of these perils.

108.    Defendants should be enjoined from their unlawful premium lumping practices and failing to disclose the actual costs of the coverages they offer to policyholders.  Defendants are also liable to Plaintiff and the other members of the Class for the actual damages they have suffered because of Defendants' actions, including failing to refund unearned portions of the paid premiums, or one hundred dollars ($100), whichever is greater.  In the Court's discretion, it can award treble damages as well as costs and reasonable attorney fees pursuant to section 201-9.2(a) of the Pennsylvania unfair trade practices and consumer protection law.

### FOURTH CAUSE OF ACTION
#### Request for Injunctive Relief
#### (On Behalf of Plaintiff and the Classes)

109.    Plaintiff repeats and realleges every allegation contained above as if fully set forth herein.

110.    Defendants are unlawfully charging a lump sum premium for post-departure and pre-departure coverages within the Policy and similar insurance policies.  Defendants have further refused to refund any unearned portions of the premium for post-departure coverages when a trip is cancelled before the departure date.  Plaintiff and members of the Class did not travel on the

specified dates, resulting in systematic overpayments for insurance coverage for risks that never attached.

111.    This Court may grant an injunction when the complaint alleges a defendant's actions or omissions will continue to produce great injury to the plaintiffs and members of the Class.

112.    Without the injunctive relief requested herein, Plaintiff and the Class will suffer irreparable harm, and lack an adequate remedy at law, if Defendants continue to charge lump sum premiums for distinct coverages (pre-departure and post-departure coverages have different effective dates).

113.    The Court should enter an order enjoining Defendants from engaging in the wrongful and unlawful acts described herein and specifically enjoin Defendants from applying the current "15 Day Look" Provision to post-departure coverages.  In addition, the Court should enjoin Defendants from lumping premiums for pre-departure and post-departure coverage and require Defendants to refund any portion of the premiums that are unearned.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and other members of the Class, respectfully requests that the Court:

A.    Certify the Class(es) defined herein pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and designate the Plaintiff as the representative of, and their undersigned counsel, as Counsel for the Class;

B.    Enter judgments against each of the Defendants and in favor of the Plaintiff and other members of the Class based on Plaintiff's claims asserted herein;

C.      Award Plaintiff and the Class all damages allowed by law in an amount to be determined at trial;

D.      Award Plaintiff and the Class restitution and/or disgorgement of unearned gains;

E.      Award Plaintiff and the Class costs and reasonable attorneys' fees, as allowed by law under the Pennsylvania Consumer Protection Act and otherwise by law;

F.      Award Plaintiff and the Class prejudgment and post-judgment interest, as allowed by law;

G.      Award Plaintiff and the Class injunctive relief, as appropriate and requested herein; and

H.      Award such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: February 23, 2022                    */s/ Joseph P. Guglielmo*

Joseph P. Guglielmo
Carey Alexander
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Fl.
New York, NY 10169
Tel.: (212) 223-6444
jguglielmo@scott-scott.com
calexander@scott-scott.com

Brian C. Gudmundson
Michael J. Laird
Rachel K. Tack
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street

Minneapolis, MN 55402
Tel.: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.con
rachel.tack@zimmreed.com

Gary F. Lynch
Jamisen Etzel
Nicholas Colella
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Fl.
Pittsburgh, PA 15222
Tel.: (412) 322-9243
Gary@lcllp.com
Jamisen@lcllp.com
NickC@lcllp.com