# EXHIBIT 2

# 22-336-cv

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

IN RE GENERALI COVID-19 TRAVEL INSURANCE LITIGATION

Rebecca Oglevee, Kristen Johner, Renee Clonts, Melissa Garner, Amitabh Sharma, Gary Schrader, Howard Morris, on behalf of themselves and all others similarly situated,

*Plaintiffs - Appellants,*

Amy Flanigan, Matthew Nixon, Kari Nixon, Richard Robbins, Mark Swafford, Val Dziagwa, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

- v. -

Generali U.S. Branch, Customized Services Administrators, Inc. d/b/a CSA Travel Protection and Insurance Services d/b/a Generali Global Assistance and Insurance Services,

*Defendants – Appellees.*

*On appeal from a Fed. R. Civ. P. 54(b) final judgment
of the United States District Court for the Southern District of New York
20-md-2968 (Hon. John G. Koeltl)*

## BRIEF OF APPELLANTS OGLEVEE, JOHNER, CLONTS, GARNER, SHARMA, SCHRADER, AND MORRIS, WITH SPECIAL APPENDIX

Jamisen A. Etzel
Lynch Carpenter, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
(412) 322-9243

David E. Kovel
Kirby McInerney LLP
250 Park Ave., Ste. 820
New York, NY 10177
(212) 371-6600

*Attorneys for Appellants*

# **Table of Contents**

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES ................................................................... 3

STATEMENT OF THE CASE ...................................................................... 5

I.    Nature of the Case and Relevant Procedural History ......................... 5

II.   Statement of Facts Relevant to the Issues on Appeal ........................ 9

    A.    Insureds' Planned Trips and Purchase
        of Generali Policies ......................................................... 9

    B.    The Material Terms of Generali's Travel
        Insurance Policies .......................................................... 10

    C.    Insureds Were Prevented from Taking Their Trips Due
        to the Worldwide Spread of a Deadly, Contagious Virus
        and Government-Imposed Isolation Measures ....................... 13

    D.    Generali Denied Insureds' Requests for Coverage
        and Did Not Return Unearned Premiums ............................. 16

SUMMARY OF ARGUMENT ..................................................................... 17

ARGUMENT ......................................................................................... 21

I.    Standard of Review .......................................................... 21

    A.    Legal Standards Governing Interpretation
        of Insurance Contracts .................................................... 21

II.   The District Court Erred in Deciding that the General
    Exclusion for "Travel Restrictions Imposed for a
    Certain Area" Defeated the Insureds' Claims ................................ 24

    A.    Broad policy exclusions cannot be construed or applied
        in a way that renders illusory a specific coverage
        provision in a named peril policy, but instead
        must be read narrowly so as to provide the
        coverage reasonably anticipated by the insured ...................... 25

B.     The district court's broad interpretation of the exclusion is impermissible because it renders entire, specific coverage provisions illusory. ........................... 27

III.   Insureds Plausibly Alleged Entitlement to the Quarantine Coverage. ............................................ 32

A.     "Isolation" is an ambiguous term under the Policies and in this context. ..................................... 33

B.     Insureds' factual allegations demonstrated "enforced isolation." ............................................... 35

IV.   Clonts, Johner, and Garner Were Entitled to Natural Disaster Coverage. ........................................... 40

A.     COVID-19 is and was a natural disaster, and prevented Insureds from reaching their accommodations by any mode of transportation. .................. 40

V.    The District Court Erred in Dismissing the Unjust Enrichment Claim Challenging Generali's Retention of Unearned Premiums Attributable to Post-Departure Coverages. ..................... 47

A.     The Policies' ten-day free look period does not override or displace the established rule that insurers must return unearned premiums when the contracted-for risk does not attach.................................. 51

B.     Pennsylvania and Florida law would not foreclose the quasi-contractual claim merely because the parties had a contractual relationship..................................... 55

C.     The district court erred in holding that the premiums for pre-departure risk and post-departure risk were not severable. .................................. 58

CONCLUSION........................................................................ 63

CERTIFICATES OF SERVICE AND COMPLIANCE.................................. 65

*SPECIAL APPENDIX FOLLOWS*

# Table of Authorities

**Cases** **Page(s)**

*401 Fourth St., Inc. v. Inv'rs Ins. Grp.*,
  879 A.2d 166 (Pa. 2005)...................................................................22–23

*AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*,
  2020 WL 7024929 (Del. Ch. Nov. 30, 2020)........................................... 42

*Alf v. State Farm Fire & Case. Co.*,
  850 P.2d 1272 (Utah 1993)...................................................................... 31

*Allaire Corp. v. Okumus*,
  433 F.3d 248 (2d Cir. 2006) .................................................................... 21

*Anderson v. Travelex Ins. Servs., Inc.*,
  2019 WL 1932763 (D. Neb. May 1, 2019)....................................50, 54, 63

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 21

*Autumn Ridge, L.P. v. Acordia of Virginia Ins. Agency, Inc.*,
  613 S.E.2d 435 (Va. 2005).................................................................. 48–49

*Bear River Mut. Ins. Co. v. Williams*,
  153 P.3d 798 (Utah 2006) ...................................................................... 22

*Bird v. Penn Cent. Co.*,
  341 F. Supp. 291 (E.D. Pa. 1972) ...........................................................60

*Black Voters Matter Fund v. Raffensperger*,
  478 F. Supp. 3d 1278 (N.D. Ga. 2020) ................................................... 42

*Bolinger v. Clark Fork Mut. Ins. Co.*,
  485 S.W.3d 803 (Mo. Ct. App. 2016)................................................25–26

*Casey v. Lamont*,
  258 A.3d 647 (Conn. 2021) .................................................................... 42

*Colon v. Howard*,
  215 F.3d 227 (2d Cir. 2000) ................................................................... 34

*Columbia Cas. Co. v. SMI Liquidating, Inc.*,
   909 F. Supp. 2d 1303 (D. Utah 2012) ....................................................... 22

*Downing v. Erie City School Dist.*,
   61 A.2d 133 (Pa. 1948)........................................................................... 60

*Easom v. US Well Servs.*,
   2021 WL 1092344 (S.D. Tex. Mar. 19, 2021) ......................................... 41

*Edleson v. Travel Ins. Int'l Inc.*,
   2021 WL 4334075 (S.D. Cal. Sept. 23, 2021) ................................... 50, 54

*Farmers Ins. Exch. v. Versaw*,
   99 P.3d 796 (Utah 2004) ....................................................................... 23

*Fidelity Nat. Title Ins. Co. of New York v. OHIC Ins. Co.*,
   619 S.E.2d 704 (Ga. Ct. App. 2005) .................................................. 31–32

*Friends of Danny DeVito v. Wolf*,
   227 A.3d 872 (Pa. 2020) ........................................................................ 41

*General American Life Ins. Co. v. Barrett*,
   847 S.W.2d 125 (W.D. Mo. 1993) ........................................................... 22

*Gonzalez v. Eagle Ins. Co.*,
   948 So.2d 1 (Fla. Ct. App. 2006)....................................................... 56–57

*Gordon v. Arch Ins. Co.*,
   2021 WL 2186392 (E.D. Pa. May 28, 2021)............................................ 50

*Great Northern Ins. Co. v. Greenwich Ins. Co.*,
   2008 WL 2048354 (W.D. Pa. May 12, 2008) ......................................... 26

*Haas v. Travelex Ins. Servs. Inc.*,
   555 F. Supp. 3d 970 (C.D. Cal. 2021) .............................................. 50, 54

*Harris v. Zurich Holding Co. of America, Inc.*,
   2006 WL 120258 (D. Utah Jan. 17, 2006).............................................. 26

*Hartford Fire Ins. Co. v. Hollis*,
   59 So. 785 (Fla. 1912) ............................................................................ 60

*Huntington Ins. Agency v. Wyoming County Ct.*,
   127 S.E. 64 (W. Va. 1925) ...................................................................... 49

*I-L Logging Co. v. Manufacturers & Wholesalers Indem. Exch.*, 275 P.2d 226 (Or. 1954) ................................................... 23

*In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ................ 21

*In re Texas Ass'n of School Boards, Inc.*, 169 S.W.3d 653 (Tex. 2005) .......................................................... 48–49

*Infantino v. Quaker City Fire & Marine Ins. Co.*, 48 A.2d 77 (Pa. Super. Ct. 1946) ........................................... 56

*Jew Ho v. Williamson*, 103 F. 10 (N.D. Cal. 1900) ...................................................... 35

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262 (S.D.N.Y. Dec. 16, 2020) ......................... 41

*John J. Curry & Son v. Harleysville Mut. Ins. Co.*, 11 Pa. D. & C.4th 521 (Pa. Ct. Com. Pl. 1991) ......................... 32

*Kansas City Col. of Osteopathic Med. v. Employers' Surplus Lines Ins. Co.*, 581 F.2d 299 (1st Cir. 1978) ................ 48

*Latta v. Farmers County Mut. Fire Ins. Co.*, 313 S.E.2d 214 (N.C. App. 1984) ............................................. 48

*Lattarulo v. Nat'l Sur. Co.*, 196 N.Y.S. 98 (N.Y. Mun. Ct. 1922) ....................................... 48

*Leach v. Scottsdale Indemn. Co.*, 323 P.3d 337 (Or. Ct. App. 2014) ............................................. 23

*Leander Land & Livestock, Inc. v. Am. Economy Ins. Co.*, 2013 WL 1786348 (D. Or. April 21, 2013) ........................ 26, 28

*Lincoln Nat'l Health & Cas. Ins. Co. v. Brown*, 782 F. Supp. 110 (M.D. Ga. 1992) ........................................ 23

*Mays v. Transamerica Ins. Co.*, 799 P.2d 653 (Or. 1990) ...................................................... 31

*Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) ................................................. 21

*Nat'l Union Fire Ins. Co. v. Cubberly*,
    67 So. 133 (Fla. 1914) ................................................................. 60

*Pa. Democratic Party v. Boockvar*,
    238 A.3d 345 (Pa. 2020) ............................................................ 42

*Parker v. Arthur Murray, Inc.*,
    295 N.E.2d 487 (Ill. Ct. App. 1973) ......................................... 52

*Parsons, Rich & Co. v. Lane*,
    106 N.W. 485 (Minn. 1906) ...................................................... 48

*Pierce v. State Farm Mut. Auto Ins. Co.*,
    2014 WL 7671718 (S.D. Fla. Dec. 17, 2014) ....................... 56–57

*Pitt v. Leonberger*,
    528 S.W.3d 1 (Mo. Ct. App. 2017) ........................................... 26

*Rhiner v. Red Shield Ins. Co.*,
    208 P.3d 1043 (Or. Ct. App. 2009) ......................................... 22

*Ritchie v. Allied Prop. & Cas. Ins. Co.*,
    307 S.W.3d 132 (Mo. 2009) ..................................................... 23

*Seeck v. Geico General Ins. Co.*,
    212 S.W.3d 129 (Mo. 2007) ..................................................... 22

*Smith v. Turner*,
    48 U.S. 283 (1849) .................................................................... 34

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012) ...................................... 52

*Swartz v. John Hancock Mut. Life Ins. Co.*,
    170 A. 355 (Pa. Super. Ct. 1934) ............................................. 56

*Thomas v. Charles Baker & Co.*,
    60 F.2d 1057 (E.D. Pa. 1932) .................................................. 61

*Todd v. Missouri United Sch. Ins. Council*,
    223 S.W.3d 156 (Mo. 2007) ..................................................... 31

*Trombetta v. Raymond James Financial Services, Inc.*,
    907 A.2d 550 (Pa. Super. Ct. 2006) ........................................ 22

*Tyler v. Capitol Indem. Ins. Co.*,
    110 A.2d 528 (Md. 1955) ...................................................................48

*U.S. Fire Ins. Co. v. Hilde*,
    322 S.E.2d 285 (Ga. Ct. App. 1984) ..........................................26

*Whitlock v. Old Am. Ins. Co.*,
    442 P.2d 26 (Utah 1968) ...............................................................24

*Wilson Area Sch. Dist. v. Skepton*,
    895 A.2d 1250 (Pa. 2006) ..............................................................55

*Winders v. State Farm Fire and Cas. Co.*,
    359 F. Supp. 3d 1274 (N.D. Ga. 2018) .....................................22

*Young Am., Inc. v. Union Cent. Life Ins. Co.*,
    101 F.3d 546 (8th Cir. 1996) ........................................................48

## Statutes

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1332(d)(2) ........................................................................... 1

Or. Rev. St. § 401.990 ................................................................... 14, 36

## Rules

Fed. R. App. P. 4(a)(5)(A) .................................................................... 1

Fed. R. Civ. P. 12(b)(6) .............................................................. 1, 6, 21

Fed. R. Civ. P. 54(b) ......................................................................... 1–2

## Regulations

31 C.F.R. § 515.560 .............................................................................30

## Other Authorities

45 C.J.S. Insurance § 723 (2022 Update)....................................49

Black's Law Dictionary (11th ed. 2019) ................................... 41

Couch on Insurance § 79:8 (3rd ed. 2021 Update) ...................48

Macmillan Dictionary.........................................................................................33

Merriam-Webster Dictionary.........................................................27, 33, 41

Williston on Contracts § 41:21 (4th ed. 2021 Update) ................................49

## JURISDICTIONAL STATEMENT

### A.    District Court Jurisdiction

The district court had diversity jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). (A-31 ¶ 20).

### B.    Appellate Jurisdiction

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

On December 21, 2021, the district court issued an order and opinion granting Defendants-Appellees' motion under Fed. R. Civ. P. 12(b)(6) to dismiss all of Plaintiffs-Appellants' claims at issue in this appeal. (SA-1–SA-37).[1] In a separate order that same day, the district court granted a motion to compel arbitration, and issued a stay of litigation, with respect to the claims of other plaintiffs below (who are not Appellants here), and some—but not all—of the claims brought by Appellant Rebecca Oglevee. (*See* A-23; Dkt. 57).

Under Fed. R. App. P. 4(a)(5)(A), the district court extended the time to appeal the December 21, 2021 opinion and order, from January 20, 2022 to February 19, 2022. (A-478). Then, on February 9, 2022, the district court entered an order severing the cases and claims of Appellants Clonts,

---

[1] Citations to "SA-" refer to the special appendix appended to this brief. Citations to "A-" refer to the joint appendix.

Garner, Johner, Sharma, Morris, and Schrader and the non-arbitrable

claims of Appellant Oglevee, and dismissing with prejudice all of the

aforementioned severed claims. (SA-38).

That same order included the district court's finding pursuant to Fed.

R. Civ. P. 54(b) that there was no just reason for delay in issuing judgment

as to the severed and dismissed claims, and directed the clerk of the district

court to enter judgment. (SA-39). This resulted in an appealable final order.

Appellants filed a timely notice of appeal on February 18, 2022, and

identified the December 21, 2021 order and opinion (Dkt. 56) and the

February 9, 2022 final judgment as the subjects of the appeal. (A-482–A-

484).

# STATEMENT OF THE ISSUES

## Issue 1

Does a travel insurance contract's general policy exclusion for "travel restrictions imposed for a certain area by governmental authority" come into direct conflict with a more specific "quarantine" coverage provision, given that all conceivable forms of a governmentally imposed quarantine have the effect of restricting travel to or from a certain area? The district court erred when it refused to interpret the exclusion more narrowly so to preserve the quarantine coverage.

This district court's ruling on this issue appears at SA-10–SA-15. Appellants preserved this issue at A-351–A-355.

## Issue 2

Did the district court err when it found that no Appellants experienced "isolation" within the meaning of the "quarantine" covered event in their policies, even though Appellants alleged that they were prevented from taking their trips as a result of government-directed public health measures—for the sole purpose of preventing the spread of a contagious virus—that required Appellants to stay home and refrain from nonessential travel, prohibited them from reaching their destinations, or would have forced them to quarantine upon arrival?

The district court's ruling on this issue appears at SA-15–SA-21. Appellants preserved this issue at A-339–A-351.

**Issue 3**

Did the district court err when it held that no Appellants stated a claim for entitlement to trip cancellation coverage under the "natural disaster" covered event in their policies, even though Appellants Clonts, Johner, and Garner alleged specific facts showing that the COVID-19 pandemic was the direct reason preventing travel to their reserved accommodations?

The district court's ruling on this issue appears at SA-21–SA-22. Appellants preserved this issue at A-333–A-339.

**Issue 4**

Did the district court improperly dismiss Appellants Morris and Schrader's unjust enrichment claims seeking restitution in the form of a partial return of premiums attributable to post-departure coverages, when Generali could not have earned those premiums because the coverage periods never began?

The district court's ruling on this issue appears at SA-26–SA-31. Appellants preserved this issue at A-360–A-363.

## STATEMENT OF THE CASE

## I.   Nature of the Case and Relevant Procedural History

Beginning in mid-2020, Plaintiff-Appellants ("Insureds") filed several class actions in federal district courts against Defendants-Appellees Generali U.S. Branch and Customized Services Administrators, Inc. ("Generali"). The actions were centralized by the Judicial Panel on Multidistrict Litigation on December 15, 2020, and thereafter transferred to the Honorable Judge John G. Koeltl, Jr. of the Southern District of New York. (*See* A-16 at Dkt. 1).

