UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICHOLAS SEIBEL, *individually and on behalf of all others similarly situated*,

                                      Plaintiff,

              – against –

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN INTERNATIONAL GROUP, INC. *doing business as* AIG,

                                    Defendants.

**OPINION AND ORDER**
22 Civ. 1483 (ER)

Ramos, D.J.:

      Seibel, individually and on behalf of others similarly situated, brings this class action against National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") and American International Group, Inc. ("AIG"), alleging that they unlawfully overcharged travel insurance premiums by offering no distinction between pre- and post-departure coverage. Before the Court is defendants' motion to dismiss the action in its entirety for failure to state a claim. For the reasons set forth below, the motion is GRANTED.

I.     BACKGROUND[1]

      AIG is a global insurance and financial services firm incorporated in Delaware and with a principal place of business in New York City. ¶¶ 13–14. AIG also has an office in Pennsylvania, where it engaged in the insurance business at all relevant times. ¶ 13. In 2006,

---

[1] The following facts are based on the complaint, which the Court accepts as true and construes in the light most favorable to Seibel. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). Unless otherwise noted, citations to "¶ __" refer to the complaint.

AIG acquired Travel Guard (also known as AIG Travel), which is a provider of travel insurance programs and emergency travel assistance. ¶ 16. NUFIC is an AIG subsidiary that underwrites policies sold by AIG Travel. ¶ 17. It is headquartered in New York, incorporated in Pennsylvania, and maintains a branch office in Pittsburgh. *Id.* Nicholas Seibel was at all relevant times a resident of Pittsburgh, Pennsylvania. ¶ 12.

On February 27, 2020, Seibel purchased a travel policy (the "First Policy") from defendants for a trip to France scheduled to begin on October 7, 2020. ¶¶ 43, 56; *see* Travel Guard Policy No. 944616762, Doc. 1-1.[2] Seibel paid a single, undivided premium of $440.98 for the First Policy, which provided bundled coverage for certain pre- and post-departure risks. ¶¶ 1, 56. The First Policy did not delineate what portion of the lump-sum premium, if any, was attributable to only pre-departure coverage, and what portion, if any, was linked only to post-departure coverage. ¶ 50. Pre-departure coverage encompassed cancellation for certain "[u]nforseen events," such as "sickness, injury, or death of an [i]nsured, [f]amily member, [t]raveling companion, [b]uisiness [p]artner, or [h]ost at [d]estination[.]" ¶¶ 29–31. Post-departure coverage encompassed certain events that could occur during a trip, such as delays, lost baggage, or medical emergencies. ¶ 38.

The first page of the First Policy provided in bolded, blue font: "**PLEASE READ THIS DOCUMENT CAREFULLY!**" *See* Doc. 1-1 at 3 (emphasis in the original). Approximately two inches below that warning was a "**FIFTEEN DAY LOOK**" provision (the "Cancellation and Refund Provision"), which stated:

> You may cancel this insurance by giving the Company or the agent written notice within the first to occur of the following: (a) 15 days from the [e]ffective [d]ate of your insurance; or (b) your scheduled *[d]eparture [d]ate*. If you do this, the

---

[2] The First Policy described itself as "a legal contract between [Seibel] and [NUFIC]." Doc. 1-1 at 2.

> Company will refund your premium paid provided no insured has filed a claim under this Policy. After this 15 day period, the premium is non-refundable.

*Id.* (emphasis in the original).

Under the section "Effective and Termination Dates," sub-section "Pre-Departure Benefits," the First Policy specified that pre-departure benefits would become effective at "12:01 A.M. local time on the date following payment to [NUFIC] . . . of the required cost." Doc. 1-1 at 5. Under the subsequent subsection, "Post-Departure Benefits," the First Policy further provided that "all coverages"—apart from "Rental Vehicle Damage Coverage," which would become effective at the time the insured signed the rental agreement and took possession of the vehicle—would begin on "12:01 A.M. local time on the scheduled [d]eparture [da]te shown on the travel documents." *Id.*

Additionally, the First Policy stated that it was applicable only to residents of Pennsylvania and 13 other states, not including New York. ¶ 46.