Insureds filed a consolidated class action complaint on February 26, 2021, alleging breach of insurance contracts, unjust enrichment, and a variety of other claims. (*See generally* A-25–A-88).

The breach of contract claims stemmed from Generali's refusal to pay certain trip cancellation benefits under travel insurance policies ("Policies" or "Policy") it underwrote and administered, after Insureds were prevented by governmental orders and the worldwide COVID-19 pandemic from taking their planned trips. (A-75–A-77 ¶¶ 160–80). Insureds alleged that circumstances of their trip cancellations fell into at least one of two "Covered Events" under the Policies: either "Being ... Quarantined" (A-40 ¶¶ 45–47; A-75–A-76 ¶¶ 160–69), or because accommodations at the

Insured's destination were "inaccessible due to fire, flood, volcano, earthquake, hurricane, or other natural disaster." (A-40 ¶ 48; A-76–A-77 ¶¶ 170–80).

Insureds Morris and Schrader also brought an unjust enrichment claim challenging Generali's refusal to return the portions of their prepaid premiums attributable to the post-departure coverages included in the Policies. (A-82–A-83 ¶¶ 210–15). The Policies contained two distinct sets of coverages: the pre-departure cancellation coverage, and a much larger number of post-departure coverages that would only take effect if and when an Insured's covered trip began. (A-63–A-67 ¶¶ 125–39). Because those trips never occurred and therefore no risk ever attached under those coverages, Insureds alleged that Generali did not earn the entire prepaid premiums and was unjustly enriched when it failed to issue partial refunds. (*Id.*).

On February 26, 2021, Generali moved to dismiss all of Insureds' claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (A-89). Insureds timely responded in opposition on June 10, 2021. (A-21 at Dkt. 37; A-318–A-366 (corrected brief)). Generali filed a reply brief on July 12, 2021. (A-367). The district court held a telephonic oral argument on the motion on December 17, 2021. (*See* Transcript, A-390–A-440).

On December 21, 2021, Judge Koeltl of the district court issued an opinion and order granting Generali's motion to dismiss in its entirety as to Insureds' claims. (SA-1–SA-3). As an initial matter, the district court held that all the breach of contract claims seeking trip cancellation coverage benefits failed as a matter of law due to a "General Exclusion" in the Policies, which stated Generali would not "'pay for any loss under this Policy caused by, or resulting from … travel restrictions imposed for a certain area by governmental authority.'" (SA-10–SA-11 (quoting A-148, pp. 10–11 ¶ 1(q)). The district court held that: "All of the losses fall within this General Exclusion." (SA-11).

The court further held that Insureds failed to state a prima facie claim for entitlement to coverage under the "Quarantine" covered event, reasoning that none of the orders or facts identified in Insureds' allegations "created a state of enforced isolation." (SA-17; *see generally* SA-15–SA-21). Regarding the "Natural Disaster" coverage, the court addressed only Insured Clonts's claim, holding that no governmental order "made it impossible for her to reach her accommodations by her original means of transportation." (SA-21–SA-22). The district court did not address this coverage claim with respect to Insureds Johner or Garner.

Turning to the unjust enrichment claim by Insureds Morris and Schrader, the district court dismissed the claim for three interrelated reasons: 1) the Policy's provision stating it was "nonrefundable" beginning ten days after purchase, which the court held "covered the dispute" and expressly foreclosed a return of premium (ostensibly under any and all circumstances) (SA-28–SA-29); 2) a determination that Florida and Pennsylvania law[2] foreclose unjust enrichment claims "wherever the subject matter of the dispute is governed by the contract," (SA-26); and 3) a finding that pre-departure and post-departure coverages were "non-severable," meaning that "the entire risk" of the Policy attached at the time of purchase. (SA-30–SA-31).

The district court extended Insureds' deadline to appeal to February 19, 2022. (A-478). Then, on February 9, 2022, the district court severed Insureds' claims from those subject to the separate order compelling arbitration and staying litigation, and dismissed with prejudice all of the aforementioned severed claims. (SA-38).

Appellants filed a timely notice of appeal on February 18, 2022. (A-482–A-484).

---

[2] The parties agreed below that Morris's claim is governed by Florida law, and Schrader's claim is governed by Pennsylvania law.

## II.    Statement of Facts Relevant to the Issues on Appeal

### A.    Insureds' Planned Trips and Purchase of Generali Policies

All of the Policies purchased by Insureds were underwritten by Defendant-Appellee Generali U.S. Branch. (A-39 ¶ 43; A-103; *e.g.*, A-145, A-159). Defendant-Appellee Customized Services Administrators, Inc. administers the policies and is a "managing general agent" of Generali U.S. Branch. (*See* A-103; A-142 ¶ 1).

Amitabh Sharma, a Utah resident, booked a trip to Hawaii scheduled for May 13 to 20, 2020, and purchased a Policy covering the trip. (A-49 ¶¶ 79–80).

Kristen Johner, a Missouri resident, booked a rental home in Costa Rica scheduled for September 8 to 22, 2020, and purchased a Policy covering the trip. (A-53 ¶¶ 92–93).

Rebecca Oglevee, a Pennsylvania resident, booked airline tickets for travel to Key West, Florida, for a trip scheduled from March 17 to 24, 2020, and purchased a Policy covering the flight cost. (A-54 ¶¶ 97–98).

Renee Clonts, a Georgia resident, booked accommodations in Panama City Beach, Florida, for May 8 to 13, 2020, and purchased a Policy covering the trip. (A-60 ¶¶ 115–16).

Melissa Garner, an Oregon resident, booked a rental home in Englewood, Florida, for April 24 to 27, 2020, and purchased a Policy covering the trip. (A-62 ¶¶ 120–21).

Howard Morris, a Florida resident (A-29, ¶ 6), booked a cruise scheduled for April 27 to May 10, 2020, and purchased a Policy covering the trip. (A-67 ¶ 140).

Gary Schrader, a Pennsylvania resident (A-30 ¶ 14), booked a cruise scheduled for February 7 to 15, 2020, and purchased a Policy covering the trip. (A-67–A-68 ¶ 144).

## B. The Material Terms of Generali's Travel Insurance Policies

All of Insureds' Policies provided a coverage for trip cancellation, described as follows:

> Benefits will be paid, up to the amount in the Schedule, for the forfeited, prepaid, non-refundable, non-refunded and unused published Payments that you paid for your Trip, if you are prevented from taking your Trip due to one of the following unforeseeable Covered Events that occur before departure on your Trip to you or your Traveling Companion, while your coverage is in effect under this Policy.

(A-39–A-40 ¶ 44; *e.g.*, A-150, p. 16). The following pertinent "Covered Event" was listed thereafter in all of Insureds' Policies: "Being hijacked or Quarantined." (A-41 ¶ 46; *e.g.*, A-150, p. 16 ¶ 4). In the "Definitions" section of the Policies, "Quarantine" was defined as "the enforced isolation of you

10

or your Traveling Companion, for the purpose of preventing the spread of illness, disease, or pests." (A-41 ¶ 46; *e.g.*, A-148, p. 9).

The Policies purchased by Insureds Clonts, Johner, and Garner listed an additional Covered Event, which stated:

> Your Accommodations at your destination made inaccessible due to fire, flood, volcano, earthquake, hurricane or other *natural disaster*. We will only pay benefits for losses occurring within 15 calendar days after the event renders the destination inaccessible. For the purpose of this coverage, inaccessible means your Accommodations cannot be reached by your original mode of transportation.

(A-41–A-42 ¶ 48; A-151, p. 18 ¶ 21 (Johner Policy); A-165, p. 19 ¶ 21 (Clonts Policy); A-175, p. 19 ¶ 21 (Garner Policy) (emphasis added).

The "General Exclusions" section of the Policies contained the following provision: "We will not pay for any loss under this Policy, caused by, or resulting from: . . . travel restrictions imposed for a certain area by a governmental authority." (*E.g.*, A-148, pp. 10–11 ¶ 1(q)).

The Policies purchased by Insureds Morris and Schrader included a panoply of post-departure coverages, such as Trip Interruption, Travel Delay, Baggage Coverage, Missed Connection, Baggage Delay, Accidental Death and Dismemberment–Travel Accident, Accidental Death and Dismemberment–Air Flight Accident, Medical and Dental, Rental Car

Damage, and Emergency Assistance and Transportation. (A-65 ¶ 132; A-222, p. 8 (Morris Policy); A-241, p. 6 (Schrader Policy)).

Insureds alleged that these are discrete lines of coverage, for which Generali separately calculates premiums, despite presenting the Policies to Insureds for purchase at a non-itemized bundled price. (A-66 ¶¶ 134–36).

The Policies' temporal coverage terms state that none of these post-departure coverages takes effect until, at the earliest, the date of scheduled departure:

> When Coverage Begins
> All coverages (except Trip Cancellation and Trip Interruption) will take effect on the later of:
> (1) the date the premium payment has been received by us; or
> (2) the date and time you start your Trip; or
> (3) 12:01 A.M. local time at your location on the Scheduled Departure Date of your Trip.

(A-64 ¶ 128; A-226, p. 18 (Morris Policy); A-244, p. 15 (Schrader Policy)).

The Polices then specifically state the coverage periods for trip cancellation and trip interruption coverages. Under the Policies, "Trip Cancellation coverage will take effect at 12:01 A.M. local time at your location on the day after the date your premium payment is received." (A-64, ¶ 129; A-226, p. 18 (Morris Policy); A-244, p. 15 (Schrader Policy)). Separately, "Trip Interruption coverage will take effect on the Scheduled

Departure Date of your Trip if the required premium payment is received."
(A-64, ¶ 129; A-226, p. 18 (Morris Policy); A-244, p. 15 (Schrader Policy)).

The Policies state that *all* coverages automatically terminate if the trip
is cancelled, meaning that any time a policyholder's trip is cancelled before
the departure date, no coverages other than trip cancellation coverage ever
take effect. (A-64, ¶ 130; A-226, p. 18 (Morris Policy); A-244, p. 16
(Schrader Policy)).

Insureds Morris and Schrader both prepaid their premiums for the
Policies. Morris paid $1,298.88, and Schrader paid $199.00. (A-67−A-68 ¶¶
140, 143−44, 147).

### C. Insureds Were Prevented from Taking Their Trips Due to the Worldwide Spread of a Deadly, Contagious Virus and Government-Imposed Isolation Measures

Insureds' allegations described how in early 2020, a novel
coronavirus ("COVID-19") rapidly spread across the world, eventually
causing a recognized pandemic. (A-33−A-35 ¶¶ 24−28). In the United
States, government measures aimed at controlling the outbreak soon
followed, starting with emergency and disaster declarations issued at the
national level, and in every state by March 17, 2020. (A-35−A36 ¶¶ 29−31).

By the end of March, roughly 95% of Americans were subject to a
mandatory "stay-at-home" order issued by their state or local governments,

typically requiring them to isolate from others and refrain from all non-essential travel. (A-37–A-38 ¶¶ 35–39). Further forms of mandatory quarantines were imposed on interstate and international travelers. (A-39 ¶¶ 41–42).

As described below, public health measures requiring isolation and prohibiting certain types of travel specifically applied to Insureds and prevented them from taking their covered trips.

### 1. Melissa Garner

Garner planned to travel from Oregon to Florida from April 24 to 27, 2020. (A-62 ¶ 121). An Oregon order applicable to Garner during that time required: "that, to the maximum extent possible, individuals stay at home .... Individuals are directed to minimize travel, other than essential travel ..." (A-63 ¶ 123; A-265 ¶ 1(a); A-271 ¶ 22). Failure to comply with the executive order constituted a misdemeanor. (A-268; *see also* Or. Rev. St. § 401.990). A "stay-at-home" order was also in effect in Florida during the dates of her planned trip. (A-63 ¶ 123).

### 2. Kristen Johner

Johner intended to travel to Costa Rica from September 8 to 22, 2020. (A-53 ¶ 93). Costa Rica closed itself to foreign visitors beginning on

14

March 18, 2020, and did not lift the entry ban applicable to Johner until November 1, 2020. (A-53−A-54 ¶ 95).

### 3. Amitabh Sharma

Sharma planned to fly to Hawaii and then vacation there from May 13 to 20, 2020. (A-49 ¶ 80). Hawaii issued a quarantine order for incoming visitors that remained in effect throughout the dates of his planned vacation, and it would have required him to quarantine for the entire duration of his trip. (A-49 ¶ 82; *see also* A-45−A-46 ¶ 67 (quoting text of quarantine order)).

### 4. Renee Clonts

Clonts scheduled a trip from Georgia to Florida between May 8 to 13, 2020, to a resort in Panama City Beach, Florida. (A-60 ¶¶ 115−16). Both states issued stay-at-home orders that remained in effect throughout the month of April, 2020. (A-61 ¶ 118). Unable to anticipate exactly when the restrictions would be lifted, Clonts cancelled her travel plans on April 7, 2020. (A-61 ¶ 119).

### 5. Rebecca Oglevee

Oglevee planned to fly from Pennsylvania to Key West, Florida and then vacation there from March 17 to 24, 2020. (A-54 ¶¶ 98−99). Oglevee tracked the news reports about Key West, Florida, accurately predicted that

15

her travel would be disrupted by the pandemic and related travel impediments, and cancelled her vacation two days prior to departure. (A-55–A-56 ¶¶ 100–03). In the middle of her planned vacation dates, Key West indeed officially closed to tourists and implemented quarantine requirements for visitors. (A-55–A-56 ¶ 101). A stay-at-home order applicable at her residence in Allegheny County, Pennsylvania, also took effect in the midst of her planned travel dates. (A-56 ¶ 102).

### 6. Howard Morris and Gary Schrader

Morris and Schrader were scheduled to take cruises that were cancelled by their operators prior to departure. (A-67 ¶ 141; A-68 ¶ 146).[3]

### D. Generali Denied Insureds' Requests for Coverage and Did Not Return Unearned Premiums

Each Insured seeking trip cancellation coverage filed a claim for Policy benefits with Generali, which was subsequently denied. (A-50 ¶ 84 (Sharma); A-54 ¶ 96 (Johner); A-55 ¶ 101, A-56 ¶ 104 (Oglevee); A-61–A-62 ¶ 119 (Clonts); A-63 ¶ 124 (Garner)). Morris repeatedly requested that Generali return some or all of his premium, but he never received a response. (A-67 ¶ 142). Neither Morris nor Schrader received any returned premiums from Generali. (A-66 ¶¶ 136–38).

---

[3] Morris and Schrader do not seek trip cancellation coverage benefits.

## SUMMARY OF ARGUMENT

In exchange for prepaid premiums, Generali agreed to cover some of the financial losses Insureds would suffer if they were prevented from taking their vacations due to being quarantined. Under a reasonable reading of the Policies as applied to the facts, that is precisely what happened to Insureds Clonts, Sharma, Johner, Garner, and Oglevee, so Generali should have paid their claims. But before addressing whether Insureds' trip cancellations fit under this coverage provision, the district court first determined that it would not have mattered. The district court found that Insureds were prevented from taking their trips due to "travel restrictions imposed for a certain area by governmental authority," a general exclusion under the Policies.

That decision was an error under the law of each Insureds' home state because it allowed a general exclusion to completely eliminate a more specific coverage in a "named perils" policy. *All* conceivable government-imposed quarantines are also travel restrictions that prohibit someone's travel to or from a certain area. The one and only way to resolve the tension between the quarantine coverage and the "certain area" exclusion—while preserving any quarantine coverage at all—is to read the more specific coverage as overriding the more general exclusion. And that is exactly what

17

established insurance and contract law precedents instruct courts to do under these circumstances.

In this case, the legally correct reading of the Policies must be that travel restrictions, even those implicating "a certain area," do not fit within the general exclusion if the restrictions are for the purpose of preventing the spread of disease. This interpretation is reasonable because it saves the quarantine coverage while preserving the general exclusion. For example, restrictions for the region around the Chernobyl nuclear plant, or Cuba, or a conflict zone, would all fit within the general exclusion.

The district court then held that Insureds were not entitled to coverage regardless of the general exclusion, and this was also error. At the most general level, a quarantine is reasonably understood as a restraint on a person's freedom of travel for the specific purpose of reducing the likelihood of disease transmission. The Policies purport to provide a more specific definition of quarantine: "the enforced isolation of you or your Traveling Companion, for the purpose of preventing the spread of illness, disease, or pests." (A-148, p. 9).

Even with this definition, a reasonable application to Insureds' allegations should result in a finding of plausible entitlement to coverage because there is still an ambiguity in the Policies: "isolation" is something

that comes in relative degrees, but the *degree* of isolation required by the Policies—such as the scope of other people or places one must be isolated *from*—is not something specified therein.

In dismissing Insureds' claims, the district court applied an extreme definition of "isolation." Insureds alleged facts showing they were subjected to orders and conditions requiring them to stay at home and refrain from traveling to their planned destinations, for the sole purpose of reducing the likelihood that they would transmit or be exposed to the COVID-19 virus. They were in a state of isolation as compared to their pre-pandemic lives, and in a way that prevented them from traveling on their planned trips. Under a reasonable interpretation of the Policies, they stated a claim for quarantine coverage.