The AIG Travel webpage, moreover, included a satisfaction guarantee (the "Satisfaction Guarantee"), which provided: "if you are not completely satisfied, you can receive a full refund of the cost, minus the service fee." ¶ 16 (citing *Explore AIG's Timeline*, AIG, https://www.aig.com/about-us/history/timeline (last visited Feb. 17, 2022)).[3]

Seibel cancelled his trip to France on August 24, 2020, approximately six months after he purchased the First Policy and approximately one-and-a-half months before the scheduled departure date. ¶¶ 56–57. That same day, Seibel contacted defendants to request a refund of premium that he had paid. ¶ 58. On August 25, 2020, AIG responded to the request: "We have

---

[3] In the memorandum in opposition to the motion to dismiss, defendants note that the Satisfaction Guarantee further provided, albeit in smaller text: "Requests must be submitted to Travel Guard in writing within 15 days of the effective date of the coverage, provided it is not past the original departure date." Doc. 34, ("Opp."), at 25.

3

reviewed your request for a premium refund. It is our policy that all premium refund requests must be submitted within 15 days of the effective date of the policy, however we are pleased to offer you a travel insurance credit voucher in the amount of $440.98." *Id.*

Ten days later, on September 4, 2020, Seibel purchased a second travel policy from defendants (the "Second Policy"), which covered an upcoming Caribbean cruise scheduled to depart from Miami, Florida on November 7, 2021. ¶¶ 62–64; *see* Travel Guard Policy No. 946119552, Doc. 2-2.[4] Seibel paid a single premium in the amount of $342.58 for the Second Policy. The Second Policy was identical to the First Policy in all material respects, but for the fact that it was applicable only to residents of Pennsylvania. ¶ 46.

In June 2021, the cruise company cancelled the trip, approximately five months before the scheduled departure date. ¶¶ 44, 62, 65. Shortly thereafter, Seibel requested a refund of the $342.58 lump-sum premium, but defendants denied his request, reasoning that the 15-day Cancellation and Refund Provision had expired approximately nine months earlier, on September 19, 2020, 15 days after Seibel purchased the Second Policy. ¶ 66.

## II.   PROCEDURAL HISTORY

On February 23, 2022, Seibel filed the instant action, alleging: (1) breach of the implied covenant of good faith and fair dealing; (2) unjust enrichment; and (3) violation of the Pennsylvania Consumer Protection Act. Seibel also seeks injunctive relief; he asks the Court to enjoin defendants from applying the Cancellation and Refund Provision to *post*-departure coverage and from lumping together premiums for pre- and post-departure coverage; he also

---

[4] Like the First Policy, the Second Policy described itself as "a legal contract between [Seibel] and [NUFIC]." Doc. 1-2 at 2.

4

requests that the Court order defendants to refund any "unearned" portion of the policy premiums.  ¶¶ 83–113.[5]  Defendants filed the motion to dismiss on May 3, 2022.  Doc. 28.

## III. STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

---

[5] Seibel seeks to represent a nationwide class defined as:  "All persons (including natural persons, corporations, firms, partnerships, joint stock companies, associations, and other organizations of persons) in the United States who, during the longest applicable statute of limitations period . . . purchased, through paying a single, lump-sum premium, a travel insurance policy from Defendants that included both pre-departure and post-departure benefits for a trip that was cancelled prior to the trip departure date." ¶ 70.

Seibel also seeks to represent a Pennsylvania subclass defined as: "All persons (including natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons) in the Commonwealth of Pennsylvania who, during the longest applicable statute of limitations period . . . purchased, through paying a single, lump-sum premium, a travel insurance policy from Defendants that included both pre-departure and post-departure benefits for a trip that was cancelled prior to the trip departure date." ¶ 71.