Three of the Insureds also paid for coverage that applied if they were prevented from reaching their destinations using the original mode of transportation due to natural disaster. Again, under an objectively reasonable reading of the Policies' language, COVID-19 was a natural disaster and prevented Insureds from traveling to their accommodations as intended. The district court addressed only one of the Insureds' claims under this provision, and held that she was not prevented by COVID-19 from reaching her destination because no governmental quarantine order

was in place on her departure date, after she had already cancelled the trip. That decision was in error because the Insureds alleged sufficient facts to show that their cancellations and losses occurred at times when they reasonably believed their accommodations were inaccessible due to the COVID-19 natural disaster, regardless of the effective dates of any government orders.

Insureds Morris and Schrader brought unjust enrichment claims, seeking restitution in the form of return of the portion of their prepaid premiums charged for, and attributable to, post-departure coverages. Generali could not possibly have earned the entire prepaid premiums because the post-departure coverage terms never began under the Policies. The district court incorrectly dismissed this claim based on the Policies' statement that premiums are "nonrefundable." But in a prepaid contract for multiple distinct services—such as these Policies with their bundling of discrete coverage lines—the word "nonrefundable" should not be interpreted to mean that a party is permitted to only partially perform while retaining the entire prepayment. Contract law and principles of equity require Generali to return the portion of Insureds' premium payments charged for, and attributable to, the various post-departure coverages that Insureds never received and Generali never provided.

## **ARGUMENT**

### I. **Standard of Review**

This Court reviews *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006).

When evaluating the sufficiency of a complaint's allegations while deciding a motion under Rule 12(b)(6), a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 213 F. Supp. 3d 631, 649 (S.D.N.Y. 2016) ("*Gold*") (citing *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Gold*, 213 F. Supp. 3d at 649 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plausibility is not certainty. *Iqbal* does not require the complaint to allege facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Gold*, 213 F. Supp. 3d at 649–50.

#### A. **Legal Standards Governing Interpretation of Insurance Contracts**

The parties did not dispute below that Insureds' breach of contract claims are governed by the laws of Georgia (Clonts), Utah (Sharma),

Pennsylvania (Oglevee), Missouri (Johner), and Oregon (Garner). (SA-9). In all relevant states, interpretation of an insurance policy is a question of law for the court, and if the policy's terms are clear and unambiguous, the court may determine and enforce the parties' intentions with reference to the plain meaning and context of the contract, taken as a whole. *See Winders v. State Farm Fire and Cas. Co.*, 359 F. Supp. 3d 1274, 1277 (N.D. Ga. 2018); *Bear River Mut. Ins. Co. v. Williams*, 153 P.3d 798, 801 (Utah 2006); *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (en banc); *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005); *Rhiner v. Red Shield Ins. Co.*, 208 P.3d 1043, 1045 (Or. Ct. App. 2009).

Specific terms override general terms, especially when there is an inconsistency or conflict between a specific and general term. *See Columbia Cas. Co. v. SMI Liquidating, Inc.*, 909 F. Supp. 2d 1303, 1317 (D. Utah 2012) ("[I]t is a basic rule of construction that the specific controls the general."); *General American Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 133 (W.D. Mo. 1993) ("A pertinent rule of construction is that specific terms and provisions of a contract are given preference over general ones."); *Trombetta v. Raymond James Financial Services, Inc.*, 907 A.2d 550, 560 (Pa. Super. Ct. 2006) ("Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the

same agreement. Furthermore, the specific controls the general when interpreting a contract.") (citations omitted).

### 1. Ambiguities must be resolved in favor of Insureds

"An ambiguity in a contract may arise (1) because of vague or ambiguous language in a particular provision or (2) because two or more contract provisions, when read together, give rise to different or inconsistent meanings." *Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 798 (Utah 2004) (internal quotation marks and citation omitted); *see also 401 Fourth St., Inc.*, 879 A.2d at 171; *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009) (en banc); *Leach v. Scottsdale Indemn. Co.*, 323 P.3d 337, 343–44 (Or. Ct. App. 2014); *Lincoln Nat'l Health & Cas. Ins. Co. v. Brown*, 782 F. Supp. 110, 113 (M.D. Ga. 1992).

Moreover, "it is well-settled that where one section of an insurance policy promises coverage and another takes it away, the contract is ambiguous." *Ritchie*, 307 S.W.3d at 141.

Any ambiguities or inconsistencies in the Policies must be resolved in favor of Insureds. *See 401 Fourth St., Inc.*, 879 A.2d at 171 ("When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured."); *Lincoln Nat'l Health & Cas. Ins. Co.*, 782 F. Supp. at 113; *Ritchie*, 307 S.W.3d at 141; *I-L Logging Co. v. Manufacturers &*

23

*Wholesalers Indem. Exch.*, 275 P.2d 226, 232 (Or. 1954) (en banc);

*Whitlock v. Old Am. Ins. Co.*, 442 P.2d 26, 28 (Utah 1968) ("[T]he insured is entitled to the broadest coverage he could reasonably understand from the policy.").

## II.    The District Court Erred in Deciding that the General Exclusion for "Travel Restrictions Imposed for a Certain Area" Defeated the Insureds' Claims

The district court erred when it held that all Insureds' travel cancellation circumstances fell within the Policies' general exclusion for "travel restrictions imposed for a certain area by governmental authority." (SA-11–SA-12). The court's construction of this exclusion broadly expanded it to mean any "travel restriction," and in doing so gave no meaningful effect to the phrase "for a certain area" in the exclusion.

The orders in question were not directed towards "a certain area"— instead, the orders operated against categories of individuals and imposed travel restrictions across the authorities' entire jurisdictions. If "certain area" is interpreted to mean *everywhere* within *the entire territory* of a government's jurisdiction (e.g., all of a county, state, or country), then "certain area" loses any distinct meaning in the policy. *All* travel restrictions imposed by a governmental authority must restrict *somebody* from going

*somewhere*, but the exclusion must be read more narrowly than that because all forms of government-imposed quarantines do the same thing.

The district court's expansive reading of the exclusion is impermissible because it would render quarantine and certain other covered events illusory. Any government-imposed quarantine carries with it, by definition and logical implication, a travel restriction for at least one certain area. A quarantine is therefore a *more specific* form of a "travel restriction imposed for a certain area," and because this coverage is more specific than the general exclusion, it must be given full effect. The only way to do that is by interpreting the exclusion so as to carve out any form of quarantine intended to reduce the transmission of disease.

> **A.    Broad policy exclusions cannot be construed or applied in a way that renders illusory a specific coverage provision in a named peril policy, but instead must be read narrowly so as to provide the coverage reasonably anticipated by the insured.**

The canon of interpretation requiring that specific policy terms control over general terms is particularly applicable to named perils policies like those involved here. Named perils polices, in contrast to all-risk policies, only require that the policyholder prove that a specific event provides coverage. *See generally Bolinger v. Clark Fork Mut. Ins. Co.*, 485

S.W.3d 803, 808–11 (Mo. Ct. App. 2016). Once done, the burden then shifts to the insurer to prove an applicable exclusion. *Id.*

General exclusions cannot be interpreted in a way that would eliminate a specific named peril, because doing so renders the coverage illusory and deprives the insured of a reasonably anticipated benefit of the bargain. *See, e.g., Pitt v. Leonberger*, 528 S.W.3d 1, 14–16 (Mo. Ct. App. 2017) (holding an insurer is not permitted to "broaden its exclusion to swallow the coverage . . . We strictly construe exclusions narrowly against the insurer."); *Great Northern Ins. Co. v. Greenwich Ins. Co.*, 2008 WL 2048354, at *4 (W.D. Pa. May 12, 2008) (finding that an illusory coverage provision exists "if an exclusion provision would effectively preclude coverage for all risks reasonably anticipated by the parties under a particular coverage provision."); *U.S. Fire Ins. Co. v. Hilde*, 322 S.E.2d 285, 288 (Ga. Ct. App. 1984) (internal citation omitted) ("[W]e have a situation where one provision of the policy excludes liability and another accepts liability . . . [they] are repugnant to one another."); *Harris v. Zurich Holding Co. of America, Inc.*, 2006 WL 120258, at *3–7 (D. Utah Jan. 17, 2006) ("[A]ny possibility of coverage existing in such an area is so insignificant that the coverage so provided is illusory."); *Leander Land &*

*Livestock, Inc. v. Am. Economy Ins. Co.*, 2013 WL 1786348, at *9 (D. Or. April 21, 2013). This is the law of the land.

### B. The district court's broad interpretation of the exclusion is impermissible because it renders entire, specific coverage provisions illusory.

The district court failed to follow this canon when it held that the general exclusion applied to all Insureds' trip cancellations. *Any* conceivable government-imposed quarantine applicable to persons is also necessarily a travel restriction for a certain area. Under any definition, if a quarantine is intended to prevent the spread of disease, it must, to some extent, restrict *someone* from going *somewhere*. Dictionary definitions of the verb form of quarantine reflect this: "1: to detain in or exclude by quarantine; 2: to isolate from normal relations or communication." Merriam-Webster, QUARANTINE, https://www.merriam-webster.com/dictionary/quarantine.

"Detain," "exclude," and "isolate" all describe restrictions of movement. The pertinent definitions of the noun form are similar:

> 2a: a term during which a ship arriving in port and suspected of carrying contagious disease is held in isolation from the shore

> 3a: a restraint upon the activities or communications of persons ... designed to prevent the spread of disease or pests

> 4: a state of enforced isolation

*Id.*

A quarantine of a ship restricts the persons on the ship from disembarking at their intended destination. If ordered to strictly quarantine at home or in a hospital ward, a person is restricted from leaving that area and entering any other. And such quarantines, to be effective, must apply reciprocally as well, by prohibiting some or all *other* persons from a certain area. Similarly, forms of quarantine applicable to larger areas restrict certain or all persons from either entering or leaving the cordoned area.

Because any type of quarantine is necessarily a *more specific* form of "travel restriction for a certain area," the more specific quarantine coverage provision must control and limit the broader general exclusion. Otherwise, no quarantine coverage exists, and the Policies' provision would be illusory.

The district court rejected this argument, erroneously concluding that something would yet remain of the quarantine coverage. (SA-13). To illustrate its view, the district court offered an example of a "true quarantine" as being "a person who came into contact with an infected person and was therefore required not to leave their home." (SA-14).

This reasoning fails to recognize that there is no difference whatsoever in the geographical scope of restriction when comparing a stay-at-home order and the district court's example of a "true quarantine." Both

impose a travel restriction on exactly the same area—anywhere other than the subject person's home. And to be effective at preventing the spread of disease, the paradigmatic "true quarantine" also must reciprocally restrict others from traveling *into* the subject person's home. Otherwise, the quarantine would be an empty gesture, not prohibiting close contact with the person suspected of being contagious. Following the district court's own reasoning, the "true quarantine" example inevitably falls within the general exclusion, as it was construed by the district court.

A correct interpretation of the general exclusion that brings it into harmony with the coverage provisions would limit it to: a travel restriction for a certain area, issued for a reason *other than:* 1) the prevention of contagious disease transmission; or 2) a mandatory evacuation due to adverse weather or natural disasters. This latter limitation is required by a separate covered event in the Policies that insures against certain mandatory evacuations. (*E.g.*, A-150, p. 16 ¶ 8).

The district court's broad interpretation of the general exclusion would destroy the quarantine coverage, the mandatory evacuation coverage, *and* even a third coverage for when an insured is unable to enter a destination country due to a vaccination requirement that the insured cannot comply with for a medical reason. (A-150, p. 17 ¶17). All three

coverages explicitly cover *more specific* forms of travel restrictions for a certain area, so the general exclusion must be narrowed to preserve them.

The Insureds' interpretation of the general exclusion does not come close to rendering it a nullity, despite the district court's belief that there "is no plausible construction of the Exclusion that does not cover the plaintiffs' cancellations." (SA-12). Insureds' interpretation would preserve their coverage but also permit a wide variety of common or notorious governmental travel restrictions to remain excluded. Ready examples include: the Chernobyl or Fukushima exclusion zones,[4] a general prohibition on tourism for political reasons (such as the one from the United States to Cuba),[5] closure of a government-controlled region, such as a national park or "Area 51" (if for a reason other than a natural disaster

---

[4] Felicity Barringer, *Kiev Journal; In Chernobyl's Zone, Streets Are Still Vacuumed*, N.Y. Times, Dec. 15, 1986 at A4 ("[I]t seemed clear on a recent trip to the area by Western correspondents that firsthand access to the plant and the evacuated area about 18 1/2 miles around it is still tightly restricted."); Keith Bradsher, *Japan Prohibits Access to Nuclear Evacuation Zone*, N.Y. Times (April 20, 2011), https://www.nytimes.com/2011/04/21/world/asia/21japan.html ("[B]eginning at midnight, no one would be allowed to enter the 12-mile zone around the reactors without official permission.").
[5] *See* 31 C.F.R. § 515.560.

evacuation or disease control), and any kind of travel restriction related to military conflict.

The cases cited by the district court in support of its interpretation are all factually inapposite. In one, a court found no inconsistency between a coverage term and an exclusion because a reading of the policy's unambiguous coverage term gave no suggestion of coverage for bodily harm resulting from intentional assault. *Todd v. Missouri United Sch. Ins. Council*, 223 S.W.3d 156, 162–68 (Mo. 2007) (en banc). Here, the Policies unambiguously must provide some kind of quarantine coverage, but as previously explained, the district court's broad interpretation of the general exclusion would preclude coverage for *any* form of quarantine.

Aside from *Todd*, the district court cited to several other cases where an exclusion was found to be controlling over a coverage provision. (SA-12). All these cases involve *general* liability coverage and *specific* exclusions thereto, the reverse of the types of provisions involved here. *See Mays v. Transamerica Ins. Co.*, 799 P.2d 653, 585 (Or. 1990) (general liability insurance policies specifically excluded losses caused by long-term and intentional discharge of pollution); *Alf v. State Farm Fire & Case. Co.*, 850 P.2d 1272, 1275 (Utah 1993) (all risk homeowner policy specifically excluded losses due to earth movement); *Fidelity Nat. Title Ins. Co. of New*

*York v. OHIC Ins. Co.*, 619 S.E.2d 704, 705 (Ga. Ct. App. 2005) (professional liability insurance policy specifically excluded losses due to conversion, misappropriation, and commingling of client funds); *John J. Curry & Son v. Harleysville Mut. Ins. Co.*, 11 Pa. D. & C.4th 521, 527–28 (Pa. Ct. Com. Pl. 1991) (finding that specific faulty workmanship exclusions in general liability policy created no ambiguities).

The additional cases cited by the district court are in accord with Insureds' position that a general exclusion may not wholly eviscerate a specific coverage. (*See generally* cases cited at SA-13). Here, the general exclusion as construed by the district court *would* eviscerate the quarantine coverage, and two others, so those cases do not support affirmance. The district court's application of the exclusion to all Insureds was error.

## III. Insureds Plausibly Alleged Entitlement to the Quarantine Coverage.

The Policies provided coverage for when the Insureds were "prevented from" taking their trips "due to" "Being … Quarantined."). (*E.g.*, A-150, p. 16). "Quarantine" is defined in the Policies as "the enforced isolation of you or your Traveling Companion, for the purpose of preventing the spread of illness [or] disease." (A-148, p. 9).

Without much elaboration, the district court reasoned that no Insured was subjected to "enforced isolation" when they "were permitted to

leave their homes for several purposes, including to see other people." (SA-17–SA-18). By implication, the definition of "isolation" employed by the district court must be one that only includes complete solitary confinement. While the generally understood meaning of "isolation" certainly *encompasses* complete and utter solitude, that meaning is surely not the *only* reasonable interpretation of "isolation" as it appears in these Policies. Indeed, the Policies are ambiguous about the *degree* of isolation required.

### A. "Isolation" is an ambiguous term under the Policies and in this context.

"Isolation" and its verb form "isolate" are not absolute terms on their own.[6] They can plainly and reasonably apply to scenarios of varying degrees, and in a variety of contexts. The Policies' use of "isolation" therefore engenders ambiguities: *how* isolated must one be to be "quarantined" under the Policies? *From whom* must one be set apart? Must an authority place a physical restraint to impose isolation, or can isolation be imposed by an order with which the subject is expected to comply? The

---

[6] Merriam-Webster, ISOLATION, https://www.merriam-webster.com/dictionary/isolation ("[T]he action of isolating : the condition of being isolated."); Merriam-Webster, ISOLATE, https://www.merriam-webster.com/dictionary/isolate ("1: to set apart from others ... 2: to select from among others."); Macmillan Dictionary, ISOLATION, https://www.macmillandictionary.com/us/dictionary/american/isolation ("the state of being separated from other people.").

term permits multiple reasonable interpretations and the Policies do not foreclose any of them.

To start with an obvious example of what no one can dispute is "enforced isolation," all prisoners in a correctional facility are by law physically separated (isolated) from *most* of society. But those in the "general population" are not isolated from each other, and even those in a "solitary confinement cell" may come into relatively close contact with correctional officers or visitors. *See generally Colon v. Howard*, 215 F.3d 227, 229–30 (2d Cir. 2000) (recounting undisputed facts about segregated housing unit confinement in New York).