IV.     **DISCUSSION**

   *Choice of Law*

Seibel argues that New York law should apply to his claims, while defendants contend Pennsylvania law should apply. As a threshold matter, the Court must therefore decide the law of which of these states to apply.[6]

"A federal court sitting in diversity applies the choice-of-law principles of the state in which it sits." *First Hill Partners, LLC v. Bluecrest Capital Mgmt.*, 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014). Given that diversity is the basis for jurisdiction in this case, the Court here applies the choice-of-law analysis of New York.

New York's "most significant relationship," or "center of gravity test," governs the choice-of-law analysis for breach of the implied covenant and unjust enrichment claims. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 596 (S.D.N.Y. 2018) ("In the absence of a governing choice-of-law provision, . . . a [plaintiff]'s implied covenant claim will be governed by the law determined under the center of gravity analysis set forth by the New York Court of Appeals."); *see also Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 238 (S.D.N.Y. 2013) ("Under New York choice of law principles, . . . the choice of law for contract and quasi-contract claims [including unjust enrichment] is determined by a 'center of gravity' analysis.") (citations omitted).

In administering the center of gravity test, "[courts] are required to apply the law of the state with the 'most significant relationship to the transaction and the parties.'" *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 21 (1st Dep't 2006)

---

[6] Seibel incorrectly asserts that a choice of law determination "cannot be resolved at this stage." Opp. at 12. Courts in this District regularly conduct choice of law analyses in resolving motions to dismiss. *See, e.g., 2004 Stuart Moldaw Tr. v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226, 232, 238 (S.D.N.Y. 2009); *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 369 n.6 (S.D.N.Y. 2015).

6

(citation omitted), *aff'd*, 9 N.Y.3d 928 (2007).  For insurance policies purchased by a natural person, "the governing law is 'the state which the parties understood to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties.'" *Cartagena v. Homeland Ins. Co. of New York*, No. 19 Civ. 6287 (CM), 2019 WL 6878243, at *4 (S.D.N.Y. Dec. 16, 2019) (quoting *Certain Underwriters at Lloyd's, London*, 36 A.D.3d at 21–22); *see also Fed. Ins. Co. v. Weinstein*, 18 Civ. 2526 (PAC), 2019 WL 1407455, at *5 (S.D.N.Y. Mar. 28, 2019) (same); *Jimenez v. Monadnock Const., Inc.*, 109 A.D. 3d 514, 516–17 (App. Div. 2013) (same).  "Where the insured risk is scattered throughout multiple states," however, "New York [c]ourts deem the risk to be located principally in the state of the insured's domicile at the time the policy was issued." *Cartagena* 2019 WL 6878243, at *4 (quoting *Certain Underwriters at Lloyd's, London*, 36 A.D.3d at 24); *Jimenez*, 109 A.D. 3d at 517 (same).  Courts will also consider contacts, "such as the place of contracting, the place of negotiation and performance, the location of the subject matter of the contract, and the domicile or place of business of the contracting parties." *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993).

Here, the Policies protected against pre- and post-departure risks across all states and countries.  ¶ 30.  The Policies' trip cancellation coverage provision, for example, covered injury of an insured or a family member without limitation as to location.  *Id.*  Accordingly, the insured risk was scattered throughout the United States.  *See Certain Underwriters at Lloyd's, London*, 36 A.D.3d at 24.  As noted, under such circumstances, courts apply the law of the state where the insured was domiciled at the time he obtained the insurance.[7]  *Id.*  In this case, Seibel was at all

---

[7] Seibel asserts that this principle should not here apply "with full force" because travel insurance is unique from other forms of insurance.  *See* Opp. at 13.  Seibel fails, however, to cite any case where a court has treated travel insurance differently or otherwise departed from the principle that where risk is spread through multiple states,

relevant times domiciled Pennsylvania. ¶ 12. This factor, alone, weighs heavily in favor of applying Pennsylvania law. *See, e.g.*, *Cartagena* 2019 WL 6878243, at *4 (applying Florida law to insurance dispute because the named insured was at all relevant times a resident of Florida); *see also Johnson v. Metro. Life Ins. Co.*, 79 A.D.3d 450, 453 (1st Dep't 2010) (explaining that "no one should be surprised" that New Jersey law applied to the dispute, where New Jersey was the place of contracting and the insured individual was in New Jersey).