Even in the classic example of a quarantined ship, those on board would be isolated from those on shore, but not from each other. The ship might even be permitted to return to its port of origin or go somewhere else, so it may only be "isolated" from the port(s) imposing the quarantine. And there are historical examples of "cordon sanitaire" quarantines, where travel into or out of a larger area was restricted, but people were generally free to interact within the quarantined areas, and those on the outside were "isolated" from the cordoned area, but nowhere else. *See generally Smith v. Turner*, 48 U.S. 283, 340–41 (1849) (describing yellow fever outbreak in 1798 leading to cordon sanitaire around Philadelphia, and travel ban

between Pennsylvania and New York); *Jew Ho v. Williamson*, 103 F. 10 (N.D. Cal. 1900) (quarantine imposed on a district in San Francisco to contain bubonic plague).

Complete solitude is not even a certainty in the example of "true quarantine" provided by the district court, in which "a person who came into contact with an infected person and was therefore required not to leave their home." (SA-14). If the subject person lived with a large family, or in a rural area, the person might lawfully be able see other people (housemates, who might also be quarantined, or not), or walk around their property.

In sum, many varieties of public health measures understood as "quarantines" require an *increase* in isolation relative to normal times, and relative to *some* other people, but not to the point of complete and utter solitude. When interpreting an ambiguous insurance contract, the district court's utilization of only the most restrictive definition of "isolation" to deny coverage was error.

## B. Insureds' factual allegations demonstrated "enforced isolation."

The stay-at-home, quarantine-on-arrival, and entry ban orders resulted in conditions reasonably understood by anyone as "enforced isolation" when compared to pre-pandemic times, and with respect to the places Insureds were planning to go. As the Insureds clearly alleged, these

orders and conditions directly interfered with, and prevented them, from taking the trips they planned.

The Oregon order applicable to Garner required: "that, to the maximum extent possible, individuals stay at home .... Individuals are directed to minimize travel, other than essential travel ..." (A-265 ¶ 1(a); A-271 ¶ 22). Failure to comply with the order constituted a misdemeanor. (A-268; *see also* Or. Rev. St. § 401.990). In plain text, Garner was under an order to isolate herself from the general population, subject only to specific exceptions, which did not include her planned travel.

Johner was completely prohibited from entering Costa Rica, and therefore isolated from it. (A-53 ¶ 95). Sharma, who was planning to travel to Hawaii, would have been "subject to mandatory self-quarantine" upon arrival for the entirety of his vacation. (A-50 ¶ 82; *see also* A-45–A-46 ¶ 67 (quoting text of quarantine order)).

As for Oglevee, Key West closed to tourists in the middle of her planned trip, so she would have been quarantined had she traveled there, and she was subject to a Pennsylvania stay-at-home order before her trip would have ended. (A-55–A-56 ¶¶ 101–03). Clonts's trip was cancelled while she was subject to Georgia's stay-at-home order and a similar order affected her destination, Florida. (A-60–A-61 ¶¶ 116–19).

36

The district court relied on a combination of its strict definition of "enforced isolation" and overly technical nuances of timing to find that the orders "did not arise before the plaintiff's departure, or … did not prevent the plaintiff from taking the trip," and therefore Insureds were not covered. (SA-20–SA-21). This was error.

The design of trip cancellation coverage in the Policies both allows and requires Insureds to exercise some degree of their own judgment and discretion, *prior to departure*, in deciding whether they are "prevented" from taking their planned trip due to a covered event. Most covered events in the Policies would not *physically restrain* persons from departing on trips or arriving at destinations, so "prevent" in the sense of the Policies must mean something broader than a physical impediment.

Examples of such coverages include: a family member's death, a person's home becoming uninhabitable, jury or military duty, job loss, a terrorist act in a city along the planned route, being required to take an academic exam, interruption of utility services at a destination, and a scheduled adoption proceeding. (*See* A-164–A-165). Not one of these events physically prevents travel. Similarly, unless a quarantine is enforced with a physical restraint or 24-hour surveillance by law enforcement, the subject is

technically not "prevented" from freedom of movement by direct physical force.

Accordingly, Insureds must, to some extent, be able to assess for themselves whether they are "prevented" from taking their planned trips, within the meaning of the Policies. If the Insured's exercise of judgment in cancelling a planned trip for one of the covered reasons was reasonable in light of the information available to the Insured at the time, Generali should not be permitted to avoid coverage just because, in retrospect, the Insured could have *possibly* or *physically* started the trip as scheduled, without regard to the potential legal consequences, risks, or other complications.

Returning to the Insureds' situations: At the time of her scheduled departure, Garner was prohibited by law from engaging in nonessential travel. It cannot be reasonably disputed that she was subject to enforced isolation in a way that legally prevented her from taking her planned trip.

Sharma and Johner *knew* they would be quarantined upon arrival at their destination or refused entry altogether. This Court should reject the notion that they are not entitled to coverage because they prudently cancelled *before* departure—as encouraged by the Policies—rather than

engaging in the futile and risky gesture of traveling, or attempting to travel, to their unreachable destinations.

Clonts was subject to a stay-at-home order when she prudently cancelled her travel plans. The happenstance that the order was lifted shortly before she was scheduled to depart should not defeat her coverage claim, because the Policy allowed *and required* her to make a judgment call at some point prior to departure.

Oglevee accurately anticipated that the rapid spread of COVID-19 would interfere with her planned travel. As with Clonts, the Policy both offered and required that she exercise some discretion, *in advance of departure*, in deciding whether she was prevented from taking her planned trip. She chose correctly, and in retrospect, it is clear that she could not have practically taken her vacation without violating orders at her destination and in her home state and county.

As detailed above and in the complaint, the Insureds' allegations that they were entitled to the quarantine coverage in the Policies were plausible under a reasonable construction of the Policies and its plain terms. This Court should reverse the district court's dismissal of their breach of contract claim under that provision.

## IV. Clonts, Johner, and Garner Were Entitled to Natural Disaster Coverage.

The district court held Clonts did not state a claim for coverage under the "natural disaster" provision because "[t]he stay-at-home orders in Georgia and Florida expired before Clonts's trip began, and the quarantine requirement imposed by Florida . . . did not cover travelers coming from Georgia. As such, none of these made it impossible for her to reach her accommodations by her original means of transportation." (SA-21–SA-22).

The district court did not specifically address Johner or Garner's claims under the natural disaster coverage, so presumably their claims were dismissed due to the district court's application of the "certain area" general exclusion to all Insureds. For the reasons described in Section II above and revisited below, that was error. Clonts, Johner, and Garner all stated valid claims for this coverage.

### A. COVID-19 is and was a natural disaster, and prevented Insureds from reaching their accommodations by any mode of transportation.

While the district court did not address whether the COVID-19 pandemic is or was a "natural disaster" within the meaning of the Policies, COVID-19 clearly fits the definition. The Policies do not further define "natural disaster." Undefined words in an insurance contract are to be given their ordinary meaning. (*See* cases cited *supra*, pp. 21–22). Further,

40

insurance policies are to be construed, and any ambiguities resolved, in favor of the Insured's reasonable expectations. (*See* cases cited *supra*, pp. 21–22).

Black's Law Dictionary defines "natural" as "[b]rought about by nature as opposed to artificial means," "disaster" as "[a] calamity; a catastrophic emergency," and "natural disaster" as "[a] natural event that causes great damage or loss of life such as a flood, earthquake, or hurricane." *See* NATURAL, Black's Law Dictionary (11th ed. 2019); DISASTER, Black's Law Dictionary (11th ed. 2019); NATURAL DISASTER, Black's Law Dictionary (11th ed. 2019).[7]

Many courts have found that COVID-19 is a "natural disaster." *See, e.g.*, *Easom v. US Well Servs.*, 2021 WL 1092344, at *8 (S.D. Tex. Mar. 19, 2021) ("COVID-19 also qualifies as a 'natural' disaster because human beings were not responsible for starting or consciously spreading the virus."); *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 7405262, at *6 (S.D.N.Y. Dec. 16, 2020) ("It cannot be seriously disputed that the COVID-19 pandemic is a natural disaster."); *Friends of Danny*

---

[7] Similarly, Merriam-Webster defines "natural" as "existing . . . [or] coming from nature," and "disaster" as a "sudden calamitous event bringing great damage, loss, or destruction." Merriam-Webster, NATURAL, https://www.merriam-webster.com/dictionary/natural; Merriam-Webster, DISASTER, https://www.merriam-webster.com/dictionary/disaster.

*DeVito v. Wolf*, 227 A.3d 872, 888–89 (Pa. 2020), *cert. denied*, 141 S. Ct. 239, 208 L. Ed. 2d 17 (2020) (holding that "the COVID-19 pandemic qualifies as a 'natural disaster'"); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster."); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *58 (Del. Ch. Nov. 30, 2020) ("The COVID-19 pandemic arguably fits [the agreement's] definition [of natural disaster]"); *see also Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1316 (N.D. Ga. 2020) (analyzing COVID-19 and "other natural disaster" cases); *Casey v. Lamont*, 258 A.3d 647, 490–92 (Conn. 2021) (finding that COVID-19 is a "major disaster" like "any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm or drought"). The conclusions and reasoning in those cases apply equally here.

COVID-19 undoubtedly is a natural disaster, and it was when it prevented Insureds from taking their trips in 2020. It is a virus (thus, a

product of nature) that, to date, has caused one million deaths in the United States alone, [8] so it is a disaster.

Generali argued below that within the Policies, "natural disaster" should be read more narrowly than its plain meaning because the coverage provision is a list: "fire, flood, volcano, earthquake, hurricane, or other natural disaster." (A-378). According to Generali, *ejusdem generis* requires limiting "natural disaster" in the policy as limited to "environmental, geological, or weather-related events ... that can destroy access to particular locations for limited periods of time." (A-122). But the list itself defies this limitation. Floods, volcanoes, earthquakes, and hurricanes can all destroy access to broad regions for indefinite periods of time. And the provision is actually ambiguous as to whether it would cover unintentional fires caused by human activity (e.g., an electrical fire, an out-of-control campfire, etc.), so the list is not necessarily limited to "environmental, geological, or weather-related events." Under a reasonable construction of this provision, COVID-19 only needs to be "natural," and a "disaster," and it is clearly both.

Despite the district court's conclusion that the natural disaster coverage would have been defeated by the "travel restrictions imposed for a

---

[8] *See CDC COVID Data Tracker*, Centers for Disease Control and Prevention, available at: https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last accessed May 2, 2022).

certain area" general exclusion, here, COVID-19 was the underlying natural disaster causing inaccessibility.

If a flood or volcanic lava flow washes out a road, and the local government responds by closing the road or an area served by it, the natural disaster is the efficient proximate cause of inaccessibility, not the government order. In the same way, the stay-at-home and quarantine orders, entry bans, and emergency declarations preventing travel to, or utilization of, Insureds' vacation rentals were a cause of Insureds' losses, but not the efficient proximate cause—the COVID-19 natural disaster was.

In addition, and as previously explained in Section II, the general exclusion cannot be interpreted in a way that eliminates all or most a specific named peril coverage. When a natural disaster prevents access to accommodations, as required under the coverage, the coverage should not be defeated by a concomitant or subsequent government travel restriction for that area. If that were the case, not only would the natural disaster coverage be rendered illusory, but so too would the mandatory evacuation coverage. (*E.g.*, A-150, p. 16 ¶ 8). These two specific coverages do not meaningfully exist under the Policies unless government travel restrictions related to natural disasters are *carved out of* the "certain area" general exclusion so to preserve those coverages.

The COVID-19 disaster prevented Insureds Johner, Garner, and Clonts from taking their trips. Johner booked a trip to Costa Rica from September 8 to 22, 2020, but was banned from entering the country when Costa Rica declared that COVID-19 created a national state of emergency. (A-53–A54 ¶¶ 93–96). Costa Rica's COVID-19 emergency declaration and travel ban as to Johner continued until November 1, 2020. (*Id.* ¶ 95). She could not have reached her destination and accommodation by her "original mode of transportation" or any mode of transportation because of COVID-19 and subsequent governmental orders aimed to stop its spread.

Similarly, Garner was unable to fly to Florida as she was subject to Oregon's stay-at-home order, enacted on March 23, 2020. (A-62–A-63 ¶¶ 120–24). The order was a subsequent governmental reaction to the COVID-19, and both the order and the COVID-19 disaster itself prevented Garner from traveling for leisure. (A-63 ¶ 123).

Clonts's travel was scheduled to begin May 8, 2020, but the trip was cancelled on April 7, 2020, while she was subject to Georgia's stay-at-home order. (A-60–A-61 ¶¶ 116–19). The district court's holding that her accommodations were not "inaccessible" because the stay-at-home orders in Georgia and in Florida expired before her trip departure date is an unreasonable construction of the Policies.

45

Insureds were required and permitted by the Policies to make a reasonable prediction, before departure, of whether their accommodations could be reached. Clonts reasonably and justifiably surmised at the time she cancelled her trip—and while subject to a stay-at-home order of unpredictable duration—that she would not be able to reach her accommodation as a result of the COVID-19 pandemic, a natural disaster.

But under the district court's application of the coverage to Clonts's circumstances, factual developments subsequent to her cancellation "unprevented" her from reaching her accommodations and meant coverage is not available. That makes no sense. Insureds' losses occurred at the time of cancellation and cannot be undone. Events *subsequent* to the date of cancellation cannot retroactively make the cancellation unreasonable as of the date it occurred. Clonts is entitled to the natural disaster cancellation coverage

This Court should reverse the district court's dismissal of the breach of contract claim for natural disaster trip cancellation coverage.

**V.** **The District Court Erred in Dismissing the Unjust Enrichment Claim Challenging Generali's Retention of Unearned Premiums Attributable to Post-Departure Coverages.**

By the terms of the Policies, all but one distinct coverage (trip cancellation) never took effect for either Insureds Morris or Schrader, and thus Generali never really had to bear the vast majority of the risks it was paid to cover. (A-225–A-226 ("Eligibility and Effective Dates" provision in Morris Policy, showing only trip cancellation coverage begins before date of departure); A-244 (same provision in Schrader Policy)).

Insureds' claim for unjust enrichment for the return of their prepaid, unearned premiums was well-pled under Pennsylvania and Florida law. Insureds alleged that certain post-departure coverages did not "begin" until the *later* of: (1) the date the premium payment has been received; (2) the date and time their trip started; or (3) 12:01 am on the Scheduled Departure Date, and that cruise operators' advance cancellations of their trips meant that the post-departure coverages never took effect. (A-64 ¶¶ 128–30; A-67–68 ¶¶ 141, 144).

Because the Policies provided that the post-departure coverage did not start until their trips began, and their trips were cancelled before then, Generali never assumed any risk associated with the perils of post-

departure travel, entitling Insureds to a return of their premiums associated with the coverage of post-departure risk. (A-66 ¶¶ 136–37).

A longstanding principle of insurance law is that when premiums are prepaid, but the risk never attaches through no fault of the insured, the insurer *must* return *any* unearned premium paid by the insured. *In re Texas Ass'n of School Boards, Inc.*, 169 S.W.3d 653, 659 (Tex. 2005) ("[T]here is no premium due until risk attaches."); *Autumn Ridge, L.P. v. Acordia of Virginia Ins. Agency, Inc.*, 613 S.E.2d 435, 438–39 (Va. 2005); *Kansas City Col. of Osteopathic Med. v. Employers' Surplus Lines Ins. Co.*, 581 F.2d 299, 301–02 (1st Cir. 1978); *Tyler v. Capitol Indem. Ins. Co.*, 110 A.2d 528, 531–32 (Md. 1955); *Parsons, Rich & Co. v. Lane*, 106 N.W. 485, 494 (Minn. 1906); *Latta v. Farmers County Mut. Fire Ins. Co.*, 313 S.E.2d 214, 215 (N.C. Ct. App. 1984); *Young Am., Inc. v. Union Cent. Life Ins. Co.*, 101 F.3d 546, 548 (8th Cir. 1996); *Lattarulo v. Nat'l Sur. Co.*, 196 N.Y.S. 98 (N.Y. Mun. Ct. 1922) (holding when a bond was filed, as required, with an application for a liquor permit, but then the permit was never issued, so that no risk ever arose on the bond, the premium had to be returned).[9]

---

[9] This general rule is also detailed in numerous treatises. *See* Plitt, Steven et al, *Couch on Insurance* § 79:8 (3rd ed. 2021 Update) ("When the risk has not attached, or where no part of the interest insured is exposed to any of

This principle arises from the nature of a contract for insurance. An insurance agreement "is an aleatory contract; that is, a contract in which a promise is conditioned on the happening of a fortuitous event, an event of chance." *In re Texas Ass'n of Sch. Boards, Inc.*, 169 S.W.3d at 658. Because the agreement to indemnify a risk is the essential consideration provided by the insurer, when circumstances lead to a failure of the risk to attach, the result is equivalent to a failure of consideration.

In other words, if two parties bet on a dice roll, but the dice roll never happens, "all bets are off," because neither party could win the bet as they initially envisioned it. Both should keep their wagers.