Beyond Seibel's place of domicile, however, additional aspects tie this action to Pennsylvania. Seibel seeks to certify a Pennsylvania subclass; brings a claim under Pennsylvania consumer protection law; and sues two entities with Pennsylvania offices, one of which (NUFIC) is also incorporated in Pennsylvania. ¶¶ 13, 17. What's more, the Policies—which form the backbone of this dispute—were *inapplicable* to New York residents. ¶ 46. Rather, the First Policy was applicable to residents of Pennsylvania and of thirteen other states, not including New York. *Id.* And the Second Policy was applicable *exclusively* to residents of Pennsylvania. *Id.*

To be sure, New York is tied to this action in certain respects. AIG drafted the Policies in New York,[8] where it is domiciled, and NUFIC is also domiciled in New York. ¶¶ 12–14, 7. Nonetheless, caselaw emphasizes the importance of a plaintiff's place of domicile where, as here, the insured risk spans multiple states. And as noted, additional facts further anchor this action in Pennsylvania. Accordingly, the ties to New York are insufficient to support a finding that its laws should govern. The center of gravity lies in Pennsylvania, and the Court will apply Pennsylvania law.

---

courts deem the risk to be located in the state where the insured was domiciled, unless it is shown that some other state has a more significant relationship.

[8] Seibel does not allege that he signed either of the Policies in New York. *See* Opp. at 15 n.7.

### *Breach of Implied Covenant of Good Faith and Fair Dealing*

Seibel argues that defendants breached a covenant of good faith and fair dealing implied in the Policies. Pennsylvania law, however, does not recognize an independent cause of action for breach of an implied covenant of good faith and fair dealing. *McCabe v. Marywood Univ.*, 166 A.3d 1257, 1261 n.2 (Pa. Super. Ct. 2017); *see also Carter P. v. Pook & Pook, LLC*, No. 14 Civ. 5715 (LFS), 2017 WL 6497340, at *6 (E.D. Pa. Dec. 19, 2017) ("[A] breach of the covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith.") (citation omitted); *Gentex Corp. v. Helicopter Helmets, LLC*, 17 Civ. 1136 (MWB), 2018 WL 827539, at *3 (M.D. Pa. Feb. 12, 2018) (same). Rather, "the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations." *Hanaway v. Parkesburg Grp., LP*, 132 A.3d 461, 471–72 (Pa. Super. 2015), *aff'd in part and rev'd in part on other grounds*, 641 Pa. 367 (2017). "Under Pennsylvania law, the covenant attaches to existing contractual obligations; it does not add new contractual duties." *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 583 (W.D. Pa. 2017) (marks and citation omitted). Accordingly, absent breach of an underlying contract, there is no basis to claim breach of a covenant implied in that contract. *See Gentex Corp.*, 2018 WL 827539, at *3.

In defending the breach of implied covenant claim, Seibel relies exclusively upon New York law. *See* Opp. at 29–30. Seibel makes only passing reference to Pennsylvania law in a footnote: "Through amending the complaint, [Seibel] may have a viable claim for breach of the covenant of good faith and fair dealing under Pennsylvania law." *Id.* at 29 n.21. The Court disagrees.

Here, Seibel does not allege that defendants breached either of the Policies. Instead, he bases his claim for breach of the implied covenant on defendants' enforcement of and

compliance with the terms of the Policies, as written.  Specifically, Seibel alleges that defendants breached the implied covenant by: (1) charging the lump sum premiums, and (2) refusing to provide cash refunds for the premiums outside of the 15-day refund period.  ¶¶ 85–87.  Seibel, however, fails to allege that defendants' conduct is inconsistent with their rights and obligations under the Policies, which—even if the claim is available—is a prerequisite to bringing a breach of implied covenant claim.  *See McCabe*, 166 A.3d at 1261 n.2.