Consequently, under the law of contracts, and in equity, the insurer is liable for return of the premium, because it ultimately never provided the contracted-for service. It never faced a risk of losing its bet, and would be unjustly enriched by retaining the entire premium—equivalent to the wager of the insured. *See Autumn Ridge, L.P.*, 613 S.E.2d at 438; *Huntington Ins.*

---

the perils insured against, the insurer, in the absence of any fault or fraud on the part of the insured, has no claim to the premium, and must return it."); 45 C.J.S. *Insurance* § 723 (2022 Update) ("The general rule is that the insured can recover premiums paid by him or her if, without fault on his or her part, the risk has never attached."); Lord, Richard*, Williston on Contracts* § 41:21 (4th ed. 2021 Update) ("[W]hen the risk never attaches, the reason for requiring a surrender of the premium by the insurer is apparent.").

*Agency v. Wyoming County Ct.*, 127 S.E. 64 (W. Va. 1925) ("[t]he risk undertaken by the insurer is an essential element of a contract of insurance, and no premium is due from the insured unless the risk attaches.").

Applying this longstanding legal rule, four federal district court decisions have all recently recognized the plausibility—at the dismissal stage—of unjust enrichment claims against travel insurers that failed to return premiums paid for post-departure coverages under similar circumstances: namely, when the coverages do not ever begin due to trip cancellations. *See Gordon v. Arch Ins. Co.*, 2021 WL 2186392, at *5 (E.D. Pa. May 28, 2021) (applying Pennsylvania law); *Edleson v. Travel Ins. Int'l Inc.*, 2021 WL 4334075, at *5 (S.D. Cal. Sept. 23, 2021) (finding plaintiff plausibly stated a claim for unjust enrichment under California law where plaintiff alleged the premium paid for post-departure benefits was unearned because defendants never assumed any risk of having to cover post-departure risk on plaintiff's cancelled trip); *Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 980–81 (C.D. Cal. 2021) (also applying California law); *Anderson v. Travelex Ins. Servs., Inc.*, 2019 WL 1932763, at *1–3 (D. Neb. May 1, 2019) (applying Arizona law).

These cases are all directly on point and correctly resolved motions to dismiss in favor of the insureds by allowing the unjust enrichment claims to

proceed. The district court declined to follow these decisions, distinguishing them based on perceived differences between the laws of Pennsylvania and Florida on the one hand and California and Arizona and the other (SA-28), and on the Policy's inclusion of the phrase "nonrefundable" in the description of the ten-day "free look" period. (SA 29) ("The Policies . . . expressly provided that the premiums were non-refundable after ten days.").[10]

The district court's legal conclusions were in error for several reasons.

**A.  The Policies' ten-day free look period does not override or displace the established rule that insurers must return unearned premiums when the contracted-for risk does not attach.**

First, the phrase "nonrefundable" in the context of a prepaid, form, consumer contract cannot reasonably be construed as a broad waiver of the consumer's rights to receive restitution in the event of substantial nonperformance by the counterparty; nor is it a license for the counterparty to render incomplete performance and retain the entirety of a prepayment.

---

[10] The 10-day free look period is described in the Policies as follows:
    If you are not satisfied for any reason, you may cancel coverage under the policy within 10 days after receipt. Your premium payment will be refunded, provided that there has been no incurred coverage expense and you have not left on your Trip. . . . After this 10-day period, the payment for this coverage is nonrefundable.
(A-223).

*See, e.g.*, *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[T]he word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment.") (citation and quotation marks omitted); *Parker v. Arthur Murray, Inc.*, 295 N.E.2d 487, 490 (Ill. Ct. App. 1973) ("We need rely on no construction aids to conclude that plaintiff never contemplated that by signing a contract with such terms as 'NON-CANCELLABLE' and 'NO REFUNDS' he was waiving a remedy expressly recognized by Illinois courts.").

Imagine placing a bet on blackjack hand at a casino. Before the dealer can play all the cards and resolve the hand, the casino is forced to close due to a power outage. Could the casino keep your wager because it had an "all bets are nonrefundable" sign next to the table? Of course not. The wagered event never happened and the casino did not perform its end of the bargain.

The correct interpretation of the term "nonrefundable" in the Policies is that, after the ten-day free look period, the insured may not *voluntarily* cancel the coverage and receive a return of premium. Such an interpretation is consistent with the language of the Policy and Generali's legitimate interests in disallowing a unilateral Policy cancellation by the

insured after already bearing the risks *associated with the pre-departure trip cancellation coverage.*

But it was unreasonable for the district court to construe the meaning of the term "nonrefundable" so as to permit Generali to retain the premiums *associated with post-departure coverages* where, as here, the Policies were *not* voluntarily cancelled by Insureds, but were terminated before departure because the trips were cancelled by trip operators.

Another way of looking at this is that the parties made bets regarding events that might occur during two separate time periods. The first bet was resolved when the trips were cancelled for uncovered reasons, but the second bet regarding post-departure events was not resolved because the trip never started. So Generali performed for part of the contract, but it could not perform the rest. That does not mean it can keep Insureds' wagers for both bets.

The district court's dismissal of these claims allows an unjust windfall to Generali in a way that is not contemplated by any clear provision in the Policies, and is inconsistent with well-established principles of insurance law that prohibit the retention of unearned premiums in the absence of an unambiguous contractual agreement to the contrary. For this reason, similar arguments by travel insurers relying on the refund offered in "free-

look" periods have been rejected. *See Edleson*, 2021 WL 4334075, at *4 ("Plaintiff's assertion that the subject matter of the Plan does not cover refunds of the portion of the premium attributable to post-departure coverage where the trip is canceled prior to departure is a reasonable interpretation of the Plan language."); *Haas*, 555 F. Supp. 3d at 981 ("[I]t would be reasonable in this case to read the absence of a refund provision for unforeseen, no-fault events as implying that such refunds are indeed available according to applicable insurance law."); *Anderson*, 2019 WL 1932763, at *3 ("The Court disagrees that consumer dissatisfaction is the only basis for a premium refund. A consumer's satisfaction with their travel insurance purchase does not obviate the prohibition of illusory coverage in an insurance policy.").

In short, the phrase "the payment for this coverage is nonrefundable" within the Policy—but without any specific agreement as to the fate of unearned premiums for post-departure coverages in the event of involuntary trip cancellation—was an insufficient basis for the district court to hold that the contracting parties "expressly" agreed Generali could retain the entire premium paid.

### B. Pennsylvania and Florida law would not foreclose the quasi-contractual claim merely because the parties had a contractual relationship.

The district court was also incorrect in its assessment that Florida and Pennsylvania law would prohibit Insureds' claims due to the mere existence of a written contract between the parties governing the "subject matter" of the dispute. (SA-28). The Pennsylvania decision relied upon by the district court for this broad proposition, *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254–55 (Pa. 2006), is a plurality opinion joined by only three of seven justices of the Pennsylvania Supreme Court. *Id.* at 1251, 1256 (indicating opinion by Cappy, J., joined by Castille and Eakin, JJ.).

The concurring opinion, joined by two justices, expresses disagreement that the "bright-line rule that a written contract precludes recovery based on unjust enrichment" is "inviolable." *Id.* at 1256. Instead, the concurrence would recognize "the possibility that an action for unjust enrichment might lie in some set of circumstances in which services or benefits are conferred in connection with a contractual relationship that are clearly beyond the contemplation of the parties to the agreement." *Id.*

The split opinion in *Wilson* casts significant doubt on the district court's conclusion that a "bright-line" rule under Pennsylvania law prevents Schrader's cause of action. In line with the concurrence's concern, the

parties here never specifically contemplated or described in their agreement what would happen to the undoubtedly unearned portion of the premium attributable to post-departure coverage when a trip is cancelled through no fault of the insured.

Moreover, Pennsylvania courts have long recognized the basic tenet that unearned premiums attributable to failed coverages must be returned to insureds as restitution. *See Swartz v. John Hancock Mut. Life Ins. Co.*, 170 A. 355, 355–56 (Pa. Super. Ct. 1934) (affirming insured was entitled to the return of four premiums when four of five policies purchased by insured from the same insurer were later determined to be void due to a duplicative coverage prohibitions in each policy); *Infantino v. Quaker City Fire & Marine Ins. Co.*, 48 A.2d 77, 77–78 (Pa. Super. Ct. 1946) (affirming judgment in assumpsit for return of unearned premium after insurer cancelled policy, despite dispute regarding whether insured consented to issuance of policy).

Similarly, Florida courts have recognized an entitlement to return of unearned premiums under an unjust enrichment theory, regardless of the obvious fact that insureds and insurers are both parties to a contract. *See Gonzalez v. Eagle Ins. Co.*, 948 So.2d 1, 2–3 (Fla. Ct. App. 2006). The primary decision relied on by the district court, *Pierce v. State Farm Mut.*

56

*Auto Ins. Co.*, 2014 WL 7671718 (S.D. Fla. Dec. 17, 2014), is distinguishable because it involved plaintiff's claim that she unnecessarily paid for "wage loss protection" coverage in an automobile policy despite being retired and uninterested in rejoining the workforce. *Id.* at *1. The general nature of the claim was that State Farm should have done more to facilitate plaintiff's declination of the coverage, *id.*, but the court observed that State Farm was only statutorily required to *disclose the option* to decline the coverage, and plaintiff did not allege that State Farm failed to make such a disclosure or that she ever actually declined the coverage. *Id.*

The facts in *Pierce* bear no resemblance to those involved here. Insureds here complain of premiums they prepaid for coverages that—by nature of the coverage term language in the Policy and the unexpected fact that the cruise operators cancelled the trips during a pandemic—*never* came into effect and never put Generali at risk. The second dice roll, or blackjack hand, never happened, so neither bettor should keep the other's wager. This scenario is closer to *Gonzalez*, where the insurer's election to cancel the policy as a result of an insured's omission led to the failure of any coverage to take effect, and obligated the insurer to return the prepaid, unearned premium. *Gonzalez*, 948 So.2d at 2–3.

When viewed against the well-established common law principle—recognized in both Florida and Pennsylvania—that insurers may not retain unearned premiums, the mere insertion of the word "nonrefundable" in Generali's Policies with Insureds Morris and Schrader was not sufficient to waive Insureds' restitution rights when the coverage failed to take effect, through no fault of their own. The district court's contrary conclusion permitted an unjust windfall to Generali without sound justification in either the language of the contracts, or principles of equity.

## C. The district court erred in holding that the premiums for pre-departure risk and post-departure risk were not severable.

The district court included in its reasons for dismissal a finding that the pre- and post-departure coverage provisions were not severable, and that therefore "the entire risk attached when the Policies were purchased." (SA-30–31). To be sure, the risk of the trip cancellation coverage attached, and with respect to Insureds Morris and Schrader, Generali did not breach its agreement to cover that risk. (The first of the two wagers). But that was not the entire risk bargained for in the Policies.

Insureds alleged that the pre- and post-departure coverages are discrete lines of coverage and that the premiums attributable to them are separately calculated by Generali. (A-66). Their severability and separate

temporal points of attachment are also plausible, if not obviously apparent, because they have distinct periodic terms that are not the same, leading to the reality of what occurred: the trip cancellation was triggered, but no other coverage ever was. (A-64 ¶¶ 127–30; *see also* A-225–26, A-244).

The Policies include two separate sets of coverages completely divided by the types of risks insured against and the time periods during which they apply. (First a roll at the craps table, then a hand of blackjack). The district court's contrary conclusion that the coverages are not severable is not supported by any fact in the record, and is not compelled by any legal principle applicable to the alleged facts.

The district court based its conclusion on language in the Policies stating that they are "single pay, single term" insurance. (SA-30). There is no legal authority cited by the district court, or Generali, supporting the notion that this phrase only denotes an *inseverable* bundle of coverages. Instead, the more obvious and natural meaning of that phrase is that the Policies are not renewable and must be paid at one time (in advance). Those meanings are consistent with the nature of the coverage provided (insuring a specific, identifiable planned trip) and the rest of the actual phrase in the contract. ("You have purchased single pay, single term, *non-renewable* insurance coverage.") (A-163, p. 12) (emphasis added). But it

does not mean the coverages are inseverable or that a grossed-up premium is mathematically incapable being allocated to the discrete coverages purchased.

The additional reasons given by the district court for determining that the coverages were not severable are also insufficient to justify dismissal at this initial stage of the case. The mere fact that a premium is paid in gross is not the test as to the divisibility of a contract. *Bird v. Penn Cent. Co.*, 341 F. Supp. 291, 293 (E.D. Pa. 1972) (under Pennsylvania law, "the payment of a single premium is no longer to be deemed determinative of whether an insurance contract is entire or severable."); *Nat'l Union Fire Ins. Co. v. Cubberly*, 67 So. 133, 134 (Fla. 1914) (holding a contract of insurance covering different kinds of property, separately valued, was divisible).

Instead, under Pennsylvania law, whether an insurance contract is severable depends upon the manifest intent of the parties as expressed in the body of the insurance instrument, as well as other circumstances attending the issuance of the insurance contract. *Downing v. Erie City School Dist.*, 61 A.2d 133 (Pa. 1948). Likewise, under Florida law, the fact that a combined premium is paid does not prevent a policy from being divisible where the insurance covers separate items that are separately valued, even if there is an interdependency of risk. *Hartford Fire Ins. Co. v.*

60

*Hollis*, 59 So. 785 (Fla. 1912). The structure of the Policies shows that the Insureds were buying coverages that would be in effect at two different points in time and cover different events, so Generali's act of consolidating the premium into one number at the points of sale is not significant.

The district court's reliance on *Thomas v. Charles Baker & Co.*, 60 F.2d 1057 (E.D. Pa. 1932) was also error. In *Thomas*, the policyholder argued that the premium was apportionable because the policy required an initial deposit premium and subsequent premium payments equal to a certain amount of gross sales made during the policy term. *Id.* at 1059. However, the court held that the policyholder's liability for the remaining premium after termination of a policy three and one-half months after it became effective was not apportionable because the entire risk of loss attached upon the delivery of the policy. *Id.* at 1060. That is entirely distinguishable from this case where Generali's post-departure risks *never* attached.

Here, Insureds plausibly alleged that the premiums paid for pre-departure risk and post-departure risk are severable. In the Policies, such risks are divided in time, nature, coverage limits, and by exclusivity. For instance, trip cancellation coverage begins on the day the premium is paid,

while coverage for trip interruption and all remaining post-departure risks does not begin until the scheduled date of departure. (A-64 ¶ 127–30).

Further, the potential benefits under trip cancellation coverage are mutually exclusive from benefits under all other coverages, because no-post-departure risk can occur if a trip is cancelled, (A-64 ¶ 130), and no cancellation coverage can be triggered unless the event occurs "before departure." (A-164, p. 17). Finally, the Policies' description of coverage specifies that the insurance to be provided covers separately enumerated risks, and in states in which Generali is required to file rate schedules, those filings confirm Generali separately calculates the premiums for each line of coverage. (A-65–66 ¶¶ 131–35). Accordingly, Insureds plausibly alleged severable pre-departure and post-departure coverages and premiums.

The *Anderson* court correctly rejected a defendant's argument that an unjust enrichment claim was barred because the insurance plan sold was "a single insurance policy with a single undivided premium":

> At this stage . . . the Court cannot conclude, as a matter of law, that the defendants' risk regarding post-departure perils attached when the coverage was initially purchased . . . Pre-departure coverage is effective upon receipt of payment, but post-departure coverage is not, in all cases, effective upon receipt of payment. It is therefore reasonable to infer that the defendants did not agree to assume post-departure risks until the post-departure coverages took effect, which, according to the insurance certificate, *would ordinarily be the date and time the covered trip actually begins.*

*Anderson*, 2019 WL 1932763, at *3 (emphasis added).

For these reasons, the district court erred in dismissing Insureds' unjust enrichment claims for the return of unearned premiums where the perils for post-departure coverage never attached.

## **<u>CONCLUSION</u>**

Appellants respectfully request that with respect to Counts I, II, and VII of their consolidated class action complaint, this Court vacate the district court's entry of judgment and reverse the district court's orders of dismissal.

Dated: May 17, 2022        Respectfully submitted by:

*/s/ Jamisen A. Etzel*

Jamisen A. Etzel
**Lynch Carpenter, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 322-9243
jamisen@lcllp.com

David E. Kovel
**Kirby McInerney LLP**
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
dkovel@kmllp.com

Bryan L. Clobes
**Cafferty Clobes Meriwether & Sprengel LLP**

205 North Monroe
Media, PA 19063
(215) 864-2800
bclobes@caffertyclobes.com

*Counsel for Appellants*

## <u>CERTIFICATES OF SERVICE AND COMPLIANCE</u>

I, Jamisen A. Etzel, certify as follows:

1.     Pursuant to Fed. R. App. P. 32(g), I certify that this Brief of Appellants complies with Fed. R. App. P. 32(a)(7)(B)(i), as modified by Local Rule 32.1(a)(4).

     a.  According to the word count in the word processing system employed in drafting this brief (Microsoft Word), the Brief of Appellants contains 13,089 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

     b.  This Brief is written in Georgia typeface, a proportionally-spaced, 14-point serif font.