Therefore, Seibel fails to state a claim for breach of an implied covenant of good faith and fair dealing under Pennsylvania law.  The claim is dismissed.[9]

### *Unjust Enrichment*

Seibel alleges that he is entitled to a refund for the portions of the premiums attributable to *post*-departure benefits.  ¶¶ 91, 93–99.  Seibel argues that insureds are typically entitled to a refund where the risk covered by a policy has not attached, *see Kansas City Coll. Of Osteopathic Med. V. Employers' Surplus Lines Ins. Co.*, 581 F.2d 299, 301 (1st Cir. 1978),[10] and that here, defendants were not exposed to any post-departure risks because both of his trips were cancelled.  Seibel thus contends that it would be unjust for defendants to retain payment for "unearned" post-departure coverage.  *See* Opp. at 15–16.

Under Pennsylvania law, however, "'the doctrine of unjust enrichment is *inapplicable* when the relationship between parties is founded upon a written agreement or express contract.'" *Grudkowski v. Foremost Ins. Co.*, 556 Fed. Appx. 165, 169–70 (3d Cir. 2014) (emphasis added) (quoting *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (2006) (internal marks and

---

[9] Having dismissed the cause of action for failure to state a claim, the Court need not address Defendants' additional argument, that the implied covenant claim as to *AIG* must be dismissed because AIG was not party to the Policies, which were between NUFIC and Seibel.  *See* Docs. 1-1 at 2; 1-2 at 2.

[10] Seibel does not cite any Pennsylvania legal authority in support of this proposition.

citations omitted)); *see also MyService Force, Inc. v. Am. Home Shield*, No. 10 Civ. 6793 (JRP), 2013 WL 180287, at *22 (E.D. Pa. Jan. 17, 2013) ("Since the parties have entered into four written contracts that concern the subject matter of their unjust enrichment claim, we conclude that [the defendant] is entitled to the entry of judgment as a matter of law as to this claim."); *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (same).

Here, Seibel cannot state a claim for unjust enrichment because the Policies govern his relationship with defendants. In the analogous case of *In re Generali COVID-19 Travel Insurance Litigation*, the court held similarly, applying Pennsylvania law. 576 F. Supp. 3d. 36 (S.D.N.Y. 2021), *aff'd Oglevee v. Generali U.S. Branch*, No. 22 Civ. 336., No. 22 Civ. 336, 2022 WL 16631170 (2d Cir Nov. 2, 2022). There, the plaintiffs brought unjust enrichment claims premised on the refusal of an insurer to provide a cash refund of a portion of up-front, lump-sum travel insurance premiums allegedly linked to *post*-departure benefits, after their trips were canceled. *Id.* at 51. The policies at issue in *Generali*, provided that the premium was non-refundable after a 10-day "policy-examination period." *Id.* at 40. The *Generali* policies also specified that the insurance coverage was "single pay, single term." *Id.* The court determined on motion to dismiss that the plaintiffs could not sue for unjust enrichment because the policies covered the dispute. *Id.* at 50–51 (noting that in Pennsylvania, "an unjust enrichment claim is foreclosed wherever the subject matter of the dispute is governed by the contract.") (citing *Skepton*, 895 A.2d at 1254–55). The court further explained that the insurance policies were "not severable," reasoning that although the policies "itemize[d] pre- and post-departure coverage, . . . plaintiffs paid a single premium in gross, and the pre- and post-departure risks were interdependent: the possibility of trip cancellation affected the likelihood of post-departure risks arising, a possibility that may be priced into the cost of insurance." *Id.* at 52. Therefore, the

11

court concluded that "the entire risk attached when the [p]olicies were purchased," and dismissed the unjust enrichment claim.  *Id.*

On appeal, the *Generali* plaintiffs argued that

> because the [p]olicies provided that the post-departure coverage did not start until their trips began, and their trips were canceled before then, [the plaintiffs] never assumed any risk associated with the perils of post-departure travel, [which entitles them] to a return of their premiums associated with the coverage of post-departure risk.