2.     On today's date, May 17, 2022, I filed this brief with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system, which will cause service on counsel for all parties of record, who are registered CM/ECF Users.

 

                                          */s/ Jamisen A. Etzel*
                                          Jamisen A. Etzel

# SPECIAL APPENDIX CONTENTS

Opinion and Order of Dec. 21, 2021,
     Dismissing Appellants' Claims (Dkt. 56) ......................................SA-1

Final Judgment
     [and Severance of Appellants' Claims] (Dkt. 65) ........................SA-38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GENERALI COVID-19 TRAVEL
INSURANCE LITIGATION.                    20-md-2968 (JGK)

                                         OPINION AND ORDER

JOHN G. KOELTL, District Judge:

      The plaintiffs brought this putative class action against

the defendants, Generali US Branch and Customized Services

Administrators, Inc. (together, "Generali"), alleging breach of

insurance contracts and related non-contract claims.

      The plaintiffs alleged that they incurred losses because

they planned and paid for travel that was canceled because of

restrictions that were occasioned by Covid-19. They claim that

their losses were covered by trip insurance contracts issued by

Generali because their losses were "Covered Events." The

plaintiffs point to two alleged Covered Events: (1) a

"Quarantine" provision of the relevant policy, or (2) the

provision for "unavailable accommodations due to . . . natural

disaster." The defendants contend that the trip cancelations

were not occasioned by those Covered Events and that, in any

event, the government regulations that brought about the

plaintiffs' losses fell within an explicit Exclusion in the

Policies for any loss under the Policy "caused by, or resulting

1

from, . . . travel restrictions imposed for a certain area by governmental authority." Generali now moves to dismiss the action as to plaintiffs Clonts, Garner, Johner, Sharma, Oglevee, Morris, and Shrader.

Generali also moved to compel arbitration as to Oglevee, as well as certain other plaintiffs who are not the subjects of Generali's motion to dismiss. The plaintiffs as to whom Generali moved to compel arbitration purchased their trips and the corresponding insurance through Vrbo.com, except Oglevee, who purchased only her accommodations and the corresponding insurance on Vrbo.com. Oglevee purchased her flights and the corresponding insurance on FlightHub. The basis of Generali's motion to compel arbitration is an arbitration clause in the terms of service of Vrbo.com, which provided that Generali was a beneficiary of the clause. The motion to compel arbitration is addressed in a concurrently-filed opinion, but for the purposes of this motion it is relevant that the motion to compel arbitration is granted as to Oglevee with respect to her claims arising from her purchase of travel insurance through Vrbo.com, and denied as to Oglevee's other claims.

For the reasons explained below, the motion to dismiss is **granted** as to Clonts, Garner, Johner, Sharma, Morris, and Shrader. The motion to dismiss is **denied** as moot as to certain

claims by Oglevee that are subject to arbitration, and **granted** as to Oglevee with respect to her other claims.

## I.

### A.

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).[1] The Court may also consider documents that are integral to the complaint or incorporated by reference, and those facts or documents of which the court can take judicial notice. Casey v. Odwalla, Inc., 338 F. Supp. 3d 284, 293 (S.D.N.Y. 2018). This includes contracts, Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 71–72 (2d Cir. 1995), and executive orders, Michael Cetta, Inc. v. Admiral Indem. Co., 506 F. Supp. 3d 168, 173 (S.D.N.Y. 2020), which the parties also agree are subject to judicial notice.

### B.

The following facts are taken from the Consolidated Class Action Complaint (the "Complaint"), Generali's insurance policies (the "Policies"), which are referenced in and integral to the Complaint, and various executive orders referenced in the Complaint.

---

[1] Unless otherwise noted, this Opinion omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

3

**SA-3**

**1.**

Each of the plaintiffs planned trips scheduled for 2020 for
which they purchased travel insurance from Generali. The
insurance coverage provided was specified in the Policies, and
did not differ among the plaintiffs in most key respects.

The Policies provided that Generali would compensate the
insureds for certain losses that occurred if the insured was
prevented from taking a trip due to an unforeseeable "Covered
Event[] that occur[ed] before departure." Compl. ¶ 44. In all
policies, the term "Covered Event" included "Being . . .
Quarantined." The Policies defined the term Quarantine as "the
enforced isolation of [the insured or their] Traveling
Companion, for the purpose of preventing the spread of illness."
Id. at ¶ 46. In some policies, the term "Covered Event" also
included the insured's "Accommodations at [their] destination
[being] made inaccessible due to fire, flood, volcano,
earthquake, hurricane or other natural disaster." Id. ¶¶ 46-50.

After listing the Covered Events, the Policies noted that
this coverage was "subject to the General Exclusions." The
section entitled "General Exclusions" provided that Generali
would "not pay for any loss under th[e] Policy, caused by, or
resulting from" certain listed events. These General Exclusions
included "travel restrictions imposed for a certain area by

governmental authority." Id. ¶ 51; Zurlage Decl. Ex. A, ECF No. 29-1, at 10-11.

The Policies also included a provision that after a 10-day policy-examination period, the insured's payment was non-refundable, id. at 6, and a provision that the insurance coverage was "single pay, single term." Id. at 13. The Policies contained various coverage limits.

**2.**

During the first week of 2020, a new coronavirus ("Covid-19") was identified in China.[2] By March, Covid-19 had spread so broadly that the World Health Organization declared it a pandemic. On March 2, Generali posted a notice on its website that it considered Covid-19 to have been foreseeable as of January 29.

Over the course of 2020, countries, states, and localities issued orders to attempt to limit the spread of the disease. The plaintiffs were all slated to take the trips for which they had purchased insurance during 2020. All of these trips were canceled over the course of the year. The plaintiffs filed claims under the Policies, seeking compensation under the Policies. Generali denied the claims in an email, explaining that the Policies only provided benefits for specific, listed

_____

[2] Unless otherwise specified, all dates in this Opinion are from 2020.

5

**SA-5**

events, including Quarantines as the Policies defined the term,
and that stay-at-home orders were not considered Quarantines
under the Policies. The email also explained that the Policies
did not cover losses resulting from travel restrictions by a
governmental authority or by an event that could have reasonably
been foreseen.

**3.**

The plaintiffs brought this putative class action against
Generali. They sought to represent four distinct classes[3]:

- Clonts, Garner, Johner, Sharma, and Oglevee sought to
  represent the Quarantine Class, a class of "[a]ll persons
  who purchased or obtained Defendants' travel protection
  policies without a pandemic exclusion and were prevented
  from taking their trips because of a quarantine order,
  stay-at-home order, or similar restriction related to the
  COVID-19 pandemic";
- Clonts, Garner, and Johner sought to represent the Natural
  Disaster Class, a class of "[a]ll persons who purchased or
  obtained Defendants' travel protection policies without a
  pandemic exclusion that list inaccessible accommodation as
  a covered event, and were prevented from taking their trips
  due to their accommodation being inaccessible as a result
  of the COVID-19 natural disaster";
- Clonts, Garner, Johner, and Sharma sought to represent the
  Early 2020 Purchaser Class, a class of "all persons who
  purchased or obtained Defendants' travel protection
  policies between January 29 and March 11, 2020, without a
  pandemic exclusion, and were unable to take their trip for
  reasons related to the COVID-19 pandemic"; and
- Morris and Shrader sought to represent the Unearned
  Premiums Class, a class of "[a]ll persons who purchased or
  obtained Defendants' travel protection policies and whose
  trips were cancelled and fully refunded prior to their

---

[3] The would-be class representatives who are subject to the motion
to compel arbitration and who are not the subjects of the motion
to dismiss are not included in this list.

6

**SA-6**

departure date, but who have not received premium refunds from Defendants for post-departure risks."

In each case, the plaintiffs sought to represent nationwide classes or, should the classes not be certified nationwide, statewide classes. Each putative class brought distinct claims, including claims for breach of contract, unjust enrichment, conversion, bad faith, and breach of the duty of good faith and fair dealing. The plaintiffs sought relief including a return of all or part of the insurance premiums they paid, compensation for the losses they incurred, and declaratory relief.

Generali now moves to dismiss the action as to Clonts, Garner, Johner, Sharma, Oglevee, Morris, and Shrader. The claims brought by each putative class and named plaintiff are reflected in the following chart, which identifies the plaintiffs, their states of residence, and their claims. The chart only identifies the claims subject to the motion to dismiss and excludes the claims subject to the motion to arbitrate.

| Name | Applicable Law | Quarantine Class | Natural Disaster Class | Early 2020 Purchaser Class | | | | Unearned Premium Class | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Count: | | I | II | III | IV | V | VI | VII | VIII | IX |
| | | Breach of Contract | Breach of Contract | Unjust Enrichment | Conversion | Bad Faith | Breach of the Duty of Good Faith and Fair Dealing | Unjust Enrichment | Conversion | Breach of the Duty of Good Faith and Fair Dealing |
| Clonts | Georgia | Yes | Yes | Yes | Yes | Yes | Yes | | | |
| Garner | Oregon | Yes | Yes | Yes | Yes | Yes | Yes | | | |
| Johner | Missouri | Yes | Yes | Yes | Yes | Yes | Yes | | | |
| Sharma | Utah | Yes | | Yes | Yes | Yes | Yes | | | |
| Oglevee | Pennsylvania | Yes | | | | | | | | |
| Morris | Florida | | | | | | | Yes | Yes | Yes |
| Shrader | Pennsylvania | | | | | | | Yes | Yes | Yes |

8

**SA-8**

II.

The plaintiffs raise both contract and non-contract claims. The plaintiffs do not dispute the defendants' statement that each of their claims are governed by the laws of their home states. See ECF No. 28 at 11. Accordingly, the Court will apply to each plaintiff's claims the law of that plaintiff's home state. See Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d 673, 705 (S.D.N.Y. 2021).

Because the motion to compel arbitration is granted in part as to plaintiff Oglevee, the motion to dismiss is denied as moot with respect to the claims to be arbitrated — namely, the claims arising out of her transaction on Vrbo.com. To the extent this Opinion addresses Oglevee's claims, it addresses only those claims arising out of her transaction on FlightHub.

### A. Contract Claims

The plaintiffs seek compensation under the Policies, which they allege provide for coverage for their losses. In insurance actions, to state a prima facie claim, the insured must show that the claim is within the scope of the coverage, and the applicability of an exclusion is an affirmative defense. See Allstate Ins. Co. v. Grayes, 216 Ga. App. 419, 420 (1995); FountainCourt Homeowners' Ass'n v. FountainCourt Dev., LLC, 264 Or. App. 468, 480 (2014), aff'd, 380 P.3d 916 (Or. 2016); Nixon v. Life Invs. Ins. Co. of Am., 675 S.W.2d 676, 679 (Mo. Ct. App.

1984); <u>Cincinnati Ins. Co. v. AMSCO Windows</u>, 921 F. Supp. 2d
1226, 1233 (D. Utah 2013), <u>supplemented</u>, No. 2:10-cv-00542, 2013
WL 12141330 (D. Utah Sept. 23, 2013), and <u>aff'd</u>, 593 F. App'x
802 (10th Cir. 2014); <u>State Farm Fire & Cas. Co. v. Est. of
Mehlman</u>, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania
law). A court may grant a motion to dismiss based on an
affirmative defense where "'the complaint itself establish[es]
the circumstances required as a predicate to a finding' that the
affirmative defense applies." <u>In re Sept. 11 Prop. Damage & Bus.
Loss Litig.</u>, 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007).

A valid exclusion applies to all of the plaintiffs' claims,
arising out of both the "Quarantine" Covered Event and the
Covered Event for "Accommodations at [their] destination [being]
made inaccessible due to . . . natural disaster." Therefore, the
Policies do not cover the plaintiffs' claims. Moreover, almost
all of the plaintiffs have not stated facts showing even a prima
facie entitlement to coverage due to the alleged Covered Events
for Quarantine or their accommodations being inaccessible due to
natural disaster.

### 1.

The plaintiffs have failed to state facts showing that they
are entitled to compensation under the Policies because the
defendants have shown as a matter of law that the plaintiffs'
claims are barred by the valid General Exclusion.

Each Policy has a section entitled "General Exclusions."
That section provides that Generali "will not pay for any loss
under this Policy caused by, or resulting from . . . travel
restrictions imposed for a certain area by governmental
authority." Zurlage Decl. Ex. A, ECF No. 29-1, at 10–11. The
Policies further specify that their "coverage is subject to the
General Exclusions." Id. at 18. Thus, under the language of the
Policies, if a loss falls within both a coverage provision and a
General Exclusion, the General Exclusion controls, and Generali
is not contractually required to pay for the losses.

All of the losses fall within this General Exclusion. To
the extent Covid-19 "prevented [the plaintiffs] from taking
[their] Trips," it was only by means of the orders to which the
plaintiffs make reference. See Compl. ¶¶ 117-19 ("As a result of
the pending declarations [of states of emergency, Clonts's]
. . . reservation was cancelled."); id. ¶ 124 ("As a result of
the declarations [of states of emergency and] Oregon's stay-at-
home order, . . . Garner cancelled her trip[.]"); id. ¶ 96
("[D]ue to the . . . tourist ban, Johner . . . cancelled her
reservation."); id. ¶¶ 82-84 ("Sharma's flights were cancelled"
after "Hawaii issued a mandatory quarantine" and "Salt Lake City
adopted a stay-at-home order."); id. ¶¶ 99-101 ("Oglevee
cancelled her trip when faced with travel impediments in
Pennsylvania and Florida," namely, both states declaring states

of emergency.). Thus, on a plain reading of the Policies, the plaintiffs' cancellations were all caused by governmental orders, which are travel restrictions for which the Policies exclude coverage. There is no plausible construction of the Exclusion that does not cover the plaintiffs' cancellations.

The plaintiffs argue that the presence of both coverage and an exclusion is an "inconsistency" that must be resolved in favor of the insured. This argument is without merit. The plaintiffs cite Todd v. Missouri United School Insurance Council, 223 S.W.3d 156, 163 (Mo. 2007), for the proposition that inconsistencies should be resolved in favor of the insured. But that case also noted that "[i]nsurance policies customarily include . . . exclusions that exclude from coverage otherwise covered risks. . . . [T]he use of definitions and exclusions is not necessarily contradictory or inconsistent." Id. at 162-63. In fact, Todd found an exclusion to be applicable, and denied coverage. Id. at 164; see also Mays v. Transamerica Ins. Co., 103 Or. App. 578, 585 (1990) (holding that an exclusion does not render a contract ambiguous); Alf v. State Farm Fire & Cas. Co., 850 P.2d 1272, 1275 (Utah 1993) (same); cf. Fid. Nat. Title Ins. Co. of N.Y. v. OHIC Ins. Co., 275 Ga. App. 55, 58 (2005); John J. Curry & Son v. Harleysville Mut. Ins. Co., 11 Pa. D. & C.4th 521, 527 (Com. Pl. 1991). Likewise, there is no "inconsistency" in this case. The Policies make clear that if a Covered Event

overlaps with a General Exclusion, the General Exclusion
controls. This is neither inconsistent nor ambiguous.

Contrary to the plaintiffs' suggestion, the Exclusion does
not render the coverage illusory. For an exclusion to render
coverage illusory, it must eliminate all or most of the
coverage. See, e.g., Cynergy, LLC v. First Am. Title Ins. Co.,
706 F.3d 1321, 1327 (11th Cir. 2013) (finding that, under
Georgia law, coverage was not illusory where an exclusion did
not "eviscerate" or "completely abrogate[]" coverage); Emps.-
Shopmens Loc. 516 Pension Tr. v. Travelers Cas. & Sur. Co. of
Am., 235 Or. App. 573, 588-89 (2010) (finding that coverage was
not illusory where an exclusion did not "completely
eviscerate[]" coverage); Endurance Am. Specialty Ins. Co. v.
Brown, 487 F. Supp. 3d 774, 780 (W.D. Mo. 2020) (finding
coverage not illusory where an exclusion did not "exclude
coverage for virtually all liability"); Atl. Cas. Ins. Co. v.
Zymblosky, No. 1167 MDA 2016, 2017 WL 3017728, at *6 (Pa. Super.
Ct. July 17, 2017) (finding that coverage was not illusory where
there remained coverage for some acts); cf. Harris v. Zurich
Holding Co. of Am., No. 2:05-cv-482, 2006 WL 120258, at *6 (D.
Utah Jan. 17, 2006) (noting that coverage was illusory only
where an exclusion "wholly eviscerate[d]" coverage).

In this case, the Exclusion does not eliminate all or most
of the coverage. There are Quarantines that do not fall within

the Exclusion and for which the Policies would therefore provide
coverage. For example, a person who came into contact with an
infected person and was therefore required not to leave their
home would be in "enforced isolation . . . for the purpose of
preventing the spread of illness," and therefore would be under
a true Quarantine. But such a requirement could not be described
as a "travel restriction imposed for a certain area." It
therefore would not fall within the Exclusion, and would be
covered by the Policy. In short, true Quarantines would be
covered by the Policies and not covered by the Exclusion. The
Exclusion would not render coverage for a true Quarantine
illusory.