Doc. 34-2, Appellants' Opening Brief in *Generali*, at 9–10.  Affirming in full the holdings of the lower court, the Second Circuit rejected this argument.

Seibel fails to convince the Court why it should not reach the same determination as that of the *Generali* court with respect to his unjust enrichment claim.  The fact that the Policies do not contain the language "single pay, single term," as the *Generali* policies do, is of no consequence.  The court in *Generali* considered that phrase relevant to the inquiry of whether the premiums were paid in gross.  *Id.* at 52.  But here, Seibel concedes that point.  *See* Opp. at 23 ("Here, Plaintiff paid a gross premium.").  Seibel therefore fails to establish that the Policies' express Cancellation and Refund Provision materially differs from that of the *Generali* policies.

Furthermore, Seibel argues that the 15-day Cancellation and Refund Provision lacks consideration and is thus void.  The Court disagrees.  On the one hand, Seibel paid a single premium in exchange for pre- and post- departure coverage; and on the other, defendants insured Seibel against potential occurrence of pre- and post- departure risks.  Thus, regardless of whether the bundled risks covered by the Policies occurred, defendants earned the premiums that Seibel paid for each policy.  *See Generali*, 576 F. Supp. 3d. at 52 (noting that the *entire* risk attached when the policies were purchased and that the policies were not severable).

Like in *Generali*, Seibel paid single, upfront premiums in gross, and his trips were cancelled *after* an express reimbursement period had expired.  Because Seibel fails to advance any convincing reason for why the Cancellation and Refund Provision does not cover this dispute, he cannot sue for unjust enrichment.  *Id.*; *see also Foremost Ins. Co.*, 556 Fed. Appx. 165, 169–70.  Accordingly, the claim is dismissed.

### *The Pennsylvania Consumer Protection Act*

The Pennsylvania Consumer Protection Act (the "Act") prohibits any person from engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices," 73 Pa. Stat. Ann. § 201-3, and provides a list of specific forbidden acts, *id.* § 201-2(4).  "The statute further makes available a private cause of action for '[a]ny person who purchases or leases goods or services . . . and thereby suffers any ascertainable loss . . . as a result of the use or employment by any person of a method, act or practice declared unlawful.'"  *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 465 (E.D. Pa. 2009) (quoting 73 Pa. Stat. Ann. § 201-9.2(a)).

Seibel sues pursuant to two provisions of the Act:  first, § 201-2(4)(v), which applies "'only to claims of false advertising' and require[s] the plaintiff to show that '(1) a defendant's representation is false; (2) it actually deceives or has a tendency to deceive; and (3) the representation is likely to make a difference in the purchasing decision[,]'" *Ranalli v. Etsy.com, LLC*, 570 F. Supp. 3d 301, 305 (W.D. Pa. 2021) (quoting *Seldon*, 647 F. Supp. 2d at 466); and second, § 201-2(4)(xxi), a catch-all provision, which forbids "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  Seibel asserts that both the Satisfaction Guarantee on the AIG Travel website and the Cancellation and Refund Provision violated these provisions of the Act.

13

The Satisfaction Guarantee provided: "If you are not completely satisfied, you can receive a full refund of the cost, minus the service fee. Requests must be submitted to Travel Guard in writing within 15 days of the effective date of the coverage, provided it is not past the original departure date." *Explore AIG's Timeline*, AIG, https://www.aig.com/about-us/history/timeline (last visited Feb. 17, 2022)). Similarly, the Cancelation and Refund Provision provided that an insured could cancel the insurance by providing written notice "within the first to occur of the following: (a) 15 days from the [e]ffective [d]ate of your insurance; or (b) [the] scheduled *[d]eparture [d]ate*." Docs. 1-1 at 2; 1-2 at 2 (emphasis in original). After the 15-day period, however, the Cancelation and Refund Provision stated that the premium would be non-refundable. *Id.*