Likewise, there are many ways accommodations could be
rendered inaccessible due to natural disaster that do not
involve an intervening government-issued travel restriction. A
hurricane could severely damage a prospective accommodation or
render an access road to an accommodation inaccessible.
Accordingly, the Exclusion does not render the coverage provided
by the Policies illusory, but rather is simply a valid carveout.

Finally, the plaintiffs argue that the existence of
epidemic or pandemic exclusions in other Generali policies
implies that the Exclusion in the plaintiffs' policies does not
subsume the Covid-19 pandemic. But the fact that Generali has
chosen to exclude epidemics or pandemics in other policies does

not render the Exclusion in these Policies ambiguous. The
Exclusion unambiguously covers "travel restrictions imposed for
a certain area by governmental authority," and that plainly
covers the orders at issue in this case. Accordingly, the
plaintiffs' allegations regarding Generali's other policies do
not permit an inference that the Exclusion might not apply to
the plaintiffs' claims.

For all these reasons, the Exclusion is valid and it
unambiguously covers the plaintiffs' claims. Therefore, the
defendants have shown as a matter of law based on the
unambiguous terms of the Policies that the Exclusion bars the
plaintiffs' contract claims.

### 2.

Moreover, the plaintiffs have not pleaded facts sufficient
to show a prima facie entitlement to compensation due to a
Quarantine. Coverage under the Policies is limited to losses
that occur if the insured is "prevented from taking [a] Trip due
to" pre-departure Covered Events. Compl. ¶¶ 44, 46. Thus, to
allege entitlement to compensation due to a Quarantine, the
plaintiffs must allege a (i) pre-departure (ii) Quarantine that
(iii) prevented them from taking their trip. None of the
plaintiffs has alleged such facts.

All the plaintiffs allege that their places of origin and destinations declared states of emergency.[4] The plaintiffs also allege the following orders:

| Plaintiff | Departure Date | Origin | Issues at Origin | Destination | Issues at Destination |
|---|---|---|---|---|---|
| Clonts | May 8, 2020 | Georgia | Stay-at-home order which expired before scheduled departure | Florida | Isolation requirement from areas with "substantial community spread" |
| Garner | Apr 24, 2020 | Oregon | Stay-at-home order | Florida | Stay-at-home order and isolation required from areas with substantial community spread |
| Johner | Sep 8, 2020 | Missouri | | Costa Rica | Arrival ban ongoing at time of departure |
| Sharma | May 13, 2020 | Utah | Stay-at-home order which expired before scheduled departure | Hawaii | Quarantine requirement on arrival |
| Oglevee | Mar 17, 2020 | Pennsylvania | Stay-at-home order issued after scheduled departure | Florida | Stay-at-home order and isolation required from areas with substantial community spread; additional Key West restrictions issued after scheduled arrival |

---

[4] While other plaintiffs also alleged that they were entitled to Quarantine coverage, Generali moved to compel arbitration of those claims rather than to dismiss them. Possible dismissal of those claims is therefore not addressed in this Opinion.

First, the stay-at-home orders alleged did not constitute Quarantines. "Quarantine" is defined in the Policies as "the enforced isolation of you or your Traveling Companion, for the purpose of preventing the spread of illness." Id. at ¶ 46. The following stay-at-home orders in particular were not Quarantines:

- Georgia, id. ¶ 118 (Clonts). This required people to "remain in their place of residence," but permitted people to leave their homes to obtain supplies, exercise, and perform the "minimum necessary activities to maintain the value of a business," which included "remaining open to the public."
- Florida, id. (Clonts, Garner, and Oglevee). The Florida order provides: "[A]ll persons in Florida shall limit their movements and personal interactions outside of their home to only those necessary to obtain or provide essential services or conduct essential activities."
- Oregon, id. ¶ 123 (Garner). The Oregon order provides: "It is essential . . . that, to the maximum extent possible, individuals stay at home . . . . Individuals are directed to minimize travel."
- Salt Lake County, Utah, id. ¶ 83 (Sharma). The order "discourage[s]" non-essential travel. It permits, however, leaving the home for certain activities, including social activities, with some limitations.
- Utah, id. ¶ 83 (Sharma). The Complaint alleges that the Utah order "directed residents to stay at home as much as possible" and to "limit travel to only essential travel."
- Allegheny County, Pennsylvania, id. ¶ 102 (Oglevee). The order directed residents to "stay at home except as needed to access, support or provide life-sustaining business, emergency or government services," or to "engage in outdoor activities."

None of these stay-at-home orders created a state of enforced isolation. In all instances, the plaintiffs were permitted to leave their homes for several purposes, including

17

**SA-17**

to see other people. The plaintiffs were thus not forced to remain isolated, and the stay-at-home orders did not create a state of enforced isolation. See In re Arch Ins. Co. Ski Pass Ins. Litig., No. 4:20-md-2955, 2021 WL 4191464, at *6-8 (W.D. Mo. Sept. 8, 2021) (finding that stay-at-home orders were not a quarantine within the meaning of an insurance policy); Depasquale v. Nationwide Mut. Ins. Co., No. 20-cv-5370, 2021 WL 1815078, at *4-5 (S.D. Ohio May 6, 2021) (finding that Oregon's restrictions were not a quarantine within the meaning of an insurance policy); Cassell v. Snyders, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020) (finding that "enforced isolation" required a person to be "set apart" (citing Daniel v. Putnam County, 38 S.E. 980, 981 (Ga. 1901))), aff'd, 990 F.3d 539 (7th Cir. 2021); see also In re United Specialty Ins. Co. Ski Pass Ins. Litig., No. 20-md-2975, 2021 WL 4974981, at *5-6 (N.D. Cal. Oct. 26, 2021) (finding that closing a resort was not a quarantine within the meaning of an insurance policy).

Indeed, most of the cases interpreting the word "quarantine" in other contexts have found it to exclude stay-at-home orders. See Cassell, 458 F. Supp. 3d at 1002 (collecting cases); Antietam Battlefield KOA v. Hogan, 461 F. Supp. 3d 214, 229 n.17 (D. Md. 2020); McGhee v. City of Flagstaff, No. 20-cv-8081, 2020 WL 2308479, at *3 (D. Ariz. May 8, 2020) (applying a statutory definition).

The plaintiffs' argument that the plaintiffs were under
Quarantine because self-enforced isolation constitutes enforced
isolation is without merit. Items comprising a list should be
read to share common attributes. E.g., Winegard v. Newsday LLC,
No. 19-cv-4420, 2021 WL 3617522, at *5 (E.D.N.Y. Aug. 16, 2021).
In this case, the phrase "enforced isolation" defines the term
"Quarantine," which appears in the context of an insurance
policy amidst a list of events that arise externally to the
insured to prevent the insured from taking their trip. A "self-
enforced" isolation would fit poorly within this list. It is
clear, therefore, that the phrase "enforced isolation" implies
an external enforcer. Cf. Watson v. Oppenheim, 301 So. 3d 37, 42
(Miss. 2020). For all of these reasons, the stay-at-home orders
are not Quarantines within the meaning of the Policies.

Second, declarations of states of emergency did not
"prevent[] the plaintiffs from taking [their] Trip[s]," and
therefore did not trigger coverage under the Policies. All the
plaintiffs allege declarations of states of emergency at their
origins and/or destinations. But without more, such declarations
do not prevent a person from traveling. None of the plaintiffs
alleges tangible consequences of the declarations of states of
emergency themselves that actually prevented them from taking
their trips. Accordingly, states of emergency could not be

described as Quarantines, and do not trigger coverage under the
Policies.

Finally, many of the restrictions the plaintiffs rely on
would not provide coverage under the Quarantine provision
because they did not arise before the plaintiff's departure, or
they did not prevent the plaintiff from taking the trip, or
both.

As a result, none of the plaintiffs has stated a claim for
coverage based on "Quarantine" as a Covered Event. More
particularly:

- Clonts alleges a stay-at-home order in Georgia that
  expired before her trip began, id. ¶ 118, and which
  therefore cannot have "prevented [her] from taking
  [her] Trip." She also alleges that Florida imposed a
  stay-at-home order, as well as a quarantine
  requirement for travelers coming from "areas of
  substantial community spread," id., and that her
  reservation was canceled because of this. However,
  this does not amount to an allegation that Clonts was
  herself "being . . . Quarantined" "before [her]
  departure."
- Garner alleges that Florida, her destination, imposed
  a quarantine requirement for travelers coming from
  "areas of substantial community spread." Id. ¶ 123.
  However, she does not allege that Oregon, her state of
  origin, was such an area within the meaning of the
  Florida order. This allegation therefore does not
  constitute an allegation that she was "prevented from
  taking [her] Trip." Moreover, neither state's stay-at-
  home order or declaration of a state of emergency
  constituted a Quarantine.
- Johner alleges that "Costa Rica barred [her] from
  entering." Id. ¶ 95. But this ban cannot be described
  as an "enforced isolation": while the ban prevents
  Johner from entering Costa Rica, the ban in no way
  compels her to remain in isolation. For the same
  reason, Missouri's declaration of a state of emergency

20
**SA-20**

also did not create a state of enforced isolation, and in any event did not prevent Johner from taking her trip.

- Sharma alleges that his home state of "Utah maintained a stay-at-home directive from March 27 to May 1." Id. ¶ 83. But his trip to Hawaii was scheduled to begin May 13. Id. ¶ 80. Accordingly, Sharma does not allege that Utah's stay-at-home order "prevented [him] from taking [his] Trip." Moreover, neither Utah's stay-at-home order nor its state-of-emergency declaration was a Quarantine. Sharma also alleges that "Hawaii issued a mandatory quarantine for all travelers entering the state." Id. ¶ 82. But because the quarantine would only have taken effect after Sharma's entry to the state, it is not covered by the Policy.

- Oglevee alleges "Pennsylvania issued a stay-at-home order . . . to begin March 23." Id. ¶ 102. But neither this nor the declared "disaster emergency" was a Quarantine. She also alleges that Key West was "preparing to shut down tourism and close hotels," which shutdown was announced March 19 to go into place March 22. Id. ¶ 101. But her trip was scheduled to begin March 17. Id. ¶ 98. Because her Policy covered only events that occurred before departure, none of these events are covered by the Policy.

Therefore, none of the plaintiffs has stated a claim for Quarantine coverage.

### 3.

For similar reasons, Clonts does not state a prima facie claim for coverage arising from their accommodations being made inaccessible due to a natural disaster. The Policies define "inaccessible" as meaning that the accommodations "cannot be reached by [the insured's] original mode of transportation." Compl. ¶ 48. The stay-at-home orders in Georgia and Florida expired before Clonts's trip began, and the quarantine requirement imposed by Florida for travelers coming from areas

of substantial community spread did not cover travelers coming
from Georgia. As such, none of these made it impossible for her
to reach her accommodations by her original means of
transportation. Accordingly, Clonts has not stated a claim for
coverage arising from her accommodations being made inaccessible
due to natural disaster.

Because all of the claims are barred by the Exclusion, and
almost all of the claims are also barred because they fail to
allege sufficient facts to show a Covered Event, none of the
plaintiffs has stated a claim for coverage under the Policies,
and the plaintiffs' contract claims are **dismissed.**

### B. Unjust Enrichment Claims

The Early 2020 Purchaser and Unearned Premium plaintiffs
(in other words, all the plaintiffs who are the subjects of the
motion to dismiss except Oglevee) claim they are entitled to
complete or partial refunds of their premiums because the
defendants otherwise would have been unjustly enriched. The
Early 2020 Purchaser plaintiffs who are the subjects of the
motion to dismiss — Clonts, Garner, Johner, and Sharma — seek
full premium refunds on the theory that the plaintiffs conferred
a benefit on Generali — the premiums — and that it would be
unjust for Generali to retain that benefit because Generali knew
that the plaintiffs would not "receive the benefit of their
bargain." The Unearned Premiums plaintiffs who are the subjects

of the motion to dismiss — Morris and Shrader — seek partial
premium refunds. They reason that insureds are typically
entitled to premium refunds where the risk covered by a policy
did not attach, and that the post-departure risks covered by the
Policies did not attach. Accordingly, they argue, it would be
unjust for Generali to retain the portion of the premium
corresponding to post-departure risks. All of these claims lack
merit.

1.

Under the laws of Missouri and Utah, an unjust enrichment
claim is foreclosed if the dispute is covered by the terms of
the contract. See, e.g., Bellon Wrecking & Salvage Co. v.
Rohlfing, 81 S.W.3d 703, 711–12 (Mo. Ct. App. 2002); Boyd v.
Margolin, 421 S.W.2d 761, 767 (Mo. 1967); AGTC Inc. v. CoBon
Energy LLC, 447 P.3d 123, 130 (Utah Ct. App. 2019). Missouri and
Utah law govern the claims of Johner and Sharma, respectively.

Under Missouri law, Johner's claim is specifically
addressed by her Policy. Missouri law honors express contractual
terms as to refunds of insurance premiums. Kan. City Coll. of
Osteopathic Med. v. Emps.' Surplus Lines Ins. Co., 581 F.2d 299,
303–04 (1st Cir. 1978) (conceding that Missouri follows the rule
that premiums are refundable where no risk attached, but finding
that an express term in the policy limiting refunds overrode
this default rule). Johner's Policy expressly stated that the

premium she paid was not refundable after ten days. Under Missouri law, this term is controlling, and the Court must honor this choice by the parties. Johner's contract therefore governed the precise dispute. As such, her insurance contract precludes her unjust enrichment claim. Accordingly, Johner has not stated a claim for unjust enrichment.

Under Utah law, Sharma's claim is also specifically addressed by his Policy. Under Utah law, courts may not rewrite an insurance agreement where it is clear. Uzelac v. Fire Ins. Exch., 420 P.3d 150, 156 (Utah Ct. App. 2018). The Policy unambiguously states that it is non-refundable after ten days have passed. The contract therefore clearly covers the dispute, and Sharma has not stated a claim for unjust enrichment.

**2.**

Georgia and Oregon use a slightly broader formulation of the same rule: an unjust enrichment claim is foreclosed wherever the subject matter of the dispute is governed by a contract. See, e.g., Ceasar v. Wells Fargo Bank, N.A., 322 Ga. App. 529, 534 (2013); Kashmir Corp. v. Patterson, 43 Or. App. 45, 48 (1979), aff'd, 616 P.2d 468 (Or. 1980). Those states' laws govern the unjust enrichment claims of Clonts and Garner, respectively.

For both Clonts and Garner, there is a contract — the plaintiff's Policy — whose subject matter is the subject matter

of the dispute. Accordingly, the unjust enrichment claims of
Clonts and Garner are foreclosed by the existence of their
Policies.

Additionally, the Policies of Clonts and Garner address the
specific dispute. Under the laws of Georgia and Oregon, courts
interpret insurance contracts based on their plain meaning, and
cannot rewrite them. See, e.g., Bell v. Liberty Mut. Fire Ins.
Co., 319 Ga. App. 302, 305 (2012); Silver Eagle Co. v. Nat'l
Union Fire Ins. Co., 423 P.2d 944, 947 (Or. 1967). Both Policies
specifically provided that the premiums were non-refundable
after ten days. Clonts and Garner seek premium refunds. The
Policies therefore clearly cover the dispute, and unjust
enrichment claims are unavailable to Clonts and Garner.

**3.**

The plaintiffs argue that their claims should not be
dismissed because unjust enrichment claims can be pleaded in the
alternative. See, e.g., Gordon v. Arch Ins. Co., No. 21-cv-1911,
2021 WL 2186392, at *3 (E.D. Pa. May 28, 2021); Anderson v.
Travelex Ins. Servs., Inc., No. 8:18-cv-362, 2019 WL 1932763, at
*3 (D. Neb. May 1, 2019). But this argument is without merit as
applied in this case. While Federal Rule of Civil Procedure 8(d)
permits plaintiffs to plead alternative and inconsistent claims,
courts dismiss unjust enrichment claims pleaded in the
alternative where there is no dispute as to the validity of the

agreement. See, e.g., MF Glob. Holdings Ltd. v.

PricewaterhouseCoopers LLP, 43 F. Supp. 3d 309, 317 (S.D.N.Y.

2014). Because Clonts, Garner, Johner, and Sharma do not dispute

the validity of the Policies or argue that the Policies do not

govern their disputes, there is no viable claim for unjust

enrichment.

For these reasons, Clonts, Garner, Johner, and Sharma have

not stated claims for unjust enrichment, and these claims are

dismissed.

**4.**

Morris and Shrader seek to recover the portion of their

payments that related to the insurance coverage they purchased

for events that might occur after their departure. They argue

that Generali never had to bear the risks associated with that

portion of their trips. Therefore, they argue that Generali was

unjustly enriched by the portion of the premiums that was

attributable to that portion of their insurance coverage.

As in Georgia and Oregon, in Florida and Pennsylvania, an

unjust enrichment claim is foreclosed wherever the subject

matter of the dispute is governed by the contract. See, e.g.,

Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697

(Fla. Dist. Ct. App. 2008); Pierce v. State Farm Mut. Auto. Ins.