Seibel asserts that the Satisfaction Guarantee was deceptive because the Policies provided that post-departure coverage would not go into effect until the *departure date*, and he requested reimbursement for the portions of the premiums associated with post-departure coverage more than 15 days *before* his scheduled departure dates, after his trips were cancelled, *i.e.* on August 24, 2020 for the October 7, 2020 France trip, and in June 2021 for the November 7, 2021 cruise. ¶¶ 59, 66; *see* Docs. 1-1 at 5; 1-2 at 5 (providing that while pre-departure benefits would go into effect at 12:01 A.M. on the date following purchase of the Policy, post-departure coverage would not begin until 12:01 A.M. on the scheduled departure date). Accordingly, Seibel argues that the Satisfaction Guarantee was misleading, since defendants have refused to reimburse him for the costs of pre-departure coverage, even though he timely made those requests.

Similarly, Seibel argues that the Cancelation and Refund Provision was ambiguous and likely to deceive customers. He contends that because the Policies provided that pre-departure coverage would become go into effect at 12:01 a.m. following the date of purchase, and that all

other coverage would begin on the scheduled date of departure, a customer could have interpreted the "effective date" of the Policies to mean either the purchase date or the departure date. *Id.* Seibel asserts that under the latter interpretation, he is entitled to a refund, which defendants have refused to issue.

Whether the Satisfaction Guarantee or the Cancellation Refund Provision were misleading turns on the question of whether customers could have reasonably believed that they were entitled to a refund on or before the scheduled departure date, even if 15 days had already passed since the date of purchase.

For the following reasons, no reasonable customer would adopt this interpretation. If, as Seibel contends, "effective date" meant "departure date," then the Cancellation and Refund Provision would have allowed customers to obtain a refund "within the first to occur of the following: (a) 15 days from the [departure date]; or (b) [on the] scheduled [departure date]." Docs. 1-1 at 2; 1-2 at 2. Under this construction of the Cancellation and Refund Provision, prong (b) would *always* occur before prong (a). And prong (a), along with the "first to occur" provision, would be superfluous. Put differently, defendants would not have included a 15-day reimbursement deadline if the departure date always came first. Thus, there is only one sensible way customers could have read the Cancellation and Refund provision: that the insurance went into effect and the 15-day reimbursement period began to run on the date that the *pre*-departure coverage went into effect. Indeed, even Seibel pleads that the Policies went into effect the day after he purchased them. *See* ¶ 59 (pleading that, with respect to the First Policy, "the Fifteen Day Look period expired on March 13, 2020 (15 days after Plaintiff purchased the France Trip Policy)"); *see also* ¶ 66 (pleading that, with respect to the Second Policy, that "[t]he Fifteen Day Look period expired on September 19, 2020 (15 days after Plaintiff purchased the Cruise Trip

Policy)"). This interpretation, moreover, is consistent with defendants' packaging of the Polices as singular, indivisible bundles of coverage. Just as the *entire* risk attached to defendants when the Policies were purchased, *see Generali*, 576 F. Supp. 3d. at 52, so too did the Policies—in their *entirety*—go into effect after they were purchased.

For the foregoing reasons the Court concludes that neither the Satisfaction Guarantee nor the Cancellation Refund Provision were deceptive or unfairly misleading. The consumer protection claim is thus dismissed.

### *Injunctive Relief*

Seibel's cause of action for injunctive relief, ¶¶ 109–13, fails because "permanent injunctions are a form of relief, not a claim to be pleaded as a separate count[,]" and such claims are subject to "dismiss[al] with prejudice as a matter of law." *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, No. 20 Civ. 2888 (JFL), 2021 WL 229322, at *5–6 (E.D. Pa. Jan. 22, 2021); *KM Enters., Inc. v. McDonald*, No. 11 Civ. 5098 (ADS) (ETB), 2012 WL 4472010, at *20 (E.D.N.Y. Sept. 25, 2012) ("A request for injunctive relief does not constitute an independent cause of action," but "merely the remedy sought for the legal wrongs alleged in the [] substantive counts." (marks and citation omitted)).

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss this action is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 28, and close this case.

It is SO ORDERED.

Dated:   February 13, 2023
         New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J