Co., No. 14-cv-22691, 2014 WL 7671718, at *5 (S.D. Fla. Dec. 17,

2014) (applying this principle in the insurance context); Wilson

Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254-55 (Pa. 2006)
(holding that a party could not recover a refund on an unjust
enrichment theory where "the relationship between the parties
[wa]s founded upon a contract," even where the contract did not
address the availability or unavailability of refunds);
Grudkowski v. Foremost Ins. Co., 556 F. App'x 165, 170 (3d Cir.
2014) (applying Wilson in the insurance context). Florida and
Pennsylvania law govern the claims of Morris and Shrader,
respectively.

As with Clonts and Garner, for both Morris and Shrader,
there is a contract — the plaintiff's Policy — whose subject
matter is the subject matter of the dispute. Accordingly, the
unjust enrichment claims of Morris and Shrader are foreclosed by
the existence of their Policies, and Morris and Shrader have not
stated unjust enrichment claims.

Morris and Shrader argue that this rule is overridden where
the risk covered by the Policies did not attach, and that in
such a case, the insureds are entitled to a refund of the
portion of the premium corresponding to the risk that did not
attach. Thus, the argument goes, because Morris and Shrader did
not take their trips and the post-departure risks were severable
from the pre-departure risks, the premiums should be refunded to
the extent they correspond to post-departure risks. They cite
Anderson, 2019 WL 1932763, at *3, Gordon, 2021 WL 2186392, at

*3, Haas v. Travelex Ins. Servs. Inc., No. 220-cv-6171, 2021 WL 3682309, at *4-5 (C.D. Cal. Aug. 19, 2021), and Edelson v. Travel Ins. Int'l Inc., No. 21-cv-323, 2021 WL 4334075, at *3-5 (S.D. Cal. Sept. 23, 2021), as adhering to this reasoning. But these cases are distinguishable.

First, Anderson, applying Arizona law, and Haas and Edleson, applying California law, found that the dispute was not specifically addressed in the contract. Anderson, 2019 WL 1932763, at *3; Haas, 2021 WL 3682309, at *7; Edleson, 2021 WL 4334075, at *4. Because of this, they held that the unjust enrichment claim could proceed. Anderson, 2019 WL 1932763, at *3; Haas, 2021 WL 3682309, at *7; Edleson, 2021 WL 4334075, at *5. But Florida and Pennsylvania do not require that a dispute be specifically addressed by a contract to preclude an unjust enrichment claim; they require only that a contract govern the subject matter of the dispute. Moreover, the Policies of Morris and Shrader do in fact address the specific dispute. Under the laws of Florida and Pennsylvania, courts interpret insurance contracts based on their plain language, and cannot rewrite terms. See, e.g., SafePoint Ins. Co. v. Hallet, 322 So. 3d 204, 207 (Fla. Dist. Ct. App. 2021); Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. Ct. 2007). In contrast to Anderson, 2019 WL 1932763, at *3, Haas, 2021 WL 3682309, at *7, and Edleson, 2021 WL 4334075, at *4, the Policies of Morris and

Shrader expressly provided that the premiums were non-refundable after ten days. Morris and Shrader seek premium refunds. The Policies therefore clearly cover the dispute, and unjust enrichment claims are unavailable.

Second, Morris and Shrader have not shown that Florida and Pennsylvania follow the reasoning applied by the cases cited by the plaintiffs — namely that, notwithstanding a contract term expressly providing that refunds are unavailable, a premium refund is available with respect to any part of the risk covered by a policy that did not attach, if that part of the risk can be severed from the part of the risk that did attach. While Florida and Pennsylvania courts have sometimes severed insurance policies that purported to be inseverable, they have done so in cases where an entire policy would be voided if the risks are not severable. See, e.g., Nat'l Union Fire Ins. Co. v. Cubberly, 67 So. 133, 134 (Fla. 1914); Bird v. Penn Cent. Co., 341 F. Supp. 291, 292–93 (E.D. Pa. 1972). The plaintiffs cite no Florida case applying the severability principle in order to find that some of the risk had not attached, such that a partial premium refund might be appropriate. And in Thomas v. Charles Baker & Co., 60 F.2d 1057, 1059–61 (E.D. Pa. 1932), the court in fact held that the entire risk attached on delivery of the policy, such that the insurer was entitled to keep the premium. In Gordon, which applied Pennsylvania law, an unjust enrichment

claim survived dismissal, but the court did not explain why such a cause of action was available, and Gordon is therefore unpersuasive.

Finally, neither Morris nor Shrader has alleged a severable policy. The language of the Policies suggests that the Policies are not severable: in addition to providing that the Policies are non-refundable after ten days, the Policies note that the insured has purchased "single pay, single term" insurance. In deciding whether to treat a policy as severable notwithstanding its language, courts have relied on factors such as (1) whether the different risks are separately valued, Nat'l Union Fire Ins. Co. v. Cubberly, 67 So. 133, 134 (Fla. 1914); (2) whether the premiums are paid in gross, Unity Life Ins. Co. v. Beasley, 13 S.E.2d 32, 34 (Ga. 1941); and (3) whether the risks are interdependent, Consumer's Money Ord. Corp. of Am. (Mo.) v. N.H. Ins. Co., 386 S.W.2d 674, 677 (Mo. App. 1964). Applied to the Policies of Morris and Shrader, these factors do not support severability, particularly in light of the Policies' clear language. While the Policies of Morris and Shrader do itemize pre- and post-departure coverage, both plaintiffs paid a single premium in gross, and the pre- and post-departure risks were interdependent: the possibility of trip cancellation affected the likelihood of post-departure risks arising, a possibility that may be priced into the cost of the insurance. Accordingly,

neither Morris nor Shrader has pleaded facts showing that their Policies were severable. As such, the entire risk attached when the Policies were purchased.

For the foregoing reasons, Morris and Shrader have not stated claims for unjust enrichment, and these claims are dismissed.

### C. Bad Faith and Breach of the Duty of Good Faith and Fair Dealing Claims

Clonts, Garner, Johner, and Sharma allege bad faith and breach of the duty of good faith and fair dealing.[5] Their claims are governed by the law of Georgia, Oregon, Missouri, and Utah, respectively. On this point, these states' laws are functionally identical: essentially, claims that an insurer acted in bad faith or breached the duty of good faith and fair dealing by denying insurance benefits fail where the denial is reasonable.

Georgia law allows parties to seek damages for bad faith refusals to pay insurance claims. See Assur. Co. of Am. v. BBB Serv. Co., 576 S.E.2d 38, 41 (Ga. 2002). However, "[a] defense going far enough to show reasonable and probable cause for making it would vindicate the good faith of the company . . . . Penalties for bad faith are not authorized where the insurance

---

[5] Morris and Shrader also brought claims for breach of the duty of good faith and fair dealing. However, their Opposition narrowed their claims to unjust enrichment claims. ECF No. 38 at 37 n.35. Therefore, the claims for breach of the duty of good faith and fair dealing by Morris and Shrader are dismissed.

company has any reasonable ground to contest the claim . . . ."
Id.[6]

Oregon law provides that "a claim for breach of the duty of
good faith may be pursued independently of a claim for breach of
the express terms of the contract," and that an insurer
therefore has a duty to determine, in good faith, whether a
claim is covered, and to refrain from arbitrarily" denying
benefits under a policy. McKenzie v. Pac. Health & Life Ins.
Co., 847 P.2d 879, 881 (Or. 1993); accord Ivanov v. Farmers Ins.
Co. of Or., 185 P.3d 417, 421-22 (Or. 2008). However, courts
have held that only a "patently unreasonable[,] . . . truly
beyond-the-pale interpretation of contractual language" can
"support a breach of good faith claim" grounded in the
interpretation of a policy. Veloz v. Foremost Ins. Co. Grand
Rapids, Mich., 306 F. Supp. 3d 1271, 1281 (D. Or. 2018) (denying
a breach-of-good-faith claim even where the court ultimately
rejected the insurer's interpretation of the policy). The
implied covenant of good faith and fair dealing "cannot
contradict an express contractual term, nor otherwise provide a

---

[6] The quote ends with the clause, "and where there is a disputed
question of fact." BBB Serv. Co., 576 S.E.2d 41. This "and"
formulation does not mean that there must be a disputed question
of fact: the language can be traced back to U.S. Fid. & Guar. Co.
v. Woodward, 164 S.E.2d 878 (1968), which treated a disputed
question of fact as an example of a reasonable ground on which the
insurer could contest the claim. Id. at 881.

remedy for an . . . act that is permitted expressly by the contract." Zygar v. Johnson, 10 P.3d 326, 330 (Or. 2000).

In Missouri, the plaintiffs concede, breach of the duty of good faith and fair dealing by failing to pay an insurance claim is not a standalone tort, although there is a statute that provides enhanced remedies where the denial is "without reasonable cause or excuse." Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 66-67 (Mo. 2000). Missouri also embraces the general principle that the covenant prohibits "opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." Spencer Reed Grp., Inc. v. Pickett, 163 S.W.3d 570, 574 (Mo. Ct. App. 2005).

Utah law implies into insurance contracts a duty of good faith and fair dealing. Beck v. Farmers Ins. Exch., 701 P.2d 795, 801 (Utah 1985). That duty requires insurers to "diligently investigate the facts to enable [them] to determine whether a claim is valid," and to "fairly evaluate the claim." Id. However, "if an insurer denies an 'insured's claim that is fairly debatable, then the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so.'" Prince v. Bear River Mut. Ins. Co., 56 P.3d 524, 534-35 (Utah 2002).

The plaintiffs argue that Generali denied their claims in bad faith because they sent boilerplate claim-denial emails and performed no individualized investigation of the claims. But Generali's denials were reasonable — indeed, they were valid. Moreover, the plaintiffs in this case do not allege any facts that Generali should have investigated. The factual disputes in the case appear to be very limited; it is the law that is at issue. As such, the plaintiffs have not alleged bad faith or breach of the duty of good faith and fair dealing based on Generali's denial of their claims.

Accordingly, Clonts, Garner, Johner, and Sharma do not state claims for bad faith or breach of the covenant of good faith and fair dealing under the laws of their respective states.

### D. Conversion Claims

Clonts, Garner, Johner, and Sharma also bring conversion claims.[7] These claims are governed by the law of Georgia, Oregon, Missouri, and Utah, respectively. The claims fail for several reasons.

First, the plaintiffs' conversion claims fail because the plaintiffs have no property interest in the money they seek to

---

[7] Morris and Shrader also brought claims for conversion. However, their Opposition limited their claims to unjust enrichment claims. ECF No. 38 at 37 n.35. Therefore, the claims for conversion by Morris and Shrader are dismissed.

recover. While the precise definition of conversion varies slightly across states, all of the states whose law is at issue on this motion to dismiss define it in substance as a willful, unlawful interference with the chattel of another. Taylor v. Powertel, Inc., 250 Ga. App. 356, 358 (2001); Becker v. Pac. Forest Indus., Inc., 229 Or. App. 112, 116 (2009); Manzer v. Sanchez, 985 S.W.2d 936, 940 (Mo. Ct. App. 1999); Fibro Tr., Inc. v. Brahman Fin., Inc., 974 P.2d 288, 295-96 (Utah 1999). In other words, conversion requires that the plaintiff be entitled to the chattel at issue. Because the plaintiffs have not stated breach of contract claims, claims for bad faith, unjust enrichment claims, or any other claims that would entitle them to some payment, they are not entitled to the money they seek, and therefore this element of conversion is not met.

The conversion claims of Clonts and Johner fail for the additional reason that there is no claim for conversion of money in Georgia and Missouri unless the money is specifically identifiable. Taylor, 551 S.E.2d at 769-70 (Georgia); Walker v. Hanke, 992 S.W.2d 925, 933 (Mo. Ct. App. 1999). The money in this case is not separated or earmarked in any way, and therefore cannot be the subject of a conversion claim.

The conversion claims of Clonts, Johner, and Sharma fail for the additional reason that they are barred by the economic loss rule. Under that rule, there can be no tort claim where the

injury alleged is an economic injury tied to a contract. Georgia, Missouri, and Utah have all adopted this rule. <u>See, e.g.</u>, <u>Gen. Elec. Co. v. Lowe's Home Centers, Inc.</u>, 608 S.E.2d 636, 637 (Ga. 2005); <u>Captiva Lake Invs., LLC v. Ameristructure, Inc.</u>, 436 S.W.3d 619, 628 (Mo. Ct. App. 2014); <u>Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC</u>, 221 P.3d 234, 242 (Utah 2009).

Accordingly, the plaintiffs have not stated conversion claims, and the conversion claims must be dismissed.

### E. Declaratory Judgment Claims

Finally, the plaintiffs seek "a declaration of the parties' respective rights and duties under the Policies and request the Court to declare Defendants' conduct unlawful and in material breach." The Court will entertain a declaratory judgment claim only "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue," or "(2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." <u>Continental Cas. Co. v. Coastal Sav. Bank</u>, 977 F.2d 734, 737 (2d Cir. 1992). The plaintiffs' claims for a declaratory judgment in this case are entirely duplicative of their substantive claims, and therefore would neither serve a useful purpose in clarifying the parties' legal relations nor afford relief from uncertainty. <u>See</u> <u>Fleisher v. Phoenix Life Ins. Co.</u>, 858 F. Supp. 2d 290, 302–

03 (S.D.N.Y. 2012). Moreover, a declaratory judgment requires "a valid legal predicate." Chevron Corp. v. Naranjo, 667 F.3d 232, 244 (2d Cir. 2012). Because none of the plaintiffs' claims has merit, there is no such predicate in this case. Accordingly, the plaintiffs' claims for declaratory judgment are dismissed.

For the foregoing reasons, Generali's motion to dismiss is **granted**.

**Conclusion**

The Court has considered all of the parties' arguments. To the extent not specifically addressed, the claims are either moot or without merit. In summary, the motion to dismiss is **granted** as to Clonts, Garner, Johner, Sharma, Morris, and Shrader. The motion to dismiss is **denied** as moot as to Oglevee with respect to the claims to be arbitrated. The motion to dismiss is **granted** as to Oglevee with respect to her claims not subject to arbitration. The Clerk is directed to close Docket No. 27.

**SO ORDERED.**
**Dated:**      **New York, New York**
             **December 21, 2021**

                              _____
                                   **John G. Koeltl**
                         **United States District Judge**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE GENERALI COVID-19 TRAVEL )
INSURANCE LITIGATION, )
)          Case No. 20-md-2968
)
)

## [PROPOSED] FINAL JUDGMENT AS TO PLAINTIFFS CLONTS'S, GARNER'S, JOHNER'S, SHARMA'S, MORRIS'S, AND SCHRADER'S CLAIMS AND CERTAIN OF PLAINTIFF OGLEVEE'S CLAIMS

Following transfer to this Court as ordered by the United States Judicial Panel on Multidistrict Litigation, plaintiffs filed a consolidated class action complaint against Defendants Generali US Branch and Customized Services Administrators, Inc. alleging breach of insurance contracts and related non-contract claims. *See* ECF #24. This Court granted Defendants' motion to dismiss the claims of Plaintiffs Clonts, Garner, Johner, Sharma, Morris, and Schrader for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* ECF #56. The Court also granted Defendants' motion to dismiss plaintiff Oglevee's claims arising out of the insurance policy she purchased in connection with her flight tickets, while staying as subject to arbitration her other claims arising out of a different insurance policy purchased through VRBO.com. *See id.*; ECF #57. As all of plaintiffs' claims that the Court has not dismissed are stayed pending conclusion of arbitration, the Court now enters this Final Judgment.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the cases and claims of Plaintiffs Clonts, Garner, Johner, Sharma, Morris, and Schrader are severed and dismissed with prejudice for the reasons stated in the Court's December 21, 2021 Order. ECF #56.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the claims of Plaintiff Oglevee arising out of the Generali travel insurance policy she purchased in connection with her flight tickets are severed and dismissed with prejudice. *See* Consolidated Complaint ¶ 98, ECF

1

**SA-38**

#24; *see also* ECF #56 at 9. This Final Judgment does not apply to Plaintiff Oglevee's other claims (*i.e.,* those arising out of the policy she purchased through VRBO.com), which remain stayed pending the conclusion of arbitration. *See* ECF #57 at 23.

Finding no just reason for delay, the Court enters this judgment under Rule 54(b) of the Federal Rules of Civil Procedure.[1] The Clerk is respectfully directed to enter this Final Judgment against plaintiffs Clonts, Garner, Johner, Sharma, Morris, Schrader, and Oglevee and in favor of Defendants Generali US Branch and Customized Services Administrators, Inc. forthwith.

Dated: 2/9 , 2022

_____
UNITED STATES DISTRICT JUDGE

---

[1]     As the motion to dismiss was granted with respect to plaintiffs' superseding consolidated class action complaint in this multidistrict litigation, the Court enters this final, appealable judgment pursuant to Rule 54(b) with respect to all plaintiffs and claims specified herein. *See e.g., Gelboim v. Bank of America Corp.*, 574 U.S. 405, 413 n.3 (2015); *Bell v. Publix Super Markets, Inc.,* 982 F.3d 468, 489-90 (7th Cir. 2020) (discussing effect of consolidated complaints in multidistrict litigation on finality of judgments and Rule 54(b)).

**SA-39**

## CERTIFICATE OF SERVICE

The underlying attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for the Southern District of New York's Electronic Filing System on February 1, 2022.

/s/  Bronwyn F. Pollock

3

**SA-40